# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| **DAVID WOOD**<br>*Petitioner,*<br><br>v.<br><br>**ERIC GUERRERO**, Director,<br>Texas Department of Criminal Justice,<br>Correctional Institutions Division.<br>*Respondent.* | Case No. _____ |

---

## SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

---

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers
Supervisor, Capital Habeas Unit

Naomi Fenwick
Claire Davis
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jeremy_schepers@fd.org
naomi_fenwick@fd.org
claire_daivs@fd.org

Gregory W. Wiercioch
University of Wisconsin Law School
975 Bascom Mall
Madison, Wisconsin 53706
(Tel) 832-741-6203
(Fax) 608-263-3380
gregory.wiercioch@wisc.edu

## SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

Petitioner David Wood, through counsel, pursuant to all rights available under the Constitution, laws, or treaties of the United States, respectfully petitions this Court for a writ of habeas corpus declaring unconstitutional and invalid his conviction for capital murder as well as the resulting death sentence.

# TABLE OF CONTENTS

SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254.................................................................i

TABLE OF CONTENTS.................................................................................ii

TABLE OF AUTHORITIES ........................................................................ix

INTRODUCTION ........................................................................................ 1

PARTIES ..................................................................................................... 5

JURISDICTION AND VENUE.................................................................... 5

CLAIMS FOR RELIEF................................................................................ 6

CLAIM 1: DAVID WOOD IS ACTUALLY INNOCENT ........................... 6

   I.   The Victims' Disappearances, Discovery of the Bodies, and Police Investigation................................................................................... 7

      A.   Public Pressure ........................................................................ 8

      B.   The Formation of the Task Force ........................................ 10

      C.   David Wood Becomes a Suspect ........................................ 11

         1.   Criminal Record ........................................................ 12

         2.   The Brenda Alvey Case ............................................ 12

         3.   The Sexual Assault of Judith Brown Kelling ........... 14

      D.   The Capital Murder Indictment............................................ 15

   II.   Trial, Direct Appeal, and Postconviction Proceedings................ 16

   III.   New Evidence of Innocence ........................................................ 19

      A.   DNA evidence has definitively excluded David Wood as the contributor of male biological material on Dawn Smith's yellow terrycloth sunsuit............... 19

      B.   The jailhouse snitches, Randy Wells and James Carl Sweeney, fabricated their testimony against David Wood. ................................................ 21

         1.   Randy Wells alleges David Wood confessed to being the Desert Serial Killer............................................................. 22

         2.   Randy Wells, James Carl Sweeney, and George M. Hall are bench-warranted to the El Paso County Jail............................................. 24

         3.   Wells, Sweeney, and Hall are separated from other inmates at the El Paso County Jail and given the "red carpet" treatment................................. 27

    4.    The Task Force detectives hand their desert murders investigative files to Wells, Sweeney, and Hall. ................................................................. 28

C.    After his testimony in David Wood's case, Randy Wells was indicted for aggravated perjury for testifying falsely against his co-defendants in a first-degree murder case. ..................................................................................... 33

    1.    Randy Wells testifies against his co-defendant Jerry Hennington. ........ 33

    2.    Randy Wells testifies against his co-defendant Shirley Hennington. ..... 36

    3.    The criminal charges against Randy Wells are dismissed. ...................... 41

    4.    The prosecutor in the Jerry Hennington retrial testifies under oath that Randy Wells is a liar. ............................................................................. 41

    5.    Randy Wells is indicted for aggravated perjury. ..................................... 46

D.    Randy Wells lied when he testified that David Wood wanted his tattoos covered up so that a victim who "got away" would not be able to identify him. 48

E.    James Carl Sweeney received $13,000 for his testimony against David Wood. 53

    1.    The Letter-Writing Campaign. ................................................................. 54

    2.    The Lawsuit ............................................................................................. 59

    3.    The False Testimony about Paying Restitution ....................................... 60

F.    The State made an undisclosed deal to recommend commutation of sentence for James Carl Sweeney because of the material role he played in the conviction of David Wood. ..................................................................... 61

G.    David Wood was under police surveillance when two of the murder victims disappeared. ............................................................................................ 64

H.    David Wood's beige Nissan pickup truck—an essential element of his alleged *modus operandi*—sat in an auto salvage yard the entire month of August 1987, when three victims disappeared. ................................................. 67

    1.    The Traffic Accident. ............................................................................... 69

    2.    The Task Force Investigation .................................................................. 69

        a.    Lloyd Sowles ...................................................................................... 70

        b.    Luz Elena Gonzalez........................................................................... 71

        c.    John Mullaney .................................................................................... 71

    3.    The Parole Revocation Hearing. .............................................................. 72

    4.    The Sexual Assault Trial .......................................................................... 72

        a.    Detective John Guerrero .................................................................... 72

        b.    Leo Wood............................................................................................ 73

    5.    The Tactical Unit's Surveillance of David Wood ..................................... 73

I.  Three witnesses saw Ivy Williams after the date the State said she was last seen with David Wood. ....................................................................... 73

  1.  Steve Dahl .................................................................................... 74

  2.  Veronica Gatzka............................................................................ 77

  3.  Carol Eason .................................................................................. 79

J.  Judith Brown Kelling said David Wood did not sexually assault her. ....... 79

  1.  "David Wood had to be taken off the streets." ............................... 80

  2.  Kelling's Admission to Ramona Dismukes ................................. 82

  3.  The Pickup Truck ......................................................................... 83

  4.  The Description of the Assailant ................................................. 84

  5.  The Alibi ...................................................................................... 86

    a.  Leo Wood.................................................................................. 87

    b.  Debbie Galvan ......................................................................... 88

    c.  Joey Blaich .............................................................................. 89

  6.  Kelling's False and Inconsistent Accounts ............................... 90

    a.  The Assailant's Parting Words ............................................... 92

    b.  The Assailant's Limp............................................................... 93

    c.  Tying Kelling to the Pickup Truck ......................................... 95

    d.  Task Force Concerns about Kelling's Credibility.................. 96

  7.  Kelling's Undisclosed Deal ......................................................... 99

  8.  Carmen Brown's Undisclosed Deal .......................................... 101

K.  The State's scientific expert gave misleading testimony about the fiber comparison evidence. ..................................................................... 103

  1.  The Fiber "Match"...................................................................... 104

  2.  Dr. Palenik's Report ................................................................. 105

L.  Alternative suspect Sal Martinez gave conflicting statements to the police about knowing the victims and failed a polygraph examination. .......... 108

  1.  The First Statement .................................................................. 109

  2.  The Second Statement............................................................... 110

  3.  The Third Statement ................................................................. 110

  4.  The Fourth Statement ............................................................... 111

  5.  The Fifth Statement .................................................................. 111

  6.  The Failed Polygraph Examination ......................................... 112

  7.  Taking Biological Samples and Fingerprints ......................... 113

8.    The Declaration of Ruby Montoya ............................................. 113

M.    The State conducted minimal investigation of other alternative suspects. 114

1.    Edward Dean Barton ............................................................... 114

2.    James Patrick Bradley ............................................................. 115

N.    Task Force Detectives engaged in serious misconduct during their desert murders investigation. .............................................................................. 115

1.    Coaching the jailhouse snitches ............................................... 116

2.    Suppressing exculpatory evidence ........................................... 116

3.    Pressuring and threatening witnesses ...................................... 116

    a.    Judith Brown Kelling and Carmen Brown ......................... 116

    b.    Ramona Dismukes ............................................................ 117

    c.    Ruby Montoya .................................................................. 118

    d.    Veronica Gatzka ............................................................... 118

    e.    Debbie Galvan ................................................................. 119

4.    Suspicious behavior surrounding the collection of the fiber evidence ... 119

5.    Scrubbing and bleaching the bones .......................................... 123

6.    Destroying the Baker crime scene evidence .............................. 125

O.    The El Paso Police Department conspired to keep harmful information about a Task Force detective from coming to light, thwarting David Wood's change of venue motion in the sexual assault trial ........................................... 126

1.    The Falsification of Records .................................................... 126

2.    The Cover-up ......................................................................... 130

P.    State's witness Patricia von Maluski, who testified that she saw Karen Baker with David Wood, was mentally incompetent to testify. ...................... 132

1.    The In-Chambers Hearing ....................................................... 132

2.    The Missing Person's Police Report ........................................ 135

3.    Patricia von Maluski exhibited signs of mental illness years before the trial. ........................................................................................ 135

Q.    Task Force Detectives have been reprimanded for professional and personal misconduct. ............................................................................. 136

1.    The Wrongful Conviction of Daniel Villegas ............................ 137

2.    The Wrongful Conviction of Agustin Fabio Carreon ................. 138

3.    Assault at Nightclub ............................................................... 139

4.    Off-Duty Car Crash and Leaving Scene of Accident ................. 141

R.    The State failed to disclose a Crime Stoppers tip about an alternative suspect.................................................................................................... 144

IV.    David Wood's conviction and sentence violate the Eighth and Fourteenth Amendments because he is actually innocent. ............................................. 146

1.    The District Attorney's Review of the Task Force Investigation........... 148

2.    The Fourth and Final Component: Jailhouse Snitches.......................... 155

S.    The New Evidence ................................................................................. 159

1.    Newly Discovered Evidence................................................................ 159

2.    Evidence Never Presented.................................................................. 161

T.    David Wood's new evidence rebuts or nullifies all of the State's primary inculpatory evidence from the "old" trial. ........................................................ 163

1.    The Testimony of the Jailhouse Snitches ........................................... 163

a.    The Unknown Male DNA on Dawn Smith's Yellow Terrycloth Sunsuit 163

b.    The Declaration of George M. Hall........................................ 165

c.    The Police Surveillance ........................................................ 168

d.    The Undrivable Pickup Truck ............................................... 169

2.    The Testimony of Judith Brown Kelling.............................................. 170

3.    The Fiber Comparison Evidence ........................................................ 172

4.    The Witnesses Who Last Saw the Victims .......................................... 173

V.    Conclusion............................................................................................ 174

VI.    This claim was presented in state court................................................... 175

VII.    This claim meets the requirements of 28 U.S.C. § 2244. ....................... 175

A.    Wood diligently pursued evidence of his innocence.............................. 175

B.    Wood can make a prima facie showing of innocence. ........................... 176

CLAIM 2: THE STATE SUPPRESSED EVIDENCE IN VIOLATION OF *BRADY*. ................................................................................................................... 177

I.    The State suppressed multiple items of favorable evidence. ....................... 178

A.    David Wood was under police surveillance when two victims disappeared................................................................................................. 178

B.    Judith Brown Kelling's November 16, 1987, Interview With Police ..... 178

C.    Alternative suspect Sal Martinez failed a polygraph and provided biological samples. ..................................................................................... 179

D.    The State investigated Plyler and determined he drove a Nissan pickup truck and Harley motorcycle........................................................................ 179

II.    The suppressed evidence is cumulatively material. ................................. 180

III.    This claim was presented in state court. .................................................... 180

IV.    This claim meets the requirements of 28 U.S.C. § 2244. ........................... 181

    A.    Wood diligently pursued evidence suppressed by the State. ................. 181

    B.    Wood can make a prima facie showing of innocence. ............................. 183

CLAIM 3: THE STATE OBTAINED DAVID WOOD'S CONVICTION BY PRESENTING FALSE TESTIMONY ................................................................. 185

I.    The State presented false testimony. ......................................................... 185

    A.    The State fiber expert's testimony was false and misleading. ............... 185

        1.    Robertson testified falsely that that the orange fibers "matched." ........ 186

        2.    Robertson testified falsely about the implications of transfer, persistence, and time. .................................................................................................. 186

        3.    Robertson testified falsely about the likelihood that the fibers came from a common item or source. .............................................................................. 186

        4.    Robertson testified falsely about the fibers found in the vacuum cleaner bag. 187

    B.    The State coached the jailhouse snitches' false testimony that David Wood confessed. .................................................................................................. 188

    C.    Sweeney testified falsely that his testimony was not financially motivated and, that if he did receive the reward, he would use it to pay restitution. ................................................................................................. 188

    D.    Kelling testified falsely that David Wood sexually assaulted her. ........ 189

II.    The State knew or should have known this testimony was false. .............. 190

III.    This testimony was material. ..................................................................... 191

IV.    This claim was presented in state court. .................................................... 193

V.    This claim meets the requirements of 28 U.S.C. § 2244. ........................... 193

    A.    Wood diligently pursued evidence of false testimony. ........................... 193

    B.    Wood can make a prima facie showing of innocence. ............................. 195

CLAIM 4: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN VIOLATION OF THE SIXTH AMENDMENT ......................................................... 197

I.    Trial counsel's representation was deficient. .............................................. 197

    A.    Trial counsel failed to introduce evidence that David Wood's pickup truck was in an auto salvage yard when three of the victims went missing. ... 197

    B.    Trial counsel failed to introduce evidence that witnesses had seen Ivy Williams after the State alleged she had disappeared. .................................... 198

C.     Trial counsel failed to impeach the jailhouse snitches..........................199

D.     Trial counsel failed to impeach Judith Brown Kelling with her prior inconsistent statements....................................................................................201

E.     Trial counsel failed to introduce evidence that an alternative suspect knew three of the victims. ...................................................................................202

F.     Trial counsel failed to identify an actual conflict of interest. ...............202

II.     David Wood was prejudiced by trial counsel's deficient representation...203

III.     This claim was presented in state court....................................................205

IV.     This claim meets the requirements of 28 U.S.C. § 2244...........................205

STATUTE OF LIMITATIONS ...............................................................................206

PRAYER FOR RELIEF ...........................................................................................207

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Banks v. Dretke,*
540 U.S. 668 (2004) ........................................................................ 181

*Berger v. United States,*
295 U.S. 78 (1935) .......................................................................... 164

*Blackman v. Davis,*
909 F.3d 772 (5th Cir. 2018) ......................................................... 182

*Brady v. Maryland,*
373 U.S. 83 (1963) .................................................................*passim*

*In re Campbell,*
750 F.3d (5th Cir. 2014) ................................................................ 207

*In re Davis,*
557 U.S. 952 (2009) ........................................................................ 176

*Giglio v. United States,*
405 U.S. 150 (1972) ........................................................................ 185

*Graves v. Cockrell,*
351 F.3d 143 (5th Cir. 2003) ......................................................... 146

*Herrera v. Collins,*
506 U.S. 390 (1993) ................................................ 146, 147, 176, 177

*House v. Bell,*
547 U.S. 518 (2006) ........................................................................ 146

*Johnson v. Dretke,*
442 F.3d 901 (5th Cir. 2006) ......................................................... 175

*Kyles v. Whitley,*
514 U.S. 419 (1995) ................................................................ 177, 180

*Lindsey v. King,*
769 F.2d 1034 (5th Cir. 1985) ....................................................... 172

*McKithen v. Brown,*
481 F.3d 89 (2d Cir. 2007) ................................................................. 4

*McQuiggin v. Perkins,*
    569 U.S. 383 (2013) ........................................................................... 206

*Napue v. Illinois,*
    360 U.S. 264 (1959) ................................................... 171, 185, 190, 191

*Padilla v. Kentucky,*
    559 U.S. 356 (2010) ........................................................................... 197

*Sawyer v. Whitley,*
    505 U.S. 333 (1992) ........................................................................... 146

*Strickland v. Washington,*
    466 U.S. 668 (1984) ........................................................................... 197

*Strickler v. Greene,*
    527 U.S. 263 (1985) ........................................................................... 177

*In re Swearingen,*
    556 F.3d 344 (5th Cir. 2009) ............................................................ 206

*United States v. Bagley,*
    473 U.S. 667 (1985) .................................................................... 177, 180

*United States v. Garrison,*
    291 F. 646 (S.D.N.Y. 1923) .................................................................. 3

*In re Vasquez,*
    No. 23-40079, n.2 (5th Cir. June 23, 2023).......................... 185, 197, 206

*In re Will,*
    970 F.3d 536 (5th Cir. 2020) ..................................... 181, 182, 183, 195

*Wood v. Dretke,*
    No. 3:01-cv-2103, 2006 WL 1519969 (N.D. Tex. June 2, 2006) ..................*passim*

*Wood v. Quarterman,*
    503 F.3d 408 (5th Cir. 2007) ............................................................. 18

*In re Wood,*
    648 F. App'x 388 (5th Cir. 2016) ................................................ 18, 206

**State Cases**

*Ex parte Hernandez,*
    (Tex. Crim. App. June 21, 2006) ...................................................... 139

*State v. Villegas,*
    506 S.W.3d 717 (Tex. App. El Paso 2016)............................................. 138

*State v. Wood,*
    828 S.W.2d 471 (Tex. App. El Paso 1992)............................................. 121

*Ex parte Thomas H. Hennington, III,*
    No. 72,166 (Tex. Crim. App. Sept. 20, 1995) (unpublished) ................................ 42

*Ex parte Villegas,*
    415 S.W.3d 885 (Tex. Crim. App. 2013)............................................. 137

*Wood v. State,*
    693 S.W.3d 308 (Tex. Crim. App. 2024).......................................... 19, 21, 109, 164

*Wood v. Texas,*
    No. AP-71,594 (Tex. Crim. App. Dec. 13, 1995) ................................... 17

*Ex parte Wood,*
    568 S.W.3d 678 (Tex. Crim. App. 2018)............................................. 11

*Ex parte Wood,*
    No. WR-45,746-02, 2009 WL 10690712 (Tex. Crim. App. August 19, 2009)................................................................................. 18

*Ex parte Wood,*
    No. WR-45,746-02, 2014 WL 6765490 (Tex. Crim. App. Nov. 26, 2014).............. 18

*Ex parte Wood,*
    WR-45,746-01 (Tex. Crim. App. Sept 19, 2001) ................................... 18

## Federal Statutes

28 U.S.C. § 1331................................................................................. 5

28 U.S.C. § 2241................................................................................. 5

28 U.S.C. § 2244........................................................................*passim*

28 U.S.C. § 2254............................................................................. 5, 207

## State Statutes

Tex. Code Crim. Proc. art. 38.43 ..................................................... 15

Tex. Code Crim. Proc. art. 64 ..................................................... 19, 20, 21

Texas Penal Code § 19.03(a)(7) .......................................................... 17, 203

**Rules**

Tex. R. Evid. 403......................................................................... 159, 169

Tex. R. Evid. 404(b) ....................................................................... 17, 148

**Regulations**

Order to Dismiss, *State of Texas Shirley Hennington*, No. 18,542 (Apr. 13, 1995)........................................................................................... 41

**Constitutional Provisions**

U.S. Const. amend. VI .......................................................................... 197

U.S. Const. amend. VIII ................................................................ 146, 176

U.S. Const. amend. XIV............................................................ 146, 176, 185

**Other Authorities**

Amber Smith, *Wood's Kidnapping Charge Dropped*, El Paso Times (May 20, 1988)........................................................................................... 93

American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2022 text rev.) 139 59............................................. 135

D. Kim Rossmo & Joycelyn M. Pollock, *Confirmation Bias and Other Systemic Causes of Wrongful Convictions: A Sentinel Events Perspective*............. 1

Hon. Peter Cory, Commissioner, *The Inquiry Regarding Thomas Sophonow: The Investigation, Prosecution and Consideration of Entitlement to Compensation* 63 (Winnipeg: Manitoba Attorney General, 2001) ..................................................................... 168

https://weatherspark.com/h/d/3268/1987/8/8/Historical-Weather-on-Saturday-August-8-1987-in-El-Paso-Texas-United-States#Figures-SolarDay (last viewed Dec. 28, 2024) .................................................... 66

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?case id=4092 (last viewed Feb. 7, 2025) ........................................................ 139

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?case id=5389 (last viewed Feb. 7, 2025) ........................................................ 138

Kathy Sanders, *Prison Talks Elicit Grisly Tale of Torture, Rape and Desert Killings*, Ft. Worth Star-Telegram (July 22, 1990) ................................................ 34

Leticia Zamarripa, *Unsolved Deaths Changing Detectives: Moods, Policy Slowly Altering in Police Division*, El Paso Herald-Post (Nov. 7, 1987). ............. 10

Maybelle Trout, *Mistrial Declared in Eastland County Murder Trial*, Abilene Reporter-News (Sept. 20, 1991) ................................................ 40

Nate Blakeslee, *How to Get a Teenager to Admit to a Murder He Didn't Commit*, Texas Monthly (Jan. 7, 2014) ................................................ 137

*State v. Wells*,
Case Nos. 19,305, 19,306, 19,307, 19,308 ................................................ 42

*State v. Wells*,
No. 10195-A ................................................ 48

*State v. Wells*,
No. 10212-A ................................................ 46, 48

*State v. Wells*,
No. 18,390 ................................................ 23, 41

*State v. Wells*,
No. 18,433 (Nov. 28, 1994) ................................................ 41

*State v. Wells*,
No. 19,305 ................................................ 46

*State v. Wells*,
No. 19,308 ................................................ 48

*State v. Wells*,
No. 19,375 ................................................ 48

*State v. Wells*,
No. 19,642 ................................................ 47

*State v. Wells*,
No. 32,965 ................................................ 48

*State v. Wells*,
Nos. 19,305, 19,306, 19,307 ................................................ 46

*State v. Wells*,
Nos. 19,372, 19373, 19,374 ................................................ 47

## INTRODUCTION

Petitioner David Wood seeks relief from his unconstitutional conviction and sentence of death for capital murder because newly discovered evidence shows that he is actually innocent. In addition, he raises claims involving the presentation of false evidence, suppression of exculpatory evidence, and ineffective assistance of counsel. Each of these constitutional violations independently amounts to a grave miscarriage of justice. Taken together, they render David Wood's conviction unconscionable.

In one of the most sensational murder cases in Texas, David Wood, the "Desert Serial Killer," seeks to overturn his conviction and sentence of death because he is actually innocent. At first glance, the endeavor seems quixotic. But David Wood's case illustrates the danger created by the combustible mix of a high-profile crime and intense public pressure to solve it. These factors led to a rush to judgment that prematurely shifted an evidence-based investigation into a suspect-based investigation. Tunnel vision and confirmation bias compounded the error.[1] Prosecutorial deception, false testimony, suppressed evidence, ineffective representation, and jailhouse snitch testimony—the canary in the coal mine of wrongful convictions—thwarted justice in his case.

Twenty years after David Wood's trial, forensic testing definitively excluded him as the contributor of male DNA in a bloodstain on the clothing of a female victim.

---

[1] *See* D. Kim Rossmo & Joycelyn M. Pollock, *Confirmation Bias and Other Systemic Causes of Wrongful Convictions: A Sentinel Events Perspective*, 11 Northeastern U. L. Rev. 790 (2019).

Since that exculpatory test in 2011, the Attorney General of the State of Texas—acting as the district attorney *pro tem*—has steadfastly and inexplicably refused to agree to additional DNA testing, including testing the biological samples that the police collected from an alternative suspect. David Wood has endured a nearly forty-year odyssey through the criminal legal system. He is innocent.

David Wood's actual innocence claim is founded on newly discovered evidence, including that:

- DNA testing has conclusively excluded David Wood as the contributor of male DNA found on a bloodstain on the yellow sunsuit of the victim Dawn Smith.

- Police detectives handed their investigative files to the jailhouse snitches, Randy Wells and James Carl Sweeney, to help them fabricate their testimony that David Wood confessed to being the Desert Killer. George M. Hall, whom the State hoped to use as a third jailhouse snitch, witnessed the State coach Wells and Sweeney's false testimony.

- Wells literally "got away with murder" when a capital murder charge against him was dismissed in exchange for his testimony against David Wood. Wells was later indicted for aggravated perjury for testifying falsely against his co-defendants in their murder trials.

- Sweeney received $13,000 for his testimony against David Wood.

- David Wood was under police surveillance on the days that two of the victims disappeared. The police did not see him with either of the victims.

- The pickup truck that the jailhouse informants testified David Wood always used in carrying out the murders was seriously damaged in a traffic accident in late July 1987. It was taken to an auto salvage yard where it remained for the entire month of August, when three of the victims went missing.

- The police pressured Judith Brown Kelling, a heroin addict and prostitute, to falsely accuse David Wood of sexual assault so they could

take him "off the streets" while they continued to build their case against him as the Desert Killer. Kelling admitted that a different man assaulted her. But Kelling was allowed to testify at the capital murder trial about this extraneous offense so that the State would be able to prove David Wood's identity as the Desert Killer and his *modus operandi.*

- The State's scientific expert gave misleading testimony that fibers found in a vacuum cleaner bag associated with David Wood "matched" fibers collected from one of the crime scenes.

- Three witnesses saw the victim Ivy Williams after the date the State alleged she was last seen, leaving a bar with David Wood.

- An alternative suspect gave five conflicting statements to the police and failed a polygraph examination. The police collected biological samples from him, but those samples have never been tested to determine if he contributed the male DNA found on Dawn Smith's yellow sunsuit.

The El Paso Police Department's premature and myopic focus on David Wood set in motion an investigation plagued by tunnel vision, where the police continually assumed the worst about David Wood without adequately exploring—or even considering—alternatives. Instead, the police dismissed or explained away or suppressed evidence that undermined their presumption. Without DNA evidence or eyewitness testimony or a confession, the State admitted that it had "purely a circumstantial-evidence case."[2]

Over one hundred years ago, Judge Learned Hand observed that "[o]ur procedure has been always haunted by the ghost of the innocent man convicted," but he concluded that "[i]t is an unreal dream."[3] With the advent of DNA technology that

---

[2] 57.RR.5467.

[3] *United States v. Garrison*, 291 F. 646, 649 (S.D.N.Y. 1923).

has increased exponentially the reliability of forensic identification over earlier techniques and resulted in the exoneration of hundreds of innocent persons, Judge Hand's optimism has given way to the stark reality of wrongful convictions—"a reality which challenges us to reaffirm our commitment to the principle that the innocent should be freed."[4]

Justice must never be forfeited to finality.

---

[4] *McKithen v. Brown*, 481 F.3d 89, 91–92 (2d Cir. 2007).

## PARTIES

Petitioner David Wood is a death-sentenced prisoner in the Texas Department of Criminal Justice (TDCJ). David Wood' TDCJ number is 999051 and he is incarcerated at the Polunsky Unit, Livingston, Texas.

Respondent Eric Guerrero is the Director of TDCJ's Correctional Institutions Division and an agent of the State that has custody of David Wood. He has custody pursuant to the judgment and sentence of death entered against David Wood on November 30, 1992, in the Criminal District Court # 5 of Dallas County, Texas.

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). Venue is proper in the United States District Court for the Northern District of Texas under 28 U.S.C. § 2241(d) because it is the court for the district within which David Wood was convicted and sentenced.

## CLAIMS FOR RELIEF

### CLAIM 1: DAVID WOOD IS ACTUALLY INNOCENT

"I did not do this case. I did not do it. I am innocent of this
case. I'll fight it."

– David Wood (75.RR.7874)

"Facts are stubborn things; and whatever may be our
wishes, our inclinations, or the dictates of our passion, they
cannot alter the state of facts and evidence."

– John Adams

It takes a lot longer to correct an injustice than to create one. David Wood's
case is one of unrequited innocence. Nearly forty years ago, he found himself trapped
in a web of fabricated evidence, false testimony, prosecutorial misconduct, vindictive
police officers convinced of his guilt, and abysmal lawyering. Despite these obstacles,
David Wood has steadfastly proclaimed his innocence. This Application is his final
chance.

Facts, indeed, are stubborn things. They are intractable. The newly discovered
and never-presented facts set out in this Application make a powerful case of David
Wood's actual innocence.

This lengthy claim of actual innocence requires a roadmap for the reader. Part
I provides a factual background of the disappearance of the victims, the discovery of
their bodies, and the police investigation that quickly focused on David Wood. Part II
sets out the evidence the State presented against him at trial. Part III describes the
newly discovered evidence that supports David Wood's innocence. Part IV analyzes

his claim of actual innocence by examining the collapse of the State's case after comparing the new evidence of innocence with the evidence the State presented at trial.

## I.    The Victims' Disappearances, Discovery of the Bodies, and Police Investigation

During the summer of 1987, six teenage girls and young women disappeared in El Paso. Between September 4, 1987, and March 14, 1988, their bodies were discovered buried in shallow graves in the desert area northeast of the city.[5] Five of the bodies were located in an area of the desert approximately 1.1 miles long by a half-mile wide.[6] The sixth body was found three-quarters of a mile away.[7]

---

[5] 57.RR.5521–22.

[6] 57.RR.5519–22. Citations to the reporter's record of the 1992 capital murder trial are noted as "[volume number].RR.[page number]." Citations to the clerk's record are noted as "CR.[page number]."

[7] 57.RR.5522. In opening statements, the State referred to the area where the victims were found as David Wood's "private graveyard," and an element of his *modus operandi*—that he buried his victims in the same general area. 57 RR 5465. In fact, even leaving aside the sixth body found three-quarters of a mile away, the area is massive. It covers 352 acres of desert.



**Location of the bodies: 1. Rosa Maria Casio. 2. Karen Baker. 3. Desiree Wheatley. 4. Dawn Smith. 5. Angelica Frausto. 6. Ivy Williams.**

Four of the bodies were discovered in various states of undress, suggesting that the killer had sexually assaulted them. The condition of the bodies made it virtually impossible for the police to determine the cause of death.

A.     **Public Pressure**

The El Paso Police Department (EPPD) faced enormous, mounting, and unrelenting public pressure as the girls and young women disappeared over the summer of 1987, and the crimes remained unsolved.

8

## Northeast El Pasoans gather to talk safety

By Berta Rodriguez
El Paso Times

*Nov 08, 1987*

In wake of the discovery of five bodies in the Northeast desert, more than 200 parents and their children attended a safety program at Dolphin Terrace Elementary school Saturday.

"I think this is good if it answers questions," said Mary Wright, a parent.

Inside the gymnasium of the school in Nestheast El Paso, parents spoke with representatives of the police and fire departments and social service agencies who set up booths along the walls.

Wright and her husband, Jesse, went to the school with their four children, ages 9 to 17.

Many residents in Northeast El Paso are more cautious since the bodies were discovered, she said.

"In our neighborhood, kids had questions about everything from the shooting (of a 10-year-old girl by her 6-year-old

brother) to the bodies. They're expressing fear that they didn't understand what was going on," Mary Wright said.

Her 17-year-old son, Trevor, a senior at Parkland High School, said there has been a lot of concern at his school among the students.

"A lot of girls are getting worried now. Some of the senior guys are giving girls rides home," he said.

Saturday's parent-child safety program was the brainchild of Jean Richmond, a longtime volunteer at Dolphin Terrace.

"Because of the problems we're having here right in the Northeast with the murders, I just felt we need to make the parents aware of the problem," she said.

"Most parents are concerned. They are afraid. There's a great number of them who seem to feel more protective of their children and some who are not. Those are the ones we are trying to reach. The sad thing about it, they won't be here."

Wednesday, November 4, 1987

# Northeast residents exercise caution

By Vic Kolenc
El Paso Herald-Post

Women in Northeast El Paso are a little jittery and a lot more cautious since five bodies were discovered in the desert there.

"We don't go anywhere in the Northeast by ourselves," Missy Kirwan, 20, said Tuesday night as she sat with her friend, Dyna, 19, at Scorpio's Lounge, 10490 Dyer St., not far from where the bodies were found. Dyna does not want her last name published.

Kirwan said she used to come to the rock 'n' roll bar alone, but stopped doing so after the bodies were discovered. She then excused herself to telephone home.

"My mom worries about me coming out here," Kirwan explained.

"Some people who come to this bar are real good candidates (for being the murderer)," Dyna said. Kirwan agreed. But they said they would continue going to the bar.

"This doesn't keep me in at night. But when I'm home I keep all my windows closed," said Lorraine, 28, as she sipped a drink at Sa-So's Lounge, 9565 Dyer St. She didn't want her last name used.

### AT A GLANCE

■ **SEPT. 4:** El Paso Water Utilities employees discover decomposed bodies of Karen Baker, 20, and Rosa Maria Casio, 24, in Northeast El Paso.

■ **OCT. 20:** Skeletal remains of Desiree Wheatley, 15, and Dawn Smith, 14, found in separate graves near where first two bodies were discovered.

■ **OCT. 21:** Police Chief John Scagno says a serial killer could be loose in the city.

■ **NOV. 3:** Dog helps police find the grave of a fifth body.

Since the first bodies were discovered in September, a lot of students at Andress High School in Northeast El Paso have quit going to popular hangouts at night, reported Kim Carr, 17.

"Kids are getting a lot better grades since this happened, because they're staying home and doing their homework," Carr said.

On July 11, 1987, relatives of some of the missing girls held a protest on the International Bridge in El Paso to call attention to their plight and warn other families of the danger in the community.[8]

---

[8] 60.RR.5964–65.



# Mothers still have hope

### The search will continue for daughters of three El Pasoans

**By Christi De La Torre**
El Paso Herald-Post

The El Paso mothers of two young women missing since early June say they will not give up hope of finding their daughters.

This weekend, Mary Baker, Marge Wheatley and about 25 supporters took their plea for information to the Stanton Street Bridge.

"We want to make people aware, especially kids, of what could happen," said Baker, whose daughter Karen, 20, was last seen June 5. "Being out late at night is dangerous and kids should always let someone know where they are."

Karen disappeared that day from a parking lot near the Hawaiian Royale Motel, 8735 Dyer St.

According to Baker, Karen was outside the motel talking to a friend when the two were approached by a man driving a maroon car. Karen's friend was frightened by the car and ran ahead, leaving Karen behind.

A week after her disappearance, Karen's friend approached Mary Baker and told her what happened.

She said she turned to look back at the car and saw Karen backing away from the car before two men jumped out of the car and forced her inside.

"I haven't heard from her since," Baker said Sunday. "I've received no telephone calls. I know she didn't run away because she didn't take her medicine. She didn't leave a note. She didn't take her babies. Food stamps. Nothing."

Desiree Wheatley, 15, was reported missing June 2.

"The night Desi disappeared she told her friend she was going to leave and go home to make it for her curfew," her mother, Marge Wheatley said Sunday.

Wheatley said it was easy to know when her daughter was upset or happy.

A third El Paso woman, Cheryl Lynn Vasquez, 19, disappeared June 7.

She was last seen at a Circle K store near McCombs Street and Sarah Anne Avenue.

Some police officers were calling it the "biggest case in the history of the department."[9] The Deputy Chief of Police said:

> There are girls being killed out there. The public wants to know what we are doing. Every police officer has heard about it, and their neighbors and friends are asking them about it…. The department is feeling an impact never felt before because of the notoriety of the case, the serial killer aspect. We'll never see anything this big again.[10]

## B.     The Formation of the Task Force

Because the bodies of the victims were discovered in roughly the same area of the desert, buried in shallow graves, and appeared to have been sexually assaulted, the police eventually concluded that the crimes were the work of a serial killer. EPPD created a "Northeast Desert Murders" Task Force within the Crimes Against Persons

---

[9] Leticia Zamarripa, *Unsolved Deaths Changing Detectives: Moods, Policy Slowly Altering in Police Division*, El Paso Herald-Post (Nov. 7, 1987).

[10] *Id.*

Division (CAP).[11] The Task Force consisted of five to eight detectives devoted exclusively to solving the case.[12] A member of the District Attorney's Office was assigned to the Task Force and on call 24 hours a day to answer any legal concerns the Task Force might have.[13]

### C.     David Wood Becomes a Suspect

David Wood was born in 1957 in San Angelo, Texas, to Leo Wood and Betty Allen Wood, who suffered from mental illness. David Wood was the second oldest of their four children. He failed the first, third, and ninth grades, and attended special education classes. His fourth-grade teacher testified at the *Atkins* hearing that, in thirty-five years of teaching approximately 900 students, David Wood was the only student she had ever required to sit next to her desk. She wanted him to learn, and having him next to her desk allowed her to repeatedly explain the lessons to him one-on-one.[14] He eventually dropped out of school in the ninth grade at the age of seventeen in 1974. By that time, he was three years behind his peers. He had few close friends and associated with children who were several years younger than him.

David Wood became the prime suspect in the desert murders for two reasons: (1) his criminal record; and (2) the Brenda Alvey case.

---

[11] 66.RR.7112.

[12] Ex. 1 (EPPD Inter-Office Memorandum (Nov. 16, 1987)). Should the Court of Appeals for the Fifth Circuit grant David Wood's Motion for Authorization, Wood will file the exhibits cited to in this Petition separately in district court.

[13] 66.RR.7116.

[14] *Ex parte Wood*, 568 S.W.3d 678, 686 (Tex. Crim. App. 2018) (Alcala, J., dissenting).

### 1. Criminal Record

In August 1976, David Wood, nineteen years old, was arrested for indecency with a child. In January 1977, David Wood pleaded guilty and, in April 1977, was sentenced to five years in prison. After serving two and a half years, he was released in December 1979.

In 1980, David Wood pleaded guilty to charges of rape of an adult woman and rape of a thirteen-year-old girl. The court imposed concurrent sentences of twenty years on each charge.[15]

On January 15, 1987, David Wood was released on parole.

### 2. The Brenda Alvey Case

On January 28, 1987, two weeks after David Wood's release on parole, Brenda Alvey was sexually assaulted in El Paso.[16] Alvey never saw her assailant's face.[17] He attacked her from behind and then blindfolded her.[18]

David Wood came under suspicion a few months later when the mother of the teenage girl he was convicted of sexually assaulting in 1980 called Crime Stoppers.[19] She said that her daughter had mentioned that Alvey's assailant used the "exact

---

[15] In May 1980, a psychologist administered the Wechsler Adult Intelligence Scale (WAIS) to David Wood as part of a court-ordered evaluation to determine his competency to stand trial. He obtained a full scale IQ of 64. The psychologist concluded that: "It would seem doubtful that this individual is fully capable of participating in his own defense, and may not fully understand the charges being brought against him." Ex. 2 (Psychological Evaluation (May 23, 1980)).

[16] Ex. 3 at 1, 5 (Brenda Alvey Police Reports).

[17] *Id.* at 1, 3, 5.

[18] *Id.* at 1, 5.

[19] *Id.* at 4.

*modus operandi*" David Wood had used on her.[20] Soon afterwards, Alvey spoke with the victim of the 1980 sexual assault.[21] After speaking with the victim, Alvey thought that David Wood might be her assailant as well.[22] Alvey notified the police of her conversation with the victim and, on July 31, 1987, the police asked her to listen to recorded voices in an audio line-up.[23] Alvey identified David Wood's voice as the voice of the man who assaulted her.[24]

In November 1987, the police obtained a search warrant related to the Alvey investigation to take blood, saliva, and head and pubic hair from David Wood.[25] Task Force Det. John Guerrero attended the procedure at the hospital.[26] By that time, David Wood had been in jail for nearly a month after being arrested for the sexual assault of Judith Brown Kelling, and was the prime suspect in the desert murders case.

---

[20] *Id.*

[21] *Id.* at 5.

[22] *Id.*

[23] *Id.* at 6.

[24] *Id.* at 6–7. At that point, the police considered the Alvey case "exceptionally cleared" and intended to present it to the District Attorney's Office—inexplicably—as a "non-arrest" case. *Id.* at 7.

[25] *Id.* at 8–13.

[26] *Id.* at 14.



*El Paso Times*
Wednesday, Nov. 25, 1987   ★★

**El Paso**

# Samples taken from Wood for rape inquiry

### Parolee's voice matches rapist's, woman says

**By Amber Smith**
El Paso Times

A search warrant used last week giving police permission to take hair, blood, semen and saliva samples from David Leonard Wood is part of an investigation into a rape that occurred two weeks after his Jan. 15 parole.

Wood hasn't been charged with that sexual assault on Jan. 28. But he remains jailed without bail on charges of a separate sexual assault, aggravated kidnapping and violating the terms of the parole he was given for two 1980 sex-offense convictions.

A 19-year-old woman picked Wood's voice out from other suspects in July, according to the search warrant affidavit, as belonging to the man who raped her twice on Jan. 28 as she walked in Northeast El Paso to her boyfriend's house.

The 30-year-old Wood is the man police will not confirm nor deny is a suspect in five desert deaths.

In the search executed Nov. 20, police obtained samples of Wood's hair, blood and saliva but apparently did not obtain semen samples, said the judge who signed the warrant, 41st District Judge John McKellips.

Dr. Dennis Mabry of Sierra Medical Center reported that the woman had cuts on her toes and her upper left leg, and he took semen samples from her during the examination, according to the affidavit fil by Detective Jeff Dove of the Crimes Against Persons' sex crimes division.

The woman told police a man grabbed her from behind, covered her mouth and knocked her to the ground when she turned into an alley that intersects Dearborne Street at about 7:30 p.m. Jan. 28.

He forced her to walk with him to Veterans Park to a dirt drainage ditch that borders the north side of the park, where he attacked her. After the first attack, the man walked the woman around for about a half-hour before raping her again near the 10600 block of Kenworthy.

Wood was the object of another police search Oct. 23, the night he was arrested in connection with an alleged rape that occurred in July or August in the desert of far Northeast El Paso, where five bodies of young women and girls have been unearthed in the past three months.

Wood's 1986 beige Nissan pickup was searched at that time. Obtained in that search were one pair of men's black work boots and hair evidence, one checkered shirt with hair evidence, one small brush, one blue card, one purple-colored doll, three plastic baggies with vacuumed samples from the pickup and one wooden cane.

---

### 3.    The Sexual Assault of Judith Brown Kelling

On October 23, 1987, David Wood was arrested for the sexual assault of Judith Brown Kelling.[27] The State gave notice that it intended to introduce evidence of an extraneous offense: David Wood's sexual assault of Brenda Alvey.[28] At a pretrial hearing, the State noted that it had not yet received the lab results from the comparison of the Alvey rape kit with David Wood's biological samples.[29] The State conceded that it would not use the Alvey sexual assault as extraneous offense evidence unless the lab results showed a "positive match."[30] Four days before the sexual assault trial began, the State announced it was withdrawing its intent to use the Alvey assault as

---

[27] *See* Part III-J, *infra* ("David Wood did not sexually assault Judith Brown Kelling.").

[28] JBKCR 71. Citations to the reporter's record of the 1988 prosecution of David Wood for the sexual assault of Judith Brown Kelling are noted as "[volume number].JBKRR.[page number]." Citations to the clerk's record in the case are noted as "JBKCR.[page number]."

[29] 4.JBKRR.14.

[30] 4.JBKRR.15–16.

extraneous offense evidence, because the test results eliminated David Wood as the donor of the semen obtained from Alvey's rape kit.[31] In other words, David Wood had been exonerated of the offense that first brought him to the attention of the Task Force as a suspect in the desert murders.[32]

## D.    The Capital Murder Indictment

By 1989, the Task Force had sent hundreds of pieces of evidence from the six crime scenes to the Texas Department of Public Safety (DPS) to "[d]etermine the presence of any trace evidence which could have originated from [David Wood's] truck, residence or body of David Wood."[33] Indeed, the Task Force detectives sent many of the items they collected from the crime scenes for forensic review because they were convinced that the items would definitively link David Wood to the victims.[34] However, with the exception of orange fibers found at only one of the crime scenes,[35] DPS concluded, for each of the six crime scenes, that: "No hair, fiber or other trace evidence was detected which is comparable to trace evidence associated with David Wood."[36]

---

[31] 5.JBKRR.13.

[32] *See* Ex. 3 at 17–18 (Brenda Alvey Police Reports).

[33] Ex. 4 at 1 (DPS Trace Evidence Reports (1989)).

[34] Had this crime occurred today, David Wood would have the right to subject all the items the police collected to DNA testing. In 2013, the Texas Legislature amended the Texas Code of Criminal Procedure and required DNA testing of biological evidence in capital trials in which the State is seeking the death penalty. Tex. Code Crim. Proc. art. 38.43(i)–(m).

[35] *See* Part III-K, *infra* (alleging presentation of false evidence related to the fiber comparison analysis).

[36] Ex. 4 at 1 (DPS Trace Evidence Reports (1989).

In April 1990, the El Paso County Commissioner's Court unanimously approved a $25,000 reward for information leading to the arrest and conviction of the person responsible for the Northeast desert murders. Coupled with a $1,000 Crime Stoppers reward, a total of $26,000 was available for persons with pertinent information about the case.

```
     APPROVED - $25,000.00 REWARD TO INFORMATION LEADING TO THE
     ARREST AND CONVICTION OF THE PERSON OR PERSONS RESPONSIBLE
                FOR THE NORTHEAST DESERT MURDERS

APRIL 23, 1990                                      MOTION # 54

    On this day, on motion of Commissioner Fonseca, seconded by Commissioner
Hooten, it is the order of the Court that authorization to offer a $25,000.00
reward for information leading to the arrest and conviction of the person or
persons responsible for the Northeast murders, be approved.

    Mrs. Marcia Wheatley appeared before the Court requesting this reward,
originally for the amount of $50,0000.00 but County Attorney Joe Lucas stated
that the State statutory limit if $25,000.00.

    County Attorney stated that the reward may be donated to a Crime Stoppers
Organization and designate those funds for a particular crime.

VOTE:  YES - Hooten, Fonseca, Sanchez, Georges              NO - None
```

In July 1990, after the Task Force had focused its investigation on David Wood for three years as the primary suspect in the Northeast Desert Murders case, he was indicted for capital murder when two jailhouse snitches alleged that David Wood had confessed to them that he was the Desert Killer.

## II.    Trial, Direct Appeal, and Postconviction Proceedings

On November 30, 1992, David Wood was sentenced to death for the murder of Ivy Williams and the murder of at least one other of five named victims—Desiree Wheatley, Karen Baker, Angelica Frausto, Rosa Maria Casio, and Dawn

Smith—during different criminal transactions but pursuant to the same scheme or course of conduct.[37] The indictment listed a cause of death—stabbing with a sharp instrument—only for the first named victim, Ivy Williams, and provided no cause of death for the other five victims.[38]

To convict David Wood of capital murder, the jury had to find that he intentionally killed Ivy Williams and at least one of the other five named victims, in different transactions, pursuant to the same scheme and course of conduct. The prosecution's theory was that a single person—David Wood—committed all six murders. The prosecution based its case against him on four evidentiary components:

- Witnesses who claimed to have last seen some of the victims with David Wood, or a man fitting his description, or accepting a ride from a man driving either a red motorcycle or a beige pickup truck, similar to vehicles that David Wood owned.

- Orange fibers found at one of the crime scenes "matched" fibers taken from a vacuum cleaner bag the police retrieved at an apartment where David Wood had lived.

- A witness who testified under Rule 404(b) (to prove identity and scheme) that David Wood sexually assaulted her in the same area of the desert where the bodies were found.

- Jailhouse informants, Randy Wells and James Carl Sweeney, who testified that David Wood had confessed to them that he was the "Desert Killer."

The Texas Court of Criminal Appeals (TCCA) affirmed Wood's conviction and death sentence on December 13, 1995, *Wood v. Texas*, No. AP-71,594 (Tex. Crim. App.

---

[37] CR.3, 297–300; *see* Tex. Penal Code § 19.03(a)(7)(B).

[38] CR.3.

Dec. 13, 1995), and denied state habeas corpus relief on September 19, 2001. *Ex parte Wood*, WR-45,746-01 (Tex. Crim. App. Sept 19, 2001).

On October 2, 2002, Wood filed a Petition for a writ of habeas corpus in the Northern District of Texas, and the proceedings were referred to the United States magistrate judge. The district court denied federal habeas relief on June 2, 2006. *Wood v. Dretke*, No. 3:01-cv-2103, 2006 WL 1519969 (N.D. Tex. June 2, 2006). The United States Court of Appeals for the Fifth Circuit denied Wood a Certificate of Appealability on October 5, 2007. *Wood v. Quarterman*, 503 F.3d 408 (5th Cir. 2007).

In 2009, the 171st Judicial District Court of El Paso County, Texas, set Wood's execution for August 20, 2009. Wood filed a subsequent application for state habeas corpus raising the claim that he was categorically ineligible for the death penalty because he is intellectually disabled (*Atkins* claim). The TCCA stayed Wood's execution and remanded Wood's *Atkins* claim. *Ex parte Wood*, No. WR-45,746-02, 2009 WL 10690712 (Tex. Crim. App. August 19, 2009). The TCCA denied relief on November 26, 2014. *Ex parte Wood*, No. WR-45,746-02, 2014 WL 6765490 (Tex. Crim. App. Nov. 26, 2014). Wood also sought authorization from this Court to file a successive habeas corpus petition containing an *Atkins* claim, which was denied. *In re Wood*, 648 F. App'x 388, 389 (5th Cir. 2016).

At the same time as Wood's *Atkins* proceedings, in 2010, Wood sought DNA retesting of three items of evidence previously tested in 1992 that yielded inconclusive results: (1) scrapings from beneath the fingernails of Frausto, (2) Casio's blouse, and (3) a cutting from Smith's sunsuit. The State did not oppose Wood's motion. That

testing definitively excluded Wood as a contributor of male DNA found on a blood-stain on the clothing worn by Smith at the time of her murder. *Wood v. State*, 693 S.W.3d 308, 331 (Tex. Crim. App. 2024).

Following this exculpatory result, Wood filed additional motions pursuant to Chapter 64 of the Texas Code of Criminal Procedure to request DNA testing of over 150 items recovered by law enforcement in connection with the Northeast Desert murders and to create the DNA profile of a known alternative suspect connected to Smith. The State opposed all of Wood's motions and the motions were all denied. The TCCA affirmed the convicting court's denial on May 22, 2024. *Id.* at 341. The convicting court set Wood's execution for March 13, 2025

## III.    New Evidence of Innocence

### A.    DNA evidence has definitively excluded David Wood as the contributor of male biological material on Dawn Smith's yellow terrycloth sunsuit.

EPPD collected hundreds of items of evidence from the six crime scenes in the northeast desert of El Paso. But the prosecution submitted only three items of evidence for DNA testing before the trial in 1992: (1) scrapings from underneath one of Angelica Frausto's fingernails; (2) a cutting Rosa Maria Casio's blue blouse; and (3) a cutting from Dawn Smith's yellow terry cloth sunsuit.[39] DNA testing at that time was rudimentary and produced no results on the three items.[40]

---

[39] 67.RR.7361–63.

[40] 67.RR.7362–63.

In 2010, David Wood sought forensic DNA testing of those same three items. The State did not oppose the motion, and the court granted testing under Chapter 64 of the Texas Code of Criminal Procedure.[41] DNA testing on two of the items was again inconclusive. But testing on a blood stain on the yellow terrycloth sunsuit of the victim Dawn Smith, revealed male DNA. A partial DNA profile definitively excluded David Wood as the contributor of the male biological material.[42]



**Cuttings from Dawn Smith's yellow sunsuit**

---

**CONCLUSIONS**

<u>FR10-0193-01.01.4</u>
The partial DNA profile obtained from the cutting from the yellow sun suit (Smith) is a mixture of at least two individuals, including at least one unknown male. David Leonard Wood is excluded as a possible donor to the DNA detected from this sample.

**Report of Laboratory Examination (June 8, 2011)**

---

[41] Ex. 6 (Order for DNA Testing (Nov. 10, 2010)).

[42] Ex. 7 (Orchid Cellmark Report (June 8, 2011)).

After obtaining this exculpatory result, David Wood sought testing of over one hundred additional items recovered from the six crime scenes. Despite its non-opposition to the initial Chapter 64 motion, the Attorney General of the State of Texas opposed any further DNA testing.[43] After litigating the requests for additional DNA testing for over a decade, the convicting court denied the motions in 2022. On appeal, this Court affirmed the denial of additional DNA testing, holding that David Wood had failed to show, under Article 64.03(a)(2)(B), that "his subsequent DNA testing requests have not been made to unreasonably delay the execution of sentence."[44]

## B. The jailhouse snitches, Randy Wells and James Carl Sweeney, fabricated their testimony against David Wood.

On September 26, 2024, George M. Hall called undersigned counsel and revealed that he had witnessed the jailhouse snitches, Randy Wells and James Carl Sweeney, fabricating their stories that David Wood confessed to being the "Desert Serial Killer." After counsel interviewed Hall a few weeks later, Hall provided a sworn declaration on October 13, 2024.[45] Hall explained that he had not come forward earlier because he was on parole for 30 years, until February 2024.[46] Hall did not want to talk about David Wood's case until he had completed his parole and come "off

---

[43] Since 2008, various Assistant Attorneys General have served as prosecutor *pro tem* in the state postconviction proceedings and the Chapter 64 litigation, because the former El Paso County District Attorney, Jaime Esparza, recused himself and his office. DA Esparza had briefly represented David Wood in the capital murder case. Jaime Esparza did not seek re-election in 2020. The current El Paso County District Attorney, James Montoya, does not have a conflict of interest. However, the Attorney General continues to serve as prosecutor *pro tem*.

[44] *Wood v. State*, 693 S.W.3d 308, 312 (Tex. Crim. App. 2024).

[45] Ex. 8 (Declaration of George M. Hall (Oct. 13, 2024)).

[46] *Id.* at 1.

paper."[47] He was afraid he might get revoked if he spoke out about the case before then.[48] In August 2024, he discovered that an execution date had been set for David Wood and contacted undersigned counsel the following month.[49] Hall has had no contact with David Wood since he last saw him at the Eastham Unit in 1989.[50]

### 1. Randy Wells alleges David Wood confessed to being the Desert Serial Killer.

In March 1989, Randy Wells, a 27-year-old felon with a criminal record stretching back a decade, pled guilty to theft over $750 and began serving a two-year sentence at the Eastham Unit. Despite his lengthy criminal record, Wells received only a two-year sentence because of alleged first-hand information he had provided to law enforcement officers regarding unrelated criminal offenses. It was during his incarceration for the theft offense that Wells met David Wood and shared a cell with him.[51] When Wells arrived at Eastham, David Wood had already been in prison for nine months, serving a 50-year sentence for the sexual assault of Judith Brown Kelling. Wells was released from prison in early September 1989, after serving only six months.

---

[47] *Id.*

[48] *Id.*

[49] *Id.* at 1–2.

[50] *Id.* at 7.

[51] 65.RR.6964.



**Randy Wells (1987)**

On January 31, 1990, Leslie Roberts was murdered in Eastland County. On March 23, 1990, Wells was arrested for her murder and held on $100,000 bond. Five days later, he was indicted for capital murder.[52] After the trial court appointed Garry Lewellen to represent Wells, Wells told Lewellen that he had information about the unsolved desert murders. Lewellen then contacted Texas Ranger Gene Kea, who was leading the investigation of the Roberts murder. Desert Murders Task Force Det. Alfred Giron called Lewellen soon afterward.

Attorney Lewellen told Det. Giron that he was trying to work out a deal with the Eastland County District Attorney Emory Walton for lesser charges for Wells on

---

[52] Ex. 9 (Indictment, *State v. Wells*, No. 18,390 Mar. 28, 1990)). Wells failed two polygraph examinations related to his involvement in the Roberts murder. Ex. 10 (Randy Wells Polygraph Results). El Paso law enforcement officials never administered a polygraph to Wells related to his allegation that David Wood confessed to him.

the Roberts murder. Lewellen said that David Wood had told Wells that he committed the desert murders.[53]

On April 24, 1990, El Paso law enforcement officials, including El Paso County District Attorney Steve Simmons, Assistant District Attorney Gonzalo Garcia, and two detectives with the Task Force, traveled to Eastland County to interview Wells.[54] The El Paso officials worked with Eastland County DA Walton to convince him to offer a plea deal to Wells in exchange for his testimony against David Wood.[55]

## 2. Randy Wells, James Carl Sweeney, and George M. Hall are bench-warranted to the El Paso County Jail.

DA Simmons eventually had Randy Wells, along with two other prisoners, James Carl Sweeney and George M. Hall, bench-warranted to the El Paso County Jail.[56] Wells had provided their names to the Task Force detectives.[57] Hall had shared a cell with Sweeney at the Eastham Unit in 1989.[58] David Wood and Wells shared a cell a short distance down the run from Hall and Sweeney.[59]

---

[53] Ex. 11 (Supplementary Police Report (Apr. 29, 1990)). Wells also told Det. Giron about David Wood's confession of the murder of "a [Private Investigator], Cop or Security Guard that [David Wood] had 'capped' because he was getting too close." *Id.* The Task Force could find no reports of an unsolved murder of a police officer, private investigator, or security guard to corroborate Wells's story.

In his supplementary report, Det. Giron noted that he had tape recorded his conversation with Attorney Lewellen. The State did not provide David Wood with a copy of the tape recording.

[54] 65.RR.6990–97; *see* 66 RR 7166, 7174–75. ADA Gonzalo Garcia testified that Det. Marquez tape recorded this interview. Wells also testified that the interview was taped. 66 RR 7175–76. The State never provided David Wood with a copy of the tape recording.

[55] 8.JH1997RR.75–76. Citations to the reporter's record of the 1997 prosecution of Jerry Hennington for murder are noted as "[volume number].JH1997RR.[page number]."

[56] 65.RR.6975–76, 7031–32.

[57] 65.RR.6986.

[58] Ex. 8 at 2 (Declaration of George M. Hall (Oct. 13, 2024)).

[59] *Id.*

Wells arrived at the jail on June 3, 1990.[60] He was placed in the same tank as Sweeney, who arrived the day before, and Hall.[61] As material witnesses in a high-profile case, they were kept separate from the other inmates in the jail.[62]



When Wells arrived at the jail, he told Hall that he had been arrested for running a meth lab.[63] Wells said his attorney told him that, unless Wells had information he could give the police about an unsolved crime, he was looking at a life sentence, because he was "a three-time loser."[64] Wells told his attorney he knew something about "bodies buried in the desert in El Paso."[65]

---

[60] Ex. 12 (Randy Wells Bench Warrant); 67.RR.7299–7301; Def. Ex. 13 (Randy Wells Booking Docket).

[61] Ex. 13 (James Carl Sweeney Booking); 67.RR.7299–7301; Def. Ex. 14 (James Carl Sweeney Booking Docket). Hall arrived at the jail on May 31, 1990. Ex. 14 (George M. Hall Booking).

[62] Def. Ex. 13 ("MATERIAL WITNESS/KEEP SEP").

[63] Ex. 8 at 3 (Declaration of George M. Hall).

[64] *Id.*

[65] *Id.*

Wells knew about "bodies buried in the desert" because he knew that David Wood had hired Sweeney to file a civil rights lawsuit against El Paso officials for trying to implicate him in the deaths of the teenagers and young women found in the desert in Northeast El Paso.[66]

## Suspect in desert killings sues police

### Detectives found 'escape goat,' man says

By Berta Rodriguez
El Paso Times

A prime suspect in the desert bodies murders case filed a $20.5 million lawsuit against El Paso Police Chief John Scagno, claiming he was made an "escape goat" by detectives who were stumped by the 1987 killings.

David Leonard Wood alleges he was harrassed in a scheme to implicate him in the deaths of six young women found in the desert in Northeast El Paso. Although no one has been charged in the deaths, police still call Wood a key suspect. Other suspects were considered.

The civil rights lawsuit filed in U.S. District Court names Scagno, Deputy Chief Gus Massey, Crimes Against Persons Lt. Paul Saucedo and several detectives who were part of a task force that investigated the 1987 cases.

Police spokesman Lt. J.R. Grijalva declined to comment.

Wood is serving a 50-year sentence in prison after he was convicted of sexually assaulting a prostitute in 1987.

At his trial, police witnesses testified Wood is a suspect in the deaths but not the only suspect. Wood consistently has denied any involvement in the killings.

District Attorney Steve Simmons said Friday the cases are still under investigation by his office.

"We're going through them now. When we get through, all of them will go back to the police department. Quite a few are going back next week," for more investigation, he said.

The suit alleges police fabricated allegations against Wood; threatened and intimidated witnesses for Wood to remain silent; and posed as a private investigator for Wood.

The lawsuit said police made false reports about Wood, who was the subject of more than 100 news stories pointing to him as the killer, to "cover up the insidious insolubleness to solve the desert homicides."

Wood, who also claims he was beaten after his arrest, submitted the lawsuit from prison in the summer, but the lawsuit was not registered at the federal's clerk office until October, when he paid the registration fee.

The lawsuit seeks $5.5 million for compensatory damages and $5 million each for nominal, exemplary and actual damages. The lawsuit also asks for attorneys' fees.

Debbie Galvan, David Wood's sister, had collected over 200 newspaper articles about the desert serial murders investigation and sent them to David Wood in prison.[67] David Wood gave Sweeney access to these newspaper clippings so he could use them to draft the federal lawsuit.[68]

In the El Paso County Jail, Wells told Hall and Sweeney that the police wanted David Wood "real bad."[69] Wells said he could get his criminal charges dropped if he

---

[66] *Id.*; 65.RR.6986–88. The Federal Records Center destroyed the court documents in the lawsuit Sweeney filed on behalf of David Wood. *See* Ex. 15 (Docket, *Wood v. Scagno, et. al*, No. 89-CV-238 (filed Oct. 11, 1989)).

[67] 66.RR.7215–16.

[68] 66.RR.7215–16.

[69] Ex. 8 at 3 (Declaration of George M. Hall (Oct. 13, 2024)).

could help the police, and he asked Hall and Sweeney if they could tell him anything specific about the desert murders case.[70]

### 3.  Wells, Sweeney, and Hall are separated from other inmates at the El Paso County Jail and given the "red carpet" treatment.

Wells, Sweeney, and Hall were the only people in a tank at the El Paso County Jail that was designed to hold ten or fifteen men.[71] The jailers kept the coffee fresh in a 50-cup coffee pot for their exclusive use.[72] A telephone was put in the tank that they could use free of charge.[73] The jailers gave them cigarettes.[74] Wells, Sweeney, and Hall could get free snacks from the commissary.[75] The El Paso County DA's Office periodically put money on the books for Sweeney's additional commissary needs.[76]



---

[70] Id.

[71] Id. at 6.

[72] Id.

[73] Id.

[74] Id.

[75] Id.

[76] 65.RR.7059–60.

Eventually, two police detectives came to the jail.[77] They took Wells, Sweeney, and Hall out of the jail without handcuffs or shackles.[78] After driving them up a mountain road with scenic views of Mexico and stopping at a drive-thru restaurant to buy them food, the detectives took them to the El Paso Police Department.[79]

### 4. The Task Force detectives hand their desert murders investigative files to Wells, Sweeney, and Hall.

The detectives took Wells, Sweeney, and Hall to a conference room in the Homicide Division.[80] A photograph of David Wood was pinned on the wall of the conference room, surrounded by photographs of the desert serial murder victims.[81] The name and age of each victim were listed next to their photographs.[82] Other notes pasted on the walls indicated when the victims were last seen, the dates of their disappearance, and where their bodies were found.[83] Lines or strings radiated from David Wood's photograph to the victims' photographs, and additional lines went from the victims' photographs to other notes.[84]

---

[77] Ex. 8 at 4 (Declaration of George M. Hall (Oct. 13, 2024)).

[78] *Id.*

[79] *Id.* Sweeney's trial testimony corroborates Hall's account that the homicide detectives took them out of the jail for questioning. 65.RR.7077–79.

[80] Ex. 8 at 4 (Declaration of George M. Hall (Oct. 13, 2024)).

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

The detectives said to Wells, Sweeney, and Hall, "David Wood is our suspect. It'd be best if you tell us something because we can't let this guy walk."[85] The detectives also told them about the $25,000 reward.[86]



The detectives handed Wells, Sweeney, and Hall their files on the desert murders investigation.[87] The files contained:

- photographs of the crime scenes

- photographs of the victims

- diagrams of the crime scenes

---

[85] *Id.*

[86] *Id.*

[87] *Id.* at 5.

- handwritten notes with descriptions of the investigation

- summaries of statements from the victims' parents or the last people who had seen them.[88]

Sweeney and Wells looked through the files, but Hall refused to take part.[89] After quickly paging through the files, Hall passed them back to the detectives, "because [he] wasn't going to railroad David Wood."[90] As Sweeney's cellmate, Hall knew that Sweeney was working on a lawsuit for David Wood.[91] But David Wood never told Hall anything specific about the desert murders.[92] David Wood occasionally showed Hall newspaper articles about the case and complained about police harassment.[93] David Wood always maintained his innocence to Hall.[94] When Hall celled with Sweeney at the Eastham Unit, Sweeney told him that "the police were trying to railroad David Wood."[95]

After Sweeney and Wells had looked through the files, the detectives asked them, "Did Wood ever say anything about the murders?"[96] Wells and Sweeney then

---

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.* at 2.

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.* at 5.

confirmed that David Wood had indeed confessed to them what they had just seen in the files.[97]

When the detectives realized that Hall was not going to "corroborate" anything in the files, they told him, "We can help you, if you can help us."[98] They also said they might be able to assist him with his parole.[99] The detectives eventually moved Hall to another room where he stayed by himself for about an hour and a half.[100] They came back later and, again, asked Hall, "You sure you don't know anything?"[101] Hall said he was not going to lie about David Wood.[102]

Wells, Sweeney, and Hall spent at least five hours in the Homicide Division that day.[103] When they returned to the jail, Hall heard Sweeney and Wells talking about trying to tie David Wood to the desert murder victims.[104] Hall was excluded from their conversation because they knew he "wasn't on board."[105] Sweeney and

---

[97] *Id.* An audio-recorded interview of Wells conducted by Task Force detectives confirms Hall's account. *See* Ex. 16 (Interview of Randy Wells (June 6, 1990)). Throughout the 75-minute interview, Task Force detectives seed information, and coach and prod Wells to help him "remember" David Wood's confession. The interview also corroborates Hall's account that the Desert Murders "war room" at the Homicide Division had the names of the victims and information about them up on display. *See, e.g., id.* at 6 ("I couldn't tell you the names, and I never, I couldn't […] them names till I seen 'em on that board. And Desiree Wheatley came back."); *see also id.* at 3, 5, 9, 18–19.

[98] Ex. 8 at 5 (Declaration of George M. Hall (Oct. 13, 2024)).

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.* at 6.

[105] *Id.*

Wells were upset with Hall, because they were concerned that he would "mess up the arrangement they had to testify against David Wood."[106]

During the entire time Hall spent with Wells and Sweeney at the Eastham Unit, neither wells nor Sweeney ever told him that David Wood had confessed to the desert murders.[107]

In March 1991, Hall received a letter from El Paso County Assistant District Attorney Debra Morgan.[108] Morgan wanted to call Hall as a State's witness.[109] Hall wrote back to ADA Morgan and told her that he would not be testifying against David Wood.[110] Hall said that he was considering writing to the defense attorneys to "inform them of some improprieties that [he] was aware of and that occurred when [he] was bench warranted to El Paso last year, concerning Wells and Sweeney."[111] Hall added, "I know Sweeney committed perjury . . . and that Wells and him fabricated their stories together for openers."[112] ADA Morgan never contacted Hall about the allegations in his letter.

---

[106] *Id.* at 7.

[107] *Id.* at 2.

[108] *Id.* The State never provided David Wood with a copy of ADA Morgan's letter to Hall. He has filed, simultaneously with this Application, a Motion for Disclosure of Exculpatory Evidence, in which he requests disclosure of this letter.

[109] *Id.*

[110] *Id.* at 7; *see* George M. Hall letter to ADA Morgan (Mar. 18, 1991) at 1 (attached as exhibit to Declaration of George M. Hall).

[111] *Id.* (George M. Hall letter to ADA Morgan at 2).

[112] *Id.* at 3.

### C.   After his testimony in David Wood's case, Randy Wells was indicted for aggravated perjury for testifying falsely against his co-defendants in a first-degree murder case.

In October 1990, a ten-year odyssey began with Randy Wells as the star witness for the prosecution of his co-defendants, Thomas "Jerry" Hennington and his spouse Shirley Hennington, for the first-degree murder of Leslie Roberts in Eastland County. The odyssey ended with the indictment of Wells for aggravated perjury.

#### 1.   Randy Wells testifies against his co-defendant Jerry Hennington.

Randy Wells testified as the State's star witness against Jerry Hennington in October 1990. Called as the prosecution's first witness, Wells testified that Shirley Hennington opened the driver's door of the car where the victim Leslie Roberts was sitting, pulled her by the hair, and struck her in the head with a metal tire tool.[113] Shirley Hennington then walked around the car to the passenger side, according to Wells, pointed a gun at her husband Jerry Hennington and ordered him out of the car, before she fired two shots through the car.[114] Wells testified that Jerry Hennington then reached into the car from the passenger side, pulled Roberts's slumped body back into the car and shot her twice in the head.[115]

On cross-examination, defense counsel asked Randy Wells about the desert murders case in El Paso:

Q.   Tell the jury how much reward money is up on this for your testimony out in El Paso?

---

[113] 3.JH1990RR.136–39. Citations to the reporter's record of the 1990 prosecution of Jerry Hennington for murder are noted as "[volume number].JH1990RR.[page number]."

[114] 3.JH1990RR.140–41.

[115] 3.JH1990RR.142–44.

A.    Twenty-five thousand, I believe.

Q.    Twenty-five thousand dollars?

A.    I believe.

Q.    Okay. And there is also, according to what you told the Star Tel-
egram, a possibility of book rights and movie rights?

A.    I was told that by the El Paso cops.

Q.    Okay. That's something that you told the court—the newspaper
reporter?

A.    That's right.[116]

---

[116] Two weeks after David Wood was indicted for capital murder, Randy Wells gave a three-hour in-
terview to a reporter at the Fort Worth Star-Telegram. The Star-Telegram ran a front-page article
about David Wood's purported confession about the desert murders. Kathy Sanders, *Prison Talks
Elicit Grisly Tale of Torture, Rape and Desert Killings*, Ft. Worth Star-Telegram (July 22, 1990). A
number of other news outlets ran the interview.

Full of lurid details, the article states that Wells claimed David Wood confessed to killing 15 girls,
buried one victim alive, stretched out his victims by tying them to a tree and the bumper of his "slowly
moving truck," and re-enacted another victim's "dying quivers." *Id.* The article noted that El Paso DA
Steve Simmons wrote a letter "laud[ing] the cooperation of Wells and James Carl Sweeney … in the
case against Wood." *Id.* The State never provided David Wood with a copy of DA Simmons's letter.



**BURIED ALIVE!**

*Sadistic killer rapist tortured his victims to death on lonely stretch of Texas desert, say cops*

By JACK ALEXANDER
*Staff writer*

A fiendish killer is still haunted by the memory of one of six women he raped and murdered — the one who frantically gasped for air as he buried her alive.

"He was throwing dirt on her and it was running over her face. When she breathed, the dirt came out around her nose and mouth," said Randy Wells, a former prison cellmate of David Wood.

Wood, 33, has been indicted on murder charges in the slayings of six young women whose bodies were found in shallow desert graves northeast of El Paso, Tex.

"He'd mumble in his dreams . . . I knew he was tore up. He'd stay up for days," said Wells. He said Wood frequently re-enacted the victim's "dying quivers."

Authorities in El Paso will neither confirm nor deny that Wells' chilling information was the main reason Wood was indicted.

"We did take information from Mr. Wells about his conversations in prison with Wood, but I can't comment because we've agreed not to build public hysteria in the press about this case," said a sheriff's spokesman in El Paso.

Q.     This is a pretty lucrative deal for you, isn't it, Mr. Wells?

A.     I don't understand what you're saying.

Q.     Sir?

A.     I don't understand what you're saying.

Q.     This is this deal has turned out to be fairly profitable for you, hasn't it?

A.     No, sir, not yet.

Q.     Not yet?

A.     No, sir.

Q.     But you expect it to be, don't you?

A.     I don't know.

35

> Q. Well, you get off of a murder charge, you get twenty-five thousand dollars, what—you're talking about possible book and movie rights.[117]

In his closing argument, Assistant District Attorney Bill Dowell conceded that Randy Wells avoided the first-degree murder charge because of his agreement to testify against David Wood:

> Is Randy Wells going to receive justice for that murder? Hell, no. Is it going to be justice for the parents of Leslie [Roberts] to see a murderer get twelve years on a forgery charge and never see a thing for participating in the death of their daughter? No. Do I like it? No. Can I defend it? Oh, I can tell you, as he did, why, because he's helped solving dozens of murders in El Paso and so he trades that. Is somebody glad about that? Yeah. It's not the [parents of Leslie] Roberts. I can't defend it to the citizens of Eastland County for Leslie's death, but perhaps there is [sic] parents in El Paso that are glad that Wells made this deal so their murderer can come to trial. But that doesn't help the heartache.[118]

Jerry Hennington was convicted of first-degree murder and sentenced to 99 years in prison.

## 2. Randy Wells testifies against his co-defendant Shirley Hennington.

On September 5, 1991, Randy Wells was released on parole and posted bond on the forgery charge and on the first-degree murder charge.[119] He had remained in custody for over a year and a half, since his arrest in March 1990 for the murder of Leslie Roberts in Eastland County. Less than two weeks after his release, Wells testified for the prosecution against Shirley Hennington in her trial for the murder of Roberts.

---

[117] 3.JH1990RR.211–12.

[118] 4.JH1990RR.459–60.

[119] 65.RR.6960.

As the State's first witness, Wells testified that Shirley Hennington opened the door to the car in which Leslie Roberts was sitting and hit her in the head with a metal tire tool, knocking her unconscious.[120] Wells said that Shirley Hennington then fired a gun twice into the car.[121] At that point, according to Wells, Jerry Hennington bent down into the car and shot Roberts twice in the head.[122]

On cross-examination, Wells admitted that he repeatedly lied to law enforcement when he first discussed the murder of Roberts.[123] Defense counsel then questioned Wells about David Wood's case:

> Q.  Now, the deal in El Paso concerns a guy named Mr. Woods [sic], is that right?
>
> A.  Yes, sir.
>
> Q.  And you were in T.D.C. with him in the same cell in '89, is that right, '88, '89, during that particular time?
>
> A.  Yes, sir.
>
> Q.  And during that time he supposedly confessed to you about killing six people or nine people in El Paso?
>
> A.  A bunch of girls.
>
> Q.  A bunch of girls in El Paso. And you made a deal with those people to testify out there also did you not?

---

[120] 7 SHRR 76–78. Citations to the reporter's record of the 1991 prosecution of Shirley Hennington for murder are noted as "[volume number].SHRR.[page number]."

Three weeks before he testified in Shirley Hennington's trial, Randy Wells reviewed transcripts of his testimony in the October 1990 trial of Jerry Hennington. 7.SHRR.216.

[121] 7.SHRR.79–80.

[122] 7.SHRR.81.

[123] 7A.SHRR.321–25.

A.     Yes, sir.

Q.     They agreed to pay you twenty-five thousand dollars reward money on that didn't they?

A.     No. They didn't agree—I didn't know nothing about none of that until I got to El Paso.

Q.     When you got out to El Paso you found out that if this conviction works you're going to get twenty-five thousand dollars?

A.     I don't know if I'm going to get it or not.

Q.     Well, they told you you would?

A.     It's a reward offer.

Q.     It's a reward that you understand that leads to the conviction and if you testify and help the conviction—

A.     I should get it.

Q.     You should get it?

A.     That's right.

Q.     Now, in addition to that you understand you also would be able to get movie and book rights, you were told that by those people out there?

A.     Yes, sir.

Q.     That could be worth a lot of money?

A.     I don't know what it's worth.

Q.     Well, not only did they do that but they also—the El Paso people gave money to you in connection with buying cigarettes and other things while you were in jail, did they not?

A.     I don't think they gave us no money. We got cigarettes from them, yeah.[124]

---

[124] 7A.SHRR.325–27.

Texas Ranger Gene Kea, the lead investigator of the murder of Leslie Roberts, testified on cross-examination about Randy Wells's credibility:

Q.    Would you agree with me that Randy Wells is capable of lying to you as an officer of the law?

A.    Yes, sir.

Q.    He's done it?

A.    He has.

Q.    He's lied to you on several occasions?

A.    Yes, sir.

Q.    He's lied to you under oath?

A.    Yes, sir.

Q.    He admitted about ten lies that I counted. I haven't even counted the lies that he's made in which he's lied to you about certain things. But, now, this man, Randy Wells, you know is capable and will lie under oath if it suits his needs, if he perceives it would help him?

A.    Is that a question?

Q.    Yes, sir.

A.    Yes, sir.

Q.    Lying under oath isn't going to bother Randy Wells at all, is it, in your opinion?

A.    No, sir.

Q.    And he will lie to this jury just like he will lie to you, won't he?

A.   Yes, sir.[125]

In his closing argument, ADA Dowell attempted to assure the jury it could believe Randy Wells, despite a deal that allowed him to elude a murder charge:

> Why the deal, why did Randy Wells get the deal he got? Ladies and gentlemen, it don't [sic] make no sense to Mr. and Mrs. Roberts. You know who it's going to make sense to the most? Is parents, just like them, that have lost their loved ones in El Paso. Because Randy Wells was able to sell testimony about facts that Mr. Woods [sic] had told them [sic] him in prison about the murders he committed out there, to help them solve their crime and help them try to convict their murderer, Mr. Woods [sic]. Does that help Eastland County? No. No, we'd love to see Randy Wells spend life for his part in this murder. You bet. I bet every one of you would. But, he got a deal for twelve years on some little forgery charge, so six other families or more can get—attempt to get justice on the death of their loved ones out in El Paso. It was a trade-off. Does it make sense for Eastland County? Not to some people it won't. I know some people in El Paso that are happy.[126]

On September 20, 1991, Shirley Hennington's trial ended in a mistrial, with the jury hopelessly deadlocked.[127] One juror remarked afterwards, "In all honesty, I think that woman is innocent. I just couldn't believe that lying Wells."[128]

---

[125] 7B.SHRR.581–82.

[126] 7C.SHRR.804–05, 828–29.

[127] *See* Maybelle Trout, *Mistrial Declared in Eastland County Murder Trial*, Abilene Reporter-News (Sept. 20, 1991).

[128] *Id.*

Local          Abilene Reporter-News   Friday, Sept. 20, 1991   3A

# Mistrial declared in Eastland murder trial

Shirley Hennington was never retried. In 1995, the Eastland County DA dismissed the murder charge against her.[129]

### 3. The criminal charges against Randy Wells are dismissed.

About two years after Randy Wells testified against David Wood in the capital murder trial, the Eastland County DA sought to dismiss the capital murder charge *and* the forgery charge against Wells.[130] The court granted both motions to dismiss on the same day.[131]

### 4. The prosecutor in the Jerry Hennington retrial testifies under oath that Randy Wells is a liar.

The dismissal of the charges against Randy Wells eventually proved problematic for the Eastland County DA because, in September 1995, this Court granted Jerry Hennington's *pro se* application for writ of habeas corpus and reversed his 1990

---

[129] Motion and Order to Dismiss, *State of Texas Shirley Hennington*, No. 18,542 (Apr. 13, 1995); *see* 10.JH1997RR.633 (noting that "there was insufficient evidence, the jury having heard the case that further prosecution and conviction was unlikely").

[130] Ex. 19 (Motion and Order to Dismiss, *State v. Wells*, No. 18,390 (Nov. 28, 1994)); Ex. 20 (Motion and Order to Dismiss, *State v. Wells*, No. 18,433 (Nov. 28, 1994)); 10.JH1997RR.621, 633.

[131] *Id.*

41

murder conviction because the State suppressed exculpatory evidence.[132] The premature dismissal of the charges against Wells caused the Eastland County DA's Office to lose its leverage over him for the Jerry Hennington retrial. Perhaps not coincidentally, in December 1996, Wells was arrested in Eastland County on three counts of kidnapping and one count of unauthorized use of a vehicle.[133] In April 1997, as he sat in jail, Wells wrote to Eastland County DA Mike Siebert:

> I understand the Hennington trial is set for May 19, 1997 and that you are wanting my testimony once again in the trial. In which I am willing to do, but also fail to realize why Shirley Hennington is not going back to trial. I now honestly believe I can put evidence in your hand that will not only get Jerry Hennington to plea [sic] guilty, but Shirley also. . . . I am not going nowhere until this matter is solved. I'm not going to run from this matter at all. I will be there for my testimony in the trial. I have my neck way out on a limb right now doing what I'm doing to make this case so much easier for the state.
> . . . .
> Please help me out on this matter. *I will show up for court.*[134]

Wells bonded out of jail in May 1997, after the trial court reduced his bail. ADA Dowell asked the court to declare the bond insufficient, because Wells had violated a condition of his bond by failing to report to pretrial supervision. On June 13, the bail bond company filed a motion to withdraw as surety and an application for warrant. An arrest warrant was issued the same day. On June 24, Wells was arrested in New

---

[132] *Ex parte Thomas H. Hennington, III*, No. 72,166 (Tex. Crim. App. Sept. 20, 1995) (unpublished).

[133] *State v. Wells*, Case Nos. 19,305, 19,306, 19,307, 19,308; *see* 5.JH1997RR.36; 8.JH1997RR.72.

[134] Ex. 21 (Wells letter to DA Siebert (Apr. 30, 1997)) (emphasis in original).

Mexico. On July 7, he was returned to the Eastland County Jail, a little more than two weeks before his scheduled testimony against Jerry Hennington.[135]

In July 1997, Randy Wells testified for the second time against his co-defendant Jerry Hennington. However, in contrast to his testimony in the 1990 Jerry Hennington trial and the 1991 Shirley Hennington trial, Wells testified on direct examination that *only* Jerry Hennington shot the victim, Leslie Roberts.[136] On cross-examination, Wells denied that he had previously testified that Shirley Hennington shot the victim.[137]

Defense counsel called to the stand ADA Dowell, the prosecuting attorney, who had also tried Jerry Hennington in 1990, and Shirley Hennington in 1991:

Q. Mr. Dowell, you're familiar with a fella named Randy Wells?

A. Yes, I am.

Q. And he's testified in this proceeding?

A. Yes, he has.

Q. And you admit Mr. Randy Wells is a liar?

A. I do.

Q. You admit he's capable of lying to officers?

A. I do.

Q. You admit he has lied to officers?

---

[135] On November 17, 1997, Wells was indicted for bail jumping on each of the three kidnapping charges and the unauthorized use charge. *See* Nos. 19,372, 19,373, 19,374, 19,375.

[136] 8.JH1997RR.68–69.

[137] 8.JH1997RR.82.

A.  Yes.

Q.  You admit he lies to officers on many occasions?

A.  Yes.

Q.  You admit that he would lie under oath?

A.  Yes.

Q.  You admit he in fact did lie under oath?

A.  It's my belief he has, yes.

Q.  You admit that he is capable of and would in fact lie under oath if it suits his needs or if he perceives it would help him?

A.  Yes.

Q.  You admit that Randy Wells lied in Jerry [Hennington]'s first trial?

A.  My opinion today, yes.

Q.  You admit that Randy Wells lied in Shirley [Hennington]'s trial?

A.  Yes.

Q.  And you admit then lying under oath wouldn't bother Randy at all?

A.  I agree with that, no.

Q.  Would you agree then that Randy Wells would lie then to a jury under oath the same as he would lie to law enforcement under oath?

A.  Certainly.

Q.  And in fact has done that?

A.  I believe so.

Q.  You've heard [Texas Ranger] Kea I think make a statement he believed Randy Wells would lie in any statement he made, do you agree with that?

A. If it would suit his purpose, yes, that's the way I remember it, yes.

Q. You admit that Randy Wells has now lied in this trial?

A. I'll admit he had to either lie in this one or the other one in reference to Shirley Hennington, yes.

Q. Do you recall Mr. Wells in this trial stating he never said Shirley shot?

A. Right, that's what I mean.

Q. And of course, that's a lie isn't it?

A. As compared to his testimony at the last trial, yes, sir.[138]



Abilene Reporter-News  Saturday, July 26, 1997  11A

News

# Defense attorney puts prosecutor on stand

By MAYBELLE TROUT
Correspondent

EASTLAND —The defense rested its case shortly after lunch Friday in the second murder trial of Thomas Howard "Jerry" Hennington III, but not before calling the prosecuting attorney to the witness stand.

Hennington, 42, is accused of the shooting death in Jan. 31, 1990, of Leslie Renee Roberts, 27, who was slain in a car on a street in Ranger known as Lover's Lane.

Hennington was convicted in October, 1990, of the slaying, but was granted a new trial when it was ruled that the state withheld evidence during the first trial. His wife, Shirley Hennington, was also tried for murder, but the trial resulted in a hung jury.

Friday morning, defense attorney Jim Elliott, called assistant district attorney Bill Dowell to testify. Dowell is prosecuting the case in the absence of vacationing Eastland County District Attorney Mike Siebert.

Under questioning aimed at undermining witness Randy Wells' statements and Wells' testimony in the first trial, Dowell agreed that Wells, in exchange for his testimony, was never prosecuted for Robert's death.

Dowell also agreed that Wells' statements had been used to develop the case against Hennington, that Wells had lied to officers under oath and during the first trial, and that Wells had lied during the current trial.

Elliott also questioned forensics and ballistics expert witness Max Courtney.

Looking at a photographs taken at the scene of the slaying, Courtney pointed out what appeared to be a bullet hole inside the front passenger side of the car. He said the position of the bullet indicated the shots came from the outside of the driver's side of Robert's car Courtney also said glass was on the inside the driver's side of the car, also indicating the shots came from the driver's side of the vehicle.

Courtney also testified that Roberts was shot on the left side of her face, again indicating the shots came from the driver's side of the car.

The three points contradicted the previous statements of Wells. Wells' statements said the shots came from outside the passenger side of the vehicle. The first two shots were fired, Wells had said, by Shirley Hennington, Thomas Hennington's enraged wife. Then, Wells said, Thomas Hennington fired two additional shots from the passenger side.

Medical experts had previously testified that Roberts, in addition to being shot, was struck on the head with a blunt instrument. Courtney pointed out that one photograph appeared to show a hammer and shell casings at the scene of the murder. In the next photograph, however, only the shell casings were visible. The hammer was never taken as evidence.

Hennington has accused Wells of firing the fatal shots. In a previous signed statement, Hennington said he and Wells went to Fort Worth following the shooting and pawned a pistol and ring taken from Robert's purse.

Wells is currently being held in the Eastland County Jail on several charges.

The state rested its case against Hennington on Thursday.

Visiting Judge John Lindsey instructed jurors to return at 1:15 p.m. Monday to hear closing arguments in 91s District Court.

ABILEN

In his closing argument, ADA Bill Dowell admitted that "Randy Wells is a murderer,"[139] adding:

---

[138] 10.JH1997RR.614–16.

[139] 11.JH1997RR.679.

Now, I wish we could get them all. But a deal was made, a deal I don't have to like, a deal you don't have to like, and Randy Wells walks away from murder…. [H]e won't, can't be tried for the murder. That was the deal. Now then, who's happy about that? Well, Randy Wells. Who isn't? I'm not happy. . . . [The victim's parents] aren't happy. Who is? Perhaps the victims' parents and family of those victims in El Paso by Mr. Wood. Somebody got something for it. We just didn't get it in Eastland County.[140]

The jury returned a verdict of guilty, convicting Jerry Hennington as a party to first-degree murder.[141] The jury sentenced him to 48 years in prison, less than half the 99 years that had been imposed after his 1990 trial.[142]

### 5.    Randy Wells is indicted for aggravated perjury.

Wells was released from jail after his testimony against Jerry Hennington in July 1997. But he did not stay out of trouble for long. In September 1997, two months after he testified, Wells was arrested in McClennan County for forgery of a financial instrument. He pled guilty and received a 15-month sentence.[143] Wells asked the court to continue the August 1997 trial setting on his kidnapping and unauthorized use charges.[144] The court granted the motion and numerous additional motions for continuance. In 2001, the trial court granted the Eastland County DA's motion to dismiss the three kidnapping counts against Wells.[145] But by that time, Randy Wells was facing a charge of aggravated perjury.

---

[140] 11.JH1997RR.680–81.

[141] 11.JH1997RR.685.

[142] 12.JH1997RR.37.

[143] Judgment of Conviction, *State v. Wells*, No. 10212-A.

[144] Motion for Continuance, *State v. Wells*, No. 19,305.

[145] Motion and Order to Dismiss, *State v. Wells*, Nos. 19,305, 19,306, 19,307. The court simultaneously dismissed the bail jumping charges associated with each case because, as the DA argued, the

On March 30, 2000, Randy Wells was indicted by an Eastland County Grand Jury for aggravated perjury, a third-degree felony, due to Wells's status as a repeat and habitual felony offender. The perjury indictment arose from his materially inconsistent testimony in the trials of Shirley Hennington and Jerry Hennington about whether one, or both of them, shot the victim. Wells was arrested and his bond set at $35,000.

**INDICTMENT**

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURY, for the County of Eastland, State of Texas, duly selected, impaneled, sworn, charged, organized as such at the FEBRUARY TERM, A.D. 2000, of the 91st Judicial District Court for said County, upon their oaths present in and to said Court, at said term that **RANDY LEE WELLS**, hereinafter styled Defendant, on or about the **23RD** day of **JULY, A.D. 1997**, and before the presentment of this indictment, in the County and State aforesaid, did then and there, with intent to deceive and with knowledge of the statements' meanings, make two inconsistent statements under oath, one of the two statements being necessarily false, the first of such statements being that Shirley and Jerry Hennington both shot at Leslie Renee Roberts, such sworn statement being then and there required by law to be made under oath, while the said defendant on the 16th day of September, 1991, was then and there under an oath administered by Jim R. Wright, Judge for the 91st Judicial District Court of Eastland County, as a witness during an official proceeding, to-wit: a jury trial, in cause number 18,542, in the 91st Judicial District Court of Eastland County, Texas, styled The State of Texas vs. Shirley Hennington, and the second of such statement being that only Jerry Hennington shot at Leslie Renee Roberts, such sworn statement being then and there required by law to be made under oath, while the said defendant, on the 23rd day of July, 1997, was then and there under an oath administered by John R. Lindsey, Judge for the 91st Judicial District Court of Eastland County, as a witness during an official proceeding, to-wit: a jury trial, in cause number 18,391, in the 91st Judicial District Court of Eastland County, Texas, styled The State of Texas, vs. Thomas Howard Hennington, III, and said false statement was then and there material to such proceeding in that it could have affected the course and outcome of the official proceeding by tending to show who caused the death of Leslie Renee Roberts,

In November 2002, the trial court granted the DA's motion to dismiss the case for the reason "that further prosecution of the offense is no longer in the best interest of justice."[146] That same day, the court also granted the DA's motion to dismiss the

---

underlying offenses had been dismissed. Motion and Order to Dismiss, *State v. Wells*, Nos. 19,372, 19373, 19,374.

[146] Motion and Order to Dismiss, *State v. Wells*, No. 19,642.

unauthorized use charge.[147] In short, the DA did not prosecute any of the four charges that put Randy Wells behind bars in July 1997 and ensured he would testify for the State in the retrial of Jerry Hennington.[148]

### D. Randy Wells lied when he testified that David Wood wanted his tattoos covered up so that a victim who "got away" would not be able to identify him.

One of the more incriminating pieces of evidence the State presented involved Randy Wells's testimony that he "covered up" some of David Wood's tattoos so a victim who "got away," Judith Brown Kelling, would not be able to identify him.[149] But less than twelve hours after his arrest for the sexual assault of Kelling, the police photographed David Wood's body for the specific purpose of preserving contemporaneous evidence of his tattoos. After-the-fact modification of David Wood's tattoos in prison while serving his sentence on the sexual assault conviction would do nothing

---

[147] Motion and Order to Dismiss, *State v. Wells*, No. 19,308. The court simultaneously dismissed the bail jumping charge associated with the case. Motion and Order to Dismiss, *State v. Wells*, No. 19,375.

[148] On June 29, 2003, less than seven months after the dismissal of the aggravated perjury charge, Wells committed first-degree aggravated assault causing serious bodily injury. The next day, he unlawfully restrained his spouse, preventing her from seeking medical attention for the injuries he had caused her. On July 27, 2003, Wells was found on the roof of the Limestone County Jail, attempting to escape. Judgment of Conviction, *State v. Wells*, No. 32,965. In 2007, Wells successfully moved for *nunc pro tunc* changes to the judgment to reduce his conviction for first-degree aggravated assault causing serious bodily injury to third-degree injury to a disabled person. Order on Motion, *State v. Wells*, No. 32,965.

In November 2004, Wells pleaded no contest to the aggravated assault charge (with a habitual offender enhancement) and was sentenced to 45 years in prison. The court ordered the sentence to be served concurrently with his sentences for unlawful restraint (25 years) and escape (25 years). Judgment of Conviction, *State v. Wells*, No. 10195-A; Judgment of Conviction, *State v. Wells*, No. 10212-A.

On July 11, 2013, the Pardons and Parole Division of the Texas Department of Criminal Justice granted parole to Randy Wells. He was released to Eastland County after serving only ten years in prison.

Randy Wells died on February 4, 2025.

[149] 65.RR.6972.

to undermine Kelling's identification of him (or any others, for that matter), because the police already had a record of his tattoos before his sexual assault trial. The photographs of David Wood's tattoos taken within hours of his arrest expose Wells's lie about the reason for "covering up" David Wood's tattoos.

At the capital murder trial, Randy Wells provided inculpatory evidence about his work on David Wood's tattoos:

> Q.    Did he tell you why he wanted those tattoos covered up?
>
> A.    He said that he had tried to get two girls and one girl had got away from him and had noticed—could see the tattoo.
>
> Q.    Now, Mr. Wells, are you the one who actually covered up those tattoos?
>
> A.    Yes, ma'am.[150]

Leaving no doubt about the identity of "the girl who had got away," the State argued on direct appeal that:

> It would appear that [Wells's] testimony would give Judith Kelly's testimony particular significance and relevance. With appellant's admission that "one girl got away from him," it could be logically argued that the testimony of Judith Kelly was not an "extraneous" transaction at all, but was in fact a part of the same scheme and course of conduct on the part of appellant which resulted in the deaths of the other six girls.
>
> . . . .
>
> Of particular significance also is the fact that appellant got Wells to cover tattoos on his body because one of the girls got away from him and could possibly recognize him from the tattoos.[151]

---

[150] 65.RR.6972. Sweeney provided similar incriminating evidence about David Wood's tattoos: "He wanted the tattoos covered up so that tattoos could not be used later to identify him." 65.RR.7042.

[151] State's Direct Appeal Brief at 17, 19, *Wood v. State*, No. 71,594.

In closing argument, the prosecution emphasized the incriminating nature of the evidence Wells provided about covering up David Wood's tattoos:

> One of the most interesting things Mr. Wells has to tell us is something that relates to something physical about Mr. Wood. Mr. Wood, while in the cell with Mr. Wells, had his tattoos covered. Again, this goes back to the intelligence of Wood. He had the knife that . . . went in and out of his arm. He had the knife covered. He had the butterfly covered. Why? Because in the span of all these crimes he committed, he worried that he might be identified through these very unique tattoos. Why it is that criminals tattoo themselves and exist with these tattoos for detection I'll never know. But he had these tattoos, which were easily recognizable and identifiable. Why else would he have these tattoos covered with another tattoo there with Mr. Wells but for his guilty state of mind and the fact that he feared that he could be identified through those tattoos. This defendant was desperate. When he was down there with Mr. Wells and Mr. Sweeney, he was desperate. He was going to do whatever he could from where he was to cover his tracks. He had done that from the choices he made when he did the crimes, and he did that by covering these tattoos.[152]

Within hours after David Wood's arrest for the sexual assault of Kelling, the police took multiple photographs of David Wood's body to create a contemporaneous record of his tattoos.[153]

---

[152] 69.RR.7554–55.

[153] Ex. 22 (Supplementary Police Report (Oct. 24, 1987)). Undersigned counsel apologizes for the poor quality of the photographs obtained from the District Attorney's files. The State refused to allow counsel to make laser-colored copies of the original photographs in their possession.





The prosecution then used this photographic evidence during a pretrial identification hearing in David Wood's sexual assault trial:

Q.  Ms. Kelling, other than the pickup, or photographs of the pickup, did you look at any other photographs?

A.  Tattoos on the body.

Q.  Now, when you say on the body, would that be on a live body, or a dead body?

A.  A live body.

Q.  Was that the body of a man?

A.  Yes.

. . . .

Q.  Ms. Kelling, I show you a plastic container. It's marked for identification purposes as State's Exhibit number 2.[154] That container containing several photographs.

I show you several photographs, six to be exact, that purport to be photographs of a man with tattoos. And I ask you if you've ever seen those photographs before.

A.  Yes.

Q.  Did you see those photographs on September 22nd, 1987?

A.  Yes.[155]

---

[154] David Wood does not have a copy of State's Ex. 2. An investigator for the El Paso County District Attorney's Office, removed the exhibits in the sexual assault case from the District Clerk's Office in October 1990, after David Wood was indicted for capital murder. Clerk's Sign-out Sheet (Oct. 18, 1990)). The State never returned the exhibits to the Clerk, and these exhibits were not included with the capital murder files that the State provided to undersigned counsel in 2010.

[155] 3.JBKRR.118–19.

Any "covering up" of David Wood's tattoos by Wells occurred *after* his conviction for the sexual assault of Kelling. David Wood had no incriminating motive for wanting additional tattoo work done in prison: Kelling had already identified him.

### E. James Carl Sweeney received $13,000 for his testimony against David Wood.

James Carl Sweeney testified falsely that he was undecided about whether he would make a claim for the $26,000 reward offered for information leading to the arrest and conviction of the person responsible for the Northeast desert murders.[156] In fact, the State had already promised Sweeney half of the reward money before he testified. Sweeney's conduct immediately after David Wood's conviction reveals a man obsessed with obtaining the money that he had been promised. Less than one month after David Wood was sentenced to death, Sweeney began his pursuit of the reward. Less than one year after testifying, Sweeney filed a lawsuit in El Paso County district court seeking a declaratory judgment that he was rightfully entitled to the reward. A few months later, Sweeney settled the lawsuit and received a $13,000 check from El Paso County.

The State did not disclose any of the documents related to Sweeney's communications with the District Attorney's Office and law enforcement. David Wood obtained this *Brady* material when he discovered that Sweeney had filed a lawsuit for declaratory judgment. All of the letters in David Wood's possession were attached as

---

[156] The El Paso County Commissioners offered a $25,000 reward, and Crime Stoppers offered a $1,000 reward.

exhibits to Sweeney's lawsuit. On September 16, 2009, the El Paso Times reported

that Sweeney had been paid $13,000 for his testimony.



**Ex-cellmate of David Leonard Wood collected $13K reward**

By Diana Washington Valdez / El Paso Times

Posted: 09/16/2009 12:00:00 AM MDT

EL PASO -- A former inmate whose testimony helped convict David Leonard Wood of six murders collected reward money for helping solve the crimes.

James Carl Sweeney Jr., one of Wood's former cellmates, received $13,000 in 1993, after he filed a lawsuit against county officials and Crime Stoppers of El Paso. A total of $26,000 in rewards were offered for the 1987 slayings.

### 1.     The Letter-Writing Campaign

ADA Gonzalo Garcia promised Sweeney that he was entitled to half of the re-ward.[157] Sweeney's actions after the capital murder trial reveal his determination to collect the money that the State assured him was rightfully his. David Wood was sentenced to death on November 30, 1992. Sweeney made his initial claim for the reward days later in December 1992.[158] He wrote a letter to Lt. Paul Saucedo, Com-mander of the Crimes Against Persons (CAP) Division of the El Paso Police

---

[157] Ex. 23 at 2 (Affidavit of James Carl Sweeney (Aug. 21, 1993).

[158] *Id.* at 3.

Department.[159] Later that month, while Sweeney remained in the Dallas County Jail, the prosecuting attorneys Debra Morgan and Karen Shook assured him that they would present his application for the reward and verify the vital role he played in the successful prosecution of David Wood.[160]

When Sweeney's attempts to obtain the reward on his own failed, he hired attorney Michael A. Villalba to represent him.[161] Villalba appeared before the Commissioners Court in March 1993. ADAs Morgan and Shook, along with Lt. Saucedo, testified favorably on behalf of Sweeney and Randy Wells, but the Commissioners did not move forward in releasing the money.[162] Villalba suggested several options for Sweeney to consider before noting, "It's unfortunate that the glitch has emerged *after* you and Wells have performed your duties."[163] Sweeney wrote back and told Villalba to file a lawsuit for declaratory judgment.[164]

On March 27, 1993, Sweeney wrote to ADA Morgan requesting assistance with the reward:

> I write you with strict confidentiality.
> . . . .
> I am at my wits end Ms. Morgan. I came forward in the Wood case . . and I subjected myself to a long list of discomforts for being the State's "informant." And now, I find out that the reward (since its [sic] been

---

[159] *Id.* David Wood does not have a copy of Sweeney's letter to Lt. Saucedo.

[160] *Id.* at 3–4.

[161] Ex. 24 (Sweeney-Attorney Villalba Representation Agreement (Feb. 11, 1993).

[162] Ex. 25 (Attorney Villalba's letter to Sweeney (Mar. 10, 1993)). Attorney Villalba spoke with Gary Lewellen, attorney for Wells, who also made a claim for the reward. They agreed that Villalba would appear before the Commissioner's Court on behalf of both Sweeney and Wells, "in order to present a unified, controlled and orderly claim." *Id.* at 1.

[163] *Id.* at 2 (emphasis in original).

[164] Ex. 26 (Sweeney's letter to Attorney Villalba (Mar. 14, 1993)).

offered) is illegal. To obtain the reward, I have now been forced to retain an attorney for 40% of the actual "judgment collected," plus costs of suit. This is simply unfair and I'm now writing you once again for assistance. If you will please recall, I had mentioned in my previous letters to your office that I thought it would be necessary for the State to "protect my interests." Thus, I am asking again for your help.[165]

ADA Morgan responded immediately.[166] She assured Sweeney that she had kept his letter confidential, revealing it only to ADA Shook.[167] Morgan explained that the Sheriff would determine the payout of the reward and that Shook had written to the Sheriff explaining that the evidence Sweeney and Wells provided "was crucial to obtaining [David Wood's] conviction."[168]

When ADA Morgan's work failed to produce the reward, Sweeney wrote to El Paso County DA Jaime Esparza.[169] Sweeney protested that he and Randy Wells were "promised . . . that [they] would each receive, and split the total rewards offered; $26,000."[170] Sweeney wrote that he "was first told [he] would receive a 50/50 division of the rewards between Randy Wells and [himself]. *That* agreement was several years ago after [he] was flown to El Paso[.]"[171] He complained that he was never told he would need to retain an attorney to collect the reward.[172]

---

[165] Ex. 27 at 1 (Sweeney's letter to ADA Morgan (Mar. 27, 1993)).

[166] Ex. 28 (ADA Morgan's letter to Sweeney (Mar. 31, 1993)).

[167] *Id.*

[168] *Id.* David Wood does not have a copy of ADA Shook's letter to the Sheriff.

[169] Ex. 29 (Sweeney's letter to DA Esparza (June 1, 1993)).

[170] *Id.* at 1.

[171] *Id.* at 2 (emphasis in original).

[172] *Id.* at 3.

After nearly four months of silence from his attorney, Sweeney wrote to Villalba's associate, Gonzalo Garcia, the former ADA who first promised Sweeney the reward.[173] Garcia responded with an update on the status of Villalba's efforts to collect the reward and then suggested that Sweeney send a "demand letter" to El Paso County Judge Alicia Chacon.[174] Garcia closed by acknowledging Sweeney's "entitlement" to the reward.[175]

Sweeney followed Garcia's advice and wrote to Judge Chacon.[176] Sweeney informed Judge Chacon that, in December 1992, shortly after David Wood's conviction, he "promptly made application for the $25,000 reward."[177] Sweeney explained that he "came forward (at great risks) to assist the Government of El Paso with the solving of these murders."[178] In closing, Sweeney made clear his entitlement to the reward:

> I honored my portion of the offer; but now, it appears that El Paso officials now desire to breach their portion of the agreement.
>
> . . . .
>
> El Paso obtained its conviction because of my testimony and therefore, I am rightfully entitled to collect my portion of the $25,000.00[179]

A few days later, Sweeney wrote another letter to ADA Morgan, in which he declared that the delays in collecting the reward had left him outraged.[180] Sweeney

---

[173] Ex. 23 at 5–6 (Affidavit of James Carl Sweeney (Aug. 21, 1993)). David Wood does not have a copy of Sweeney's letter to Attorney Garcia.

[174] Ex. 30 at 1–2 (Attorney Garcia's letter to Sweeney (July 2, 1993)).

[175] *Id.* at 2.

[176] Ex. 31 (Sweeney's letter to Judge Chacon (July 7, 1993)).

[177] *Id.* at 1.

[178] *Id.*

[179] *Id.* at 2–3.

[180] Ex. 32 (Sweeney's letter to ADA Morgan (July 10, 1993)).

complained that the State no longer appeared interested in fulfilling their end of the bargain, because "the State now has its conviction."[181] He asked for assurance from ADA Morgan that she and ADA Shook would "continue to verify [his] cooperation with [their] office during the prosecution of Mr. Wood."[182] Sweeney again emphasized his important role in "solving" the desert murders case:

> Its [sic] sad that things have turned as they have, particularly in a case such as this one. In 1989, El Paso Law Enforcement Officers had numerous unsolved murders on their hands. In 1990, these cases were finally connected to Mr. Wood. From there, I believe you know the rest of the story.[183]

The same week he wrote to ADA Morgan, Sweeney sent a letter to the Sheriff's Association of Texas.[184] Sweeney explained that he "came forward under great risks to assist El Paso Officials, including Sheriff Samaniego, with information which ultimately convicted the man responsible for the senseless killing of these young girls and women."[185] Sweeney noted that he had written letters to the DA's Office "to the point of harassment" and hired an attorney, and now wanted the Sheriff's Association to direct Sheriff Samaniego to pay the reward.[186]

In response to being copied on Sweeney's letter to the Sheriff's Association, El Paso County Sheriff Samaniego wrote to Sweeney and denied all responsibility in

---

[181] *Id.* at 2.

[182] *Id.*

[183] *Id.*

[184] Ex. 33 (Sweeney's letter to Sheriff's Ass'n of Texas (July 16, 1993)).

[185] *Id.* at 2.

[186] *Id.* at 2–3.

disbursing the reward funds.[187] The Sheriff suggested Sweeney direct his complaints to the Commissioners Court.[188]

Sweeney followed the Sheriff's advice and wrote to Commissioner Charles Hooten.[189] Sweeney noted that he had "gone to great lengths to assist the prosecutors in the case" and was, therefore, "fully entitled" to half of the reward.[190] Sweeney's letter ended with a request for the immediate payment of the reward.[191]

On the same day he wrote to Commissioner Hooten, Sweeney fired Attorney Villalba.[192] Sweeney demanded that Villalba return his file, including a dozen letters that Sweeney sent to and received from various El Paso government officials asking about the reward *before* he testified against David Wood.[193]

### 2.    The Lawsuit

After terminating Attorney Villalba as his legal representative, Sweeney filed a *pro se* petition for declaratory judgment, injunction, and temporary restraining order against a number of El Paso County and City officials.[194] The parties agreed to

---

[187] Ex. 34 (Sheriff Samaniego's letter to Sweeney (Aug. 2, 1993)).

[188] *Id.*

[189] Ex. 35 (Sweeney's letter to Commissioner Hooten (Aug. 10, 1993)).

[190] *Id.* at 2.

[191] *Id.*

[192] Ex. 36 (Sweeney's letter to Attorney Villalba (Aug. 10, 1993)).

[193] *Id.* at 2. David Wood has a copy of only two of the twelve letters listed in Sweeney's letter to Attorney Villalba.

[194] Ex. 37 (Petition for Declaratory Judgment, *Sweeney v. Hooten, et al.*, No. 93-9889 (Sept. 14, 1993)).

settle, and the court dismissed the case.[195] One month later, on March 8, 1994, El Paso County issued Sweeney a check for $13,000.[196]

### 3.    The False Testimony about Paying Restitution

Not only did Sweeney lie about whether he would seek the reward, but he testified falsely when he said that he would use the money to pay the restitution he owed on his burglary conviction. After the defense had cross-examined Sweeney about his interest in the reward, ADA Morgan, on re-direct, asked Sweeney what he planned to do with the reward money if he received it:

> To make this whole thing simple, I have contacted the district attorney's office in the county where I was convicted. In my conviction, I stole some property from a boat company and some checks and I cashed those checks. And at my trial, it was
> determined that I should pay back $8,000 in restitution. And I have contacted the district attorney's office in my county and asked them if Mr. Wood is convicted, if the reward is given, that that money be given to the district attorney's office in that county to cover the restitution to the crime victims where I was convicted.[197]

On re-cross, Sweeney again testified that he owed $8,000 in restitution:

Q.    You owe $8,000 to the State of Texas because you stole $8,000 a number of years ago?

A.    Not to the state of Texas. I owe it to a business owner.

Q.    It's the restitution?

A.    Yes.

Q.    That was part of your punishment is that you make restitution?

A.    Yes, it is.

---

[195] Ex. 38 (Order of Dismissal, *Sweeney, v. Hooten, et al.*, No. 93-9889 (Feb. 8, 1994)).

[196] Ex. 39 (Report of El Paso County Auditor (July 28, 2011)).

[197] 65.RR.7082.

> . . . .
>
> Q.     You owe the money?
>
> A.     Yes, I do.[198]

Sweeney's judgment of conviction for burglary in Gregg County shows that Sweeney owed no restitution.[199]

| | | | |
|---|---|---|---|
| Date Sentence Imposed | : May 13, 1987 | Costs: | |
| Punishment and Place of Confinement: | Sixty-nine (69) Years in T.D.C. | Date to Commence: | May 13, 1987 |
| Time Credited | : 131 days served. | Total Amount of Restitution: | None |
| Concurrent Unless Otherwise Specified. | | | |

### F.     The State made an undisclosed deal to recommend commutation of sentence for James Carl Sweeney because of the material role he played in the conviction of David Wood.

For his testimony against David Wood, James Carl Sweeny was awarded $13,000 *and* released on parole after serving only seven years on a 69-year sentence for burglary.[200] Classified as an habitual criminal, Sweeney was nevertheless released 34 years before the minimum expiration date of his sentence.[201] The State made a deal with Sweeney to recommend early release on parole for assisting them in securing a conviction and death sentence against David Wood. Sweeney denied that the State had made any deal with him in exchange for his testimony.[202] The State never disclosed this deal to the defense.

---

[198] 65.RR.7083–84.

[199] Judgment, *State v. Sweeney*, Case No. 015915-B (May 28, 1987).

[200] Ex. 40 (TDCJ Public Information Disclosure Sheet for James Carl Sweeney).

[201] *Id.*

[202] 65.RR.7032.

In June 1992, four months before he testified at David Wood's trial, Sweeney wrote to Gregg County District Attorney David Brabham.[203] (Sweeney had been convicted in Gregg County for the burglary that resulted in his 69-year sentence.) Sweeney asked DA Brabham to make a recommendation to the Parole Board for a commutation of his sentence to 50 years.[204] ADA Debra Morgan had recently informed Sweeney that DA Brabham had "somewhat placed [his] request in abeyance until after the Wood trial."[205]

After writing to DA Brabham, but still three months before testifying at David Wood's trial, Sweeney wrote to El Paso County DA Steve Simmons.[206] Sweeney stated that he wanted to ask DA Simmons directly "for some considerations and hopefully some assistance."[207] Sweeney then set out in detail the difficulties he anticipated he would experience in the future.[208] Sweeney wrote that:

- He had been placed in solitary confinement after TDCJ officials received written threats on his life.

- He was confined to segregation status "after marijuana was planted under [his] bunk."

---

[203] *See* Ex. 41 at 3 (Sweeney's letter to El Paso County DA Steve Simmons (Aug. 2, 1992)). Sweeney mentioned to DA Simmons that he had written to DA Brabham on June 12, 1992. *Id.* at 3. Sweeney enclosed a copy of the letter he had written to DA Brabham. *Id.* David Wood does not have a copy of Sweeney's letter to DA Brabham.

[204] *Id.* at 3.

[205] *Id.*

[206] *Id.* at 1. In his letter to DA Simmons, Sweeney wrote that he had received a letter from ADA Debra Morgan on July 30, 1992, informing him that the trial had been moved to Dallas and that it would begin in September. *Id.* at 1. Sweeney also stated that Morgan had been "exceptionally thoughtful and courteous with keeping me informed of the case and in responding to my letters in the past." *Id.* David Wood does not have copies of any of the correspondence with ADA Morgan that Sweeney mentioned in the letter.

[207] *Id.* at 1.

[208] *Id.* at 1–3.

- He had been directly threatened by other inmates for being a "snitch."

- He was denied an advancement in his classification status because of the marijuana incident.

- His wife and his parents were "greatly concerned" for his welfare.

- He would be unable to purchase necessities when bench-warranted to Dallas for the trial because he could not transfer his money to the jail there.

- He would need to be placed in protective custody after the trial.[209]

Noting that "the effects of the [David Wood] case ... have been more punitive than the ordinary effects expected of incarceration," Sweeney wrote, "I am no longer a witness for the State, I am a victim."[210] After informing DA Simmons that he had asked DA Brabham to recommend that the Parole Board commute his sentence, Sweeney wrote that he understood "that [Simmons's] office cannot become involved in the matter of [his] request for a time cut without possibly creating a defensive argument of influential testimony."[211] Sweeney then suggested a wink-and-a- nod course of action that Simmons could take to alleviate the hardships he had to endure for his testifying for the State:

> I think Mr. Brabham has misunderstood my request in some way or an-other. I would therefore like to ask your office to contact Mr. Brabham and maybe assure him that my request for a sentence commutation to 50 years is *totally unrelated to Mr. Wood's case or has been requested for any reason associated with Mr. Wood*. Possibly, I made a mistake in even mentioning my participation with the Wood trial when I wrote Mr.

---

[209] *Id.*

[210] *Id.* at 2.

[211] *Id.* at 3.

Brabham. At any rate Mr. Simmons, I am practically at my wits end. I simply want to do my time and return to my family at the earliest possible date.[212]

After serving only seven years of his 69-year sentence, Sweeney was released on parole on February 25, 1994.[213] The minimum expiration date of his sentence was January 30, 2028.[214] He violated the terms of his parole four years later when he was convicted of misdemeanor theft.[215] His parole was revoked and he returned to prison in November 1998.[216] He served only nine months before being released on parole in August 1999.[217] He died less than five months later.



TEXAS DEPARTMENT OF CRIMINAL JUSTICE
Institutional Division

455305          001          11/9/1998          002
SWEENEY, JAMES CARL JR

## G. David Wood was under police surveillance when two of the murder victims disappeared.

For an entire week in August 1987, before the first bodies were discovered in the desert, the EPPD Tactical Unit had David Wood under surveillance as the prime

---

[212] Ex. 41 at 4 (Sweeney's letter to El Paso County DA Steve Simmons (Aug. 2, 1992)) (emphasis added).

[213] Ex. 40 (TDCJ Public Information Disclosure Sheet for James Carl Sweeney).

[214] *Id.*

[215] Ex. 42 (Texas Court Report for James Carl Sweeney).

[216] Ex. 40 (TDCJ Public Information Disclosure Sheet for James Carl Sweeney).

[217] *Id.*

suspect in the disappearance of the teenage girls and young women. The Tactical Unit drafted a series of memos detailing its surveillance of David Wood.[218] The memos establish that David Wood was under police surveillance when two of the victims, Angelica Frausto and Rosa Maria Casio, disappeared. The Tactical Unit memos make no mention of seeing David Wood with Angelica Frausto or Rosa Maria Casio. The Tactical Unit conducted their surveillance before Angelica Frausto or Rosa Maria Casio were reported missing. The State never disclosed these memos to David Wood.[219]

Believing David Wood "might be responsible for several females in the N[orth] E[ast] Area that are reported missing," Captain Massey of Crimes Against Persons (CAP) assigned members of the Tactical Unit to follow him.[220] From two to four officers followed David Wood for dozens of hours over the course of seven consecutive days, from Saturday, August 8, until Friday, August 14, 1987.[221] The Tactical Unit presented the surveillance memos to the CAP Homicide Division on September 4, 1987, the same day the first two bodies were discovered in the desert.

The police did not yet know that one of the bodies would later be identified as Rosa Maria Casio. According to the evidence the prosecution presented at trial, she

---

[218] Ex. 43 (Tactical Unit Surveillance Memos).

[219] Ex. 44 at 1 (Declaration of Dolph Quijano, Jr. (Feb. 12, 2025)).

[220] *Id.* at 2. David Wood came to the attention of the homicide detectives investigating the disappearances in July 1987, when he was wrongfully identified by Brenda Alvey as her assailant. *See* Part I-C(2), *supra*. On July 22, 1987, Det. Curtis Flynn interrogated David Wood about the disappearances. The police videotaped this interrogation. The State provided David Wood's attorney in the sexual assault trial an opportunity to view this videotape. JBKCR.63. David Wood has not been able to view or obtain a copy of this videotape.

[221] *Id.* at 3. In the Tactical Unit memo dated August 14, 1987, Sgt. Armando Nava, Jr., wrote that: "All information obtained will be turned over to the night squad that will take over at shift change, August 16, 1987." *Id.* The State has never disclosed the memos detailing the Tactical Unit's continued surveillance of David Wood after August 14, 1987.

was last seen on the night of August 12, 1987. The Tactical Unit had David Wood under surveillance that same night. The Tactical Unit reported that David Wood's red Harley Davidson motorcycle remained parked the entire time on the sidewalk under a canvas at 2215 Montana Street.[222] The Tactical Unit officers do not mention seeing David Wood's beige Nissan pickup truck.[223] Rosa Maria Casio's family did not report her missing until August 21, 1987, after the Tactical Unit drafted the memos.[224]

Angelica Frausto, the second victim to disappear the same week David Wood was under surveillance, was not reported missing until September 6, 1987, after the Tactical Unit drafted the memos.[225] Her body was not discovered until November 3, 1987. Denise Frausto Kramer, Angelica Frausto's sister, testified that she last saw Angelica in the afternoon, before dark, on Saturday, August 8, 1987.[226] (Sunset took place at 7:56 p.m. in El Paso on August 8, 1987.[227]) Despite tailing David Wood from 7:00 p.m. on August 8, 1987, until 12:10 a.m. on August 9, 1987, the Tactical Unit officers did not report seeing David Wood in the company of Angelica Frausto.[228]

Besides proving that David Wood was under police surveillance on the same days that Rosa Maria Casio and Angelica Frausto were last seen, the memos

---

[222] *Id.* at 3.

[223] *Id.* at 4.

[224] 62.RR.6439–40, 6456.

[225] 61.RR.6346.

[226] 61.RR.6350–51.

[227] *See* https://weatherspark.com/h/d/3268/1987/8/8/Historical-Weather-on-Saturday-August-8-1987-in-El-Paso-Texas-United-States#Figures-SolarDay (last viewed Dec. 28, 2024).

[228] Ex. 43 at 3 (Tactical Unit Surveillance Memos).

corroborate evidence showing that David Wood's beige Nissan pickup truck was out of commission the entire month of August. The Tactical Unit did not report seeing the beige Nissan pickup truck the entire week David Wood was under surveillance.[229]

**H.     David Wood's beige Nissan pickup truck—an essential element of his alleged *modus operandi*—sat in an auto salvage yard the entire month of August 1987, when three victims disappeared.**

The prosecution founded its "same scheme or course of conduct" case against David Wood, in large part, on his use of a beige Nissan pickup truck to carry out the abductions and assaults of his victims, and dispose of their bodies in the desert. Jail-house snitch Randy Wells testified that David Wood "always" used the "little brown pickup" when he abducted his victims.[230]

---

[229] *Id.* at 4.

[230] 65.RR.6968.



**David Wood's beige Nissan pickup truck**[231]

Although Wells testified that David Wood "always" used the "little brown pickup" to carry out his crimes, David Wood could not have used the pickup truck during the month of August 1987. The truck was badly damaged in a traffic accident on July 27, 1987, and taken to an auto salvage yard where it remained until early September 1987. During that time, three victims disappeared—Angelica Frausto (August 8); Rosa Maria Casio (August 12); and Dawn Smith (August 28).

---

[231] Undersigned counsel apologizes for the poor quality of the photograph obtained from the District Attorney's files. The State refused to allow counsel to make a laser-colored copy of the original photograph in their possession.

The Desert Murders Task Force conducted an initial investigation and confirmed that the pickup truck had, indeed, been in an accident on July 27, 1987.

### 1.    The Traffic Accident

On September 4, 1987, the bodies of Karen Baker and Rosa Maria Casio were discovered in the desert. Less than three weeks later, on September 22, Judith Brown Kelling—a confidential informant, heroin addict, and sex worker with a lengthy criminal record who was on probation—gave her first statement to the police.[232] Kelling said that she was "not really sure of the date" the assault occurred.[233] She believed it had taken place "about two months ago ... around the later days of July or the early days of August."[234] Unknown to the Task Force detectives at the time they took Kelling's statement, the pickup truck had collided with another car in a traffic accident on July 27, 1987.[235] David Wood's brother, Randy, was driving the truck when the accident occurred.[236] The pickup truck was taken to an auto salvage yard shortly after the accident.

### 2.    The Task Force Investigation

Not until nearly two months after Kelling first reported the assault did the Task Force discover that the traffic accident had caused serious damage to the pickup truck, possibly rendering it inoperable.

---

[232] Ex. 45 at 1 (Statement of Judith Brown Kelling (Sept. 22, 1987)).

[233] *Id.*

[234] *Id.*

[235] Ex. 46 (Accident Report (July 27, 1987)).

[236] *Id.*

## Suspect's truck might have been in shop during alleged assault

**By Leticia Zamarripa**
El Paso Herald-Post      NOV 17 1987

A truck reportedly driven by an alleged rapist may have been inoperable and in a body shop when the sexual assault occurred, the Herald-Post has learned.

A beige pickup often driven by David Wood, a man police consider a suspect in the murders of five women whose bodies were uncovered in the Northeast desert, was wrecked July 27 by his brother.

It was towed to Auto Parts Unlimited that day and was not removed until late August or early September, said the body shop owner.

Wood, 30, is in County Jail on charges of sexual assault and aggravated kidnapping.

On Sept. 22, a woman told police that Wood picked her up in a beige pickup, drove her to a Northeast desert area and assaulted her. She said she wasn't sure of the date but that the assault occurred between July 26 and Aug. 7.

■ **SEE TRUCK** / BACK OF SECTION

**TRUCK** / FROM PAGE A-1

Randy Allen Wood, 25, the suspect's brother, was driving the truck July 27 at the time of the accident. The truck is registered to Leo Wood, 54, father of Randy and David.

Lt. Paul Saucedo of Crimes Against Persons neither confirmed nor denied whether detectives have looked into Wood's truck being involved in an accident.

According to a police report filed by patrol Officer Bonifacio Sanchez, Randy Wood was driving west in the parking lane in the 1500 block of Montana Avenue when he tried to merge into a traffic lane and struck a 1986 blue Chevrolet truck.

After the accident, the damaged truck was towed to Auto Parts Unlimited, said the body shop owner. He asked that his name not be printed.

"It sat out here four to five weeks after it was towed in. It didn't go anywhere," he said Monday.

By the time David Wood stood trial for the sexual assault of Kelling, the State had narrowed down the date of the assault to a single day—July 26, 1987, the day *before* the traffic accident.

### a.    Lloyd Sowles

On November 20, 1987, Task Force Officer Ben Ayala interviewed Lloyd Sowles, the owner of Auto Parts Unlimited, an auto repair shop and salvage yard.[237] Lloyd Sowles explained that the pickup truck was delivered to his salvage yard on the day of the accident, to be stored there until the registered owner, Leo Wood (David Wood's father), returned from vacation.[238] Lloyd Sowles himself left for vacation on

---

[237] Ex. 47 at 1 (Statement of Lloyd Sowles (Nov. 20, 1987)).

[238] *Id.* at 1–2.

August 27 and did not return until September 14, so he did not know when the pickup truck was removed from his yard, although it would have had to have been after August 27.[239]

### b.   Luz Elena Gonzalez

On the same day that Officer Ayala took Lloyd Sowles's statement, Task Force Det. John Guerrero obtained a statement from Luz Elena Gonzalez, an employee at Auto Parts Unlimited.[240] Gonzalez said that the pickup truck had to be towed to the shop because it could not be driven.[241] She went on vacation and, when she returned on September 14, the truck was no longer in the yard.[242] Gonzalez did not know when the pickup truck was taken out of the yard.[243] Gonzalez expressly stated that she "ha[d] not lied to the police" and that she was not "covering up" for David Wood or Lloyd Sowles.[244]

### c.   John Mullaney

On November 27, 1987, David Wood's parole officer, John Mullaney, gave a statement to the police about the pickup truck.[245] Mullaney said that, on September 9, 1987, he visited David Wood at his father's home.[246] Mullaney saw David Wood in the driveway next to his pickup truck, which had gray primer on the left front quarter

---

[239] *Id.* at 2.

[240] Ex. 48 (Statement of Luz Elena Gonzalez (Nov. 20, 1987)).

[241] *Id.*

[242] *Id.*

[243] *Id.*

[244] *Id.*

[245] Ex. 49 (Statement of John Mullaney (Nov. 27, 1987)).

[246] *Id.*

panel.[247] Sal Martinez, who later became an alternative suspect, was working underneath the truck.[248] Mullaney mentioned to the police that he already knew from speaking with Sgt. Gomez, head of the Task Force, that the police suspected David Wood of the desert murders.[249]

### 3.    The Parole Revocation Hearing

On December 10, 1987, David Wood's girlfriend, Joanne (Joey) Blaich, testified at his parole revocation hearing that the pickup truck was badly damaged in an accident on July 27, 1987, and could not be driven.[250] Eugene Sowles testified that, on July 27, 1987, the truck was driven to a garage where he worked.[251]

### 4.    The Sexual Assault Trial

During the prosecution of David Wood for the sexual assault of Judith Brown Kelling, two witnesses testified that the pickup truck was unavailable during the month of August 1987.

### a.    Detective John Guerrero

Det. John Guerrero, a member of the Desert Murders Task Force, testified that David Wood's beige Nissan pickup truck was in a traffic accident on July 27, 1987, and that it was "totally undrivable" through the month of August.[252]

---

[247] *Id.*

[248] *Id.*; *see* Part III-L, *infra* ("Alternative suspect Sal Martinez gave conflicting statements to the police about knowing the victims and failed a polygraph examination.").

[249] Ex. 49 at 2 (Statement of John Mullaney (Nov. 27, 1987)).

[250] Ex. 50 at 3-D (Parole Revocation Hearing Report (Dec. 16, 1987)). The Parole Revocation Hearing Report is missing page 3-B. David Wood has not been able to view or obtain a copy of the missing page.

[251] *Id.* at 3-E. Eugene Sowles's first name is mistakenly spelled "Jean" Sowles.

[252] 8.JBKRR.249–50.

### b.    Leo Wood

David Wood's father, Leo, testified that the pickup truck remained in the auto salvage yard for six weeks after the accident on July 27, 1987.[253] Leo Wood stated that he retrieved the pickup truck with his son David from Auto Parts Unlimited on September 5, 1987.[254] Leo Wood testified that the truck was in "very bad" condition when they drove it home from the salvage yard.[255] Leo and David Wood had to attach one end of a chain to the front end of the truck and attach the other end to a forklift to pull the fender clear of the front tire.[256]

### 5.    The Tactical Unit's Surveillance of David Wood

EPPD's Tactical Unit unwittingly corroborated the evidence that the pickup truck remained at Auto Parts Unlimited for some time after the accident. The Tactical Unit officers who trailed David Wood for seven straight days from August 7–14, 1987, never mentioned spotting the Nissan pickup truck or listing it as one of the vehicles parked at any of the locations where David Wood was staying during that time.[257]

### I.    Three witnesses saw Ivy Williams after the date the State said she was last seen with David Wood.

The discovery of Ivy Williams's body in March 1988 presented the police with a problem: No one had reported her missing. The police had to retroactively determine

---

[253] 8.JBKRR.267.

[254] 8.JBKRR.267, 276.

[255] 8.JBKRR.276.

[256] 8.JBKRR.277.

[257] Ex. 43 (Tactical Unit Memos). *See* Part III-G, *supra*.

the date of her disappearance, but reconstructing her movements posed a challenge because of her peripatetic lifestyle. The Task Force noted that:

> Tracing Ivy Susanna Williams has proved very difficult due to inaccurate or non-existent work records kept by Williams employers at topless bars. Attempts to locate records of Williams at motels she was known to frequent show no record of her under her proper name or numerous aliases.[258]

The indictment alleged that David Wood killed Ivy Williams on or about May 30, 1987.[259] At trial, the State presented evidence from Jennifer Prefountain, who testified that she saw Ivy Williams leaving a bar in the company of David Wood around Memorial Day in 1987.[260] However, the State knew that three other witnesses had seen Ivy Williams after that time. Steve Dahl had seen Williams after June 15 and prior to July 4, 1987. Veronica Gatzka told the police she had seen Ivy Williams in September or October 1987, as did Carol Eason.

### 1. Steve Dahl

The police found Steve Dahl's name and address on a piece of paper in the wallet recovered from Ivy Williams's body.[261] Task Force Det. Giron learned that Dahl had worked as the manager of Wizzard's Lounge, a topless dancing establishment in El Paso.[262] Det. Giron contacted John Keaney, the former owner of Wizzard's, who

---

[258] Ex. 53 at 1–2 (Police Presentation Supplement (June 17, 1988)).

[259] CR.2–3.

[260] 60.RR.6170–72, 6183.

[261] Ex. 54 at 2 (Supplementary Police Report (Mar. 17, 1988)).

[262] Ex. 55 (Supplementary Police Report (Apr. 13, 1988)).

told him that Dahl had moved to Florida.[263] Keaney also informed Det. Giron that he had sold Wizzard's Lounge on June 15, 1987.[264]

Det. Giron spoke with Steve Dahl by telephone on April 14, 1988.[265] Det. Giron made arrangements to fly Dahl to El Paso so that the Task Force could conduct a more complete interview in person.[266] On April 30, 1988, Dahl arrived in El Paso and was interviewed at the CAP office.[267] Dahl said that he was the manager of Wizzard's from July 1986 to July 1987.[268] He usually worked seven days a week, opening the bar at 10:00 a.m. and closing it at 2:00 a.m.[269]

Steve Dahl met Ivy Williams in 1982, when she was a dancer at a club.[270] Dahl last saw Williams at John Keaney's house late in the evening during the summer of 1987.[271] Dahl knew the date was after Keaney had sold Wizzard's Lounge (June 15, 1987) but before the Fourth of July.[272] Dahl was staying at Keaney's house while Keaney was in New York.[273] Ivy Williams had arrived alone in a taxi cab.[274] She stayed at the house for about an hour and then left, walking to the store to buy some

---

[263] *Id.*

[264] *Id.*

[265] Ex. 56 (Supplementary Police Report (Apr. 14, 1988)).

[266] Ex. 57 (Supplementary Police Report (Apr. 30, 1988)).

[267] *Id.*

[268] Ex. 58 at 1 (Statement of Steve Dahl (Apr. 30, 1988)).

[269] *Id.*

[270] *Id.* at 2.

[271] *Id.*

[272] *Id.*

[273] *Id.*

[274] *Id.*

cigarettes.[275] Ivy Williams never returned to the house.[276] Dahl did not find her failure to return unusual.[277]

Dahl did not know whether David Wood knew Ivy Williams. Dahl had never seen the two of them together.[278]

The Task Force's summary of Dahl's statement is matter-of-fact: "Dahl provides the last known time period that Williams is seen alive."[279] Nevertheless, the State argued to the contrary in closing and even excoriated the defense for failing to deliver on their promise in opening to present evidence that Ivy Williams was seen after May 30, 1987:

> [T]he last time Ivy Williams was seen, she was with Mr. David Leonard Wood. Now, there have been in argument indications that someone may be brought in here that would tell you they saw her after that date. But no one did, because no one ever saw Ivy again.
>                                   . . . .
> But if you will recall, defense counsel made many promises during opening argument as to what the evidence would show, none of which came true in this case. One of which mentioned by my co-counsel that someone else had seen Ivy Williams on July 4th of 1987. That's simply not so.[280]

---

[275] *Id.*

[276] *Id.*

[277] *Id.*

[278] *Id.*

[279] Ex. 53 (Police Presentation Supplement (June 17, 1988)). Steve Dahl was killed in a motorcycle accident in Florida on January 27, 1991. Ex. 59 (Supplemental Offense Report (Feb. 22, 1991)). But Wood was indicted months before Dahl's death. *See* CR.2–3 (Indictment (July 13, 1990)).

[280] 69.RR.7435, 7534. The defense told the jury in their opening statement that:

> [E]ven though the State tells you [Ivy Wiiliams] was seen or she disappeared sometime on May 30th, I believe we are going to be able to bring you testimony that that's not when she disappeared. That even though in the Indictment they alleged that that is when she disappeared, that isn't it. She was seen alive on July the 4th.

57.RR.5493.

## 2.     Veronica Gatzka

Veronica Gatzka's driver's license was discovered at the Ivy Williams crime scene.[281] Gatzka met Det. Marquez at the CAP office two days after Williams's body was found.[282] Gatzka said that her driver's license had been stolen from The New Yorker Club when she applied for a job there in September or October of 1987.[283] She had changed into dancer clothes at the club and then placed her personal belongings and street clothes in a locker that did not have a lock on it.[284] Det. Marquez showed Gatzka a photograph of Ivy Williams, whom Gatzka recognized and knew by the name "Silver."[285] Gatzka said she realized two weeks after the audition that her driver's license was missing, but she did not report it to the police.[286] She knew her license was about to expire (on her birthday in early October), so she renewed it around that time.[287] The day Gatzka saw Ivy Williams was the "first and last time" she saw her.[288]

After Gatzka signed her statement, something unusual occurred: Gatzka signed a one-sentence addendum that contradicted her earlier statement. The addendum appears immediately below her signature following her first statement.[289] The

---

[281] Ex. 60 at 1 (Statement of Veronica Gatzka (Mar. 16, 1988)).

[282] *Id.*

[283] *Id.*

[284] *Id.*

[285] *Id.*

[286] *Id.*

[287] *Id.*

[288] *Id.*

[289] *Id.*

entirety of the addendum reads: "I wish to make a correction and state that my drivers license was missing sometime in the month of May 1987, because it was after Jeffrey was arrested, in April of 1987."[290]



The one-sentence addendum appears to render Gatzka's concrete memory of losing her license during an audition at The New Yorker Club a mistake. Only two days after discovering Ivy Williams's body, the Task Force had not yet determined the date she disappeared. That would take another few months.[291] Det. Marquez returned to Gatzka once the Task Force settled on late May 1987 as Williams's disappearance date. He convinced Gatzka to abandon her earlier statement. Det. Marquez realized that Gatzka's earlier statement undermined the narrative the Task Force had adopted: that Ivy Williams was last seen in the company of David Wood in late May 1987.

---

[290] *Id.* at 2. "Jeffrey" refers to Jeffrey Wilson, Gatzka's boyfriend. *Id.*

[291] Ex. 53 at 1–2 (Police Presentation Supplement (June 17, 1988)).

### 3.      Carol Eason

In September or October 1987, Carol Eason saw Ivy Williams get into a white pickup truck driven by a white male around 28 or 30 years old with dark brown "wavey" hair.[292]

## J.      Judith Brown Kelling said David Wood did not sexually assault her.[293]

Judith Brown Kelling told Ramona Dismukes that she had been sexually assaulted by Michael Plyler, not David Wood, whom she had never seen before.[294] Kelling said Plyler went by the nickname "Skeeter," a name that Desiree Wheatley's friends said was the name David Wood introduced himself as.[295] In exchange for testifying that David Wood assaulted her, Kelling would receive no jail time on her pending felony criminal charges.[296] The Desert Murders Task Force files include a folder labeled "Michael D. Plyler."[297] The folder contains photographs of a beige Nissan pickup truck.[298] The Task Force also received a tip from a confidential informant likely describing about Plyler:

---

[292] Ex. 61 (Carol Eason Police Report (Sept. 2, 1988)).

[293] David Wood will soon be filing in the convicting court an initial application for writ of habeas corpus under Art. 11.07, challenging his conviction and sentence for the sexual assault of Kelling.

[294] Ex. 62 at 2 (Declaration of Ramona Dismukes (Jan. 24, 2025)).

[295] *Id.* David Wood has never been known by the nickname "Skeeter." 66.RR.7214;.

[296] Ex. 62 at 2 (Declaration of Ramona Dismukes (Jan. 24, 2025)).

[297] Ex. 63 (Michael D. Plyler, Task Force folder).

[298] *Id.* The Task Force folder also contains photographs of a Harley Davidson motorcycle that Plyler drove.

```
Source / Name:  Crimestoppers #87/591

Information Received:

CI states he knows a subject by the name of "Skeeter" who resembles David Wood
and might be the person whom police are looking for. Subject used to frequent
10341 Alcan and drives a beige in color Nissan or Datsun pick-up truck.
```

### 1.   "David Wood had to be taken off the streets."[299]

In 1987, Richard Jewkes, who served as First Assistant to DA Steve Simmons,

became chief counsel to the Desert Murders Task Force, serving as a liaison between

the Police Department and the District Attorney's Office. According to Jewkes, the

police and the District Attorney faced an enormous amount of public pressure and

political heat because of the unsolved desert murders.[300] The Task Force decided that

David Wood was the perpetrator, and "[a] decision was made to take him off the

streets."[301]

Det. John Guerrero of the Task Force had an informant, Judith Brown Kelling,

who claimed that she was taken to the desert, sexually assaulted, and about to be

strangled when she escaped.[302] Det. Guerrero had been sitting on the information

because Kelling was a heroin addict and a prostitute, and she had a criminal rec-

ord.[303]

---

[299] Ex. 64 at 1 (Declaration of Richard Jewkes (Oct. 31, 2024)).

[300] *Id.*

[301] *Id.*

[302] *Id.* at 2.

[303] *Id.* At the pretrial suppression hearing in the sexual assault case, Det. Guerrero testified that he did not obtain an arrest warrant for David Wood until October 23, 1987, even though he had enough information to get a warrant on September 22, 1987, the day Kelling gave her first statement to the police. 3.JBKRR.214. Guerrero waited over a month because, he claimed, "the investigation was not

At a meeting with Police Chief John Scagno, Lt. Paul Saucedo, Commander of the CAP Division, and the detectives on the Desert Murders Task Force, they discussed what they could do to get David Wood off the streets.[304] Lt. Saucedo ordered Det. Guerrero to tell DA Simmons about the Kelling case.[305] DA Simmons eventually called Jewkes and asked him to speak directly with Det. Guerrero about Kelling.[306]

After ADA Jewkes spoke with Det. Guerrero, Jewkes warned DA Simmons that he (Jewkes) would need to meet face-to-face with Kelling, because "going before a judge and jury and vouching for her credibility would be a pretty big climb."[307] Jewkes admitted that he was "on thin ice because of her criminal history and heroin addiction."[308] When Jewkes asked Kelling to show him exactly where the assault had taken place in the desert, Kelling insisted that Det. Guerrero accompany them.[309] Det. Guerrero drove.[310]

ADA Jewkes characterized Judith Brown Kelling as "one of the more unusual witnesses [he'd] had in [his] career."[311] He described her as "wild and flaky," and explained that he had to assign a female police officer to "babysit" Kelling in a hotel

---

concluded at that time." 3.JBKRR.214. Det. Guerrero conceded on cross-examination that he did not develop any new information after September 22, 1987. 3.JBKRR.217–20.

[304] Ex. 64 at 2 (Declaration of Richard Jewkes (Oct. 31, 2024)).

[305] *Id.*

[306] *Id.*

[307] *Id.*

[308] *Id.*

[309] *Id.* at 2–3.

[310] *Id.*

[311] *Id.* at 3.

room for several days before the trial.[312] Despite the police presence, Kelling was found "mooning" people on the street from her upper-story hotel room.[313]

Jewkes conceded that the odds of convicting David Wood were no more than "a coin flip," because the incriminating evidence was "pretty slim," and Kelling had serious credibility problems.[314] Adding to the uncertainty, according to Jewkes, Kelling may have been "under the effects of her heroin addiction or in withdrawal during her testimony."[315]

### 2.    Kelling's Admission to Ramona Dismukes

Ramona Dismukes created a missing person's flyer for her sister-in-law, Cheryl Vasquez, who disappeared on June 28, 1987. Dismukes distributed them in the area where Cheryl lived and was last seen. Dismukes had heard rumors that a girl who looked like Cheryl had been seen on Dyer Street near the motorcycle bars and topless clubs, and "where the girls used to trick."[316]

Dismukes went down to Dyer Street and met Kelling.[317] When Dismukes showed Kelling a photograph of David Wood, Kelling said she had never seen him before.[318] Kelling told Dismukes that the person who had taken her out to the desert

---

[312] *Id.*

[313] *Id.*

[314] *Id.*

[315] *Id.*

[316] Ex. 62 at 2 (Declaration of Ramona Dismukes (Jan. 24, 2025)).

[317] *Id.*

[318] *Id.*

and raped her was Michael Plyler.[319] She knew him by his nickname, "Skeeter."[320] Kelling said that the police had offered to drop criminal charges against her in exchange for testifying that David Wood had raped her.[321] Kelling told Dismukes that she did not even know who David Wood was until she talked to the police.[322]

Kelling told Dismukes where Plyler lived.[323] When Dismukes and her mother went to his apartment, they saw that he had a beige Nissan pickup truck nearly identical to the one David Wood owned.[324] Plyler's truck even had similar striping on the sides.[325]

### 3.    The Pickup Truck

The Task Force folder on Plyler contains five photographs of his beige Nissan pickup truck, which looks nearly identical to David Wood's pickup truck, down to the horizontal stripes on the sides.[326]

---

[319] *Id.*

[320] *Id.*

[321] *Id.*

[322] *Id.*

[323] *Id.*

[324] *Id.*

[325] *Id.*

[326] Ex. 63 (Michael D. Plyler, Task Force folder). Undersigned counsel apologizes for the poor quality of the photographs obtained from the District Attorney's files. The State refused to allow counsel to make laser-colored copies of the original photographs in their possession.





| **Michael Plyler's truck** | **David Wood's truck** |

### 4.    The Description of the Assailant

Kelling described her assailant as a white male between 25 and 30 years old, with shoulder length "blondish" hair.[327] In July 1987, Plyler was 28 years old; David Wood was 30.[328] Kelling testified that the man had "a lot of tattoos on his arms."[329] Plyler, like David Wood, has tattoos on both forearms.[330] Plyler is five feet, eight

---

[327] Ex. 45 at 1 (Statement of Judith Brown Kelling (Sept. 22, 1987)). Undersigned counsel apologizes for the poor quality of the photographs obtained from the District Attorney's files. The State refused to allow counsel to make laser-colored copies of the original photographs in their possession.

[328] Ex. 63 (Michael Plyler, Task Force folder).

[329] 64.RR.6806; *see* 8.JBKRR.12.

[330] Ex. 63 (Michael Plyler, Task Force folder); Ex. 65 (Michael Plyler, El Paso County Booking Docket (Dec. 20, 1986)).

inches tall.[331] David Wood is six feet, one-half inch tall.[332] Kelling testified that her assailant was five feet, seven inches tall.[333]



Michael D. Plyler                    David Wood

[331] *Id.*

[332] 8.JBKRR.261.

[333] 8.JBKRR.68–69.



**Michael D. Plyler**

5.      **The Alibi**

Kelling testified that David Wood sexually assaulted her in the early evening of July 26, 1987.[334] But testimony from three persons establishes an alibi for David Wood over the weekend of July 25–26, 1987.[335] His father Leo Wood, his sister Debbie Galvan, and his girlfriend Joey Blaich could recall those dates specifically because something memorable happened on Monday, July 27, 1987: David Wood's Nissan

---

[334] 8.JBKRR.9; 64.RR.6804.

[335] When Kelling first spoke with the police on September 22, 1987, she said that the assault occurred "around the later days of July or the early days of August." Ex. 45 at 1 (Statement of Judith Brown Kelling (Sept. 22, 1987)). The evidence presented at the sexual assault trial revealed that the assault, as alleged by Kelling and her sister Carmen Brown, could *only* have taken place on July 26, 1987. *See* Art. 11.07 application, *State v. Wood*, No. 51,687-346 (to be filed).

pickup truck was in a traffic accident.[336] His brother Randy, who was driving the truck at the time, was arrested at the scene for driving with a suspended license and for an outstanding warrant for a probation violation. Joey Blaich was a passenger.[337] David Wood arrived at the scene soon afterward, because the accident occurred directly in front of Blaich's apartment.

| July | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

**1987**

### a.    Leo Wood

At the sexual assault trial, David Wood's father, Leo, testified that he, his two sons David and Randy, his daughter Debra (Debbie) Galvan and her husband Johnny Galvan, his grandchildren, Sal (Martinez), and David's girlfriend Joey Blaich attended the automobile races on Montana Street on Saturday, July 25, 1987, from

---

[336] *See* Part III-H, *supra* ("David Wood's beige Nissan pickup truck—an essential element of his alleged *modus operandi*—sat in an auto salvage yard the entire month of August 1987, when three victims disappeared.").

[337] *Id.* at 63.

seven o'clock at night until midnight.[338] After the races, in the early morning hours of Sunday, July 26, 1987, they ate a late supper at a truck stop near the I-10 freeway.[339] Leo Wood left the truck stop at six o'clock in the morning on Sunday, July 26, and drove to Houston, where he stayed for two weeks.[340] While he was in Houston, Lloyd Sowles called to tell him that the Nissan pickup truck had been damaged in an accident.[341]

### b.   Debbie Galvan

During the cross-examination of Debbie Galvan at the capital murder trial, the prosecution unintentionally elicited additional (and corroborating) evidence regarding David Wood's whereabouts on the day he allegedly assaulted Judith Brown Kelling. Galvan testified about her family's activities during the weekend immediately preceding the accident:

> On July 26th—actually, it was the 26th was a Saturday.[342] We were going to the flea market the next day. That's the reason why [David Wood] enjoys spending the night at our house. My father [Leo Wood] and David and my other brother [Randy Wood] and Joey [Blaich] and another man and my kids had gone to the races, car races that evening. And then my dad and my stepmother and David went to a truck stop and had coffee, I am told, together and then Joey was there as well. And then they came to my house—it was actually Sunday morning at this point. Okay. We went to the races on Saturday and they came to my house to spend the night on Sunday because we were all going to the flea market to sell things early Sunday morning. So that would have been

---

[338] 8.JBKRR.267–68. Leo Wood is deceased.

[339] 8.JBKRR.268.

[340] 8.JBKRR.273–74.

[341] 8.JBKRR.274–75.

[342] Galvan is mistaken. July 26, 1987, fell on a Sunday. It is clear from the context of Galvan's testimony that she is referring to events that occurred over the weekend, Saturday, July 25, and Sunday, July 26. She does correctly state, a few sentences later, that July 26 was a Sunday.

July 26th that we went to the flea market. So he spent the night with Joey at my house on that evening with my other brother as well.[343]

### c.  Joey Blaich

In December 1987, Joey Blaich testified at David Wood's parole revocation hearing after his arrest for the assault of Kelling.[344] Blaich stated that, on July 25, 1987, she and David Wood went to the racetrack with his family and did not return home until the early morning hours of July 26, 1987.[345] Later that same morning, Blaich and David Wood went to a swap meet with his family.[346] After the swap meet, she and David Wood and his brother Randy went to her apartment.[347] David and Randy Wood slept from four o'clock in the afternoon until ten o'clock at night.[348] Sometime after 10:00 p.m., David and Randy Wood went out to eat.[349] The next day (July 27, 1987), Randy borrowed David Wood's truck and got into an accident.[350]

In her first statement to the police, Judith Brown Kelling said that David Wood picked her up in his truck between 7:00 and 7:30 at night on July 26, 1987.[351] She claimed that the entire offense lasted about an hour and a half.[352] Three people

---

[343] 66.RR.7248.

[344] Ex. 50 at 3-D (Parole Revocation Hearing Report (Dec. 16, 1987)).

[345] *Id.*

[346] *Id.*

[347] *Id.*

[348] *Id.*

[349] *Id.*

[350] *Id.*

[351] Ex. 45 at 1 (Statement of Judith Brown Kelling (Sept. 22, 1987)); *see* 8.JBKRR.9; 64.RR.6853–54, 6864.

[352] 64.RR.6853–54, 6864.

testified about the events of July 25–27, 1987, and provided consistent, corroborating evidence that David Wood could not have sexually assaulted Judith Brown Kelling on the evening of July 26, 1987. He was asleep at Joey Blaich's apartment.

### 6. Kelling's False and Inconsistent Accounts

Judith Brown Kelling gave five accounts of her sexual assault:

- Statement to the police on September 22, 1987.

- Audiotaped interview with the police on November 16, 1987.[353]

- Statement to David Wood's parole officer on November 25, 1987.[354]

- Testimony at David Wood's sexual assault trial on March 15–16, 1988.

- Testimony at David Wood's capital murder trial on October 30, 1992.[355]

In the table below, a comparison of Kelling's various accounts reveals a number of material inconsistencies.

---

[353] Ex. 66 (Transcript of Judith Brown Kelling Interview (Nov. 16, 1987)). The State never disclosed this interview to the defense at either the sexual assault trial or the capital murder trial.

[354] Kelling's November 25, 1987, written statement is identical to her September 22, 1987, written statement, except a different address is listed as Kelling's residence. 8.JBKRR.61.

[355] Kelling actually gave six accounts. However, her testimony at a pretrial suppression hearing on January 17, 1988, involved primarily the procedures the police used with Kelling that resulted in her identification of David Wood as the assailant. *See* 3.JBKRR.111–38.

| Sept. 22 & Nov. 25, 1987 statements | Nov. 16, 1987 taped interview | Mar. 15, 1988 trial testimony | Oct. 30, 1992 trial testimony |
|---|---|---|---|
| This incident occurred about two months ago and I think that it wa11 around the later days of July or the early days of August. I am really not sure of the date. Statement at 1. | This incident occurred around July or August. Transcript at 1. | This incident occurred on or before July 26, 1987. 8.JBKRR.9. Kelling later admits that she does not know what date it occurred. 8.JBKRR.66–67, 82. | This incident occurred in July. 64.RR.6804. |
| He walked with a limp. Statement at 1. | He had a limp. I'm kind of sure it was the left leg he had a limp. Transcript at 10. | Kelling makes no mention of her assailant walking with a limp. | Kelling makes no mention of her assailant walking with a limp. |
| Kelling does not mention shooting heroin on the day of the assault. | Kelling does not mention shooting heroin on the day of the assault. | I injected some heroin about 9:00 a.m. that day. 8.JBKRR.52.[356] | I shot up heroin at 8:00 that morning. 64.RR.6818. |
| We came up on a gate and stopped. He got out and tried to open the gate but was unable. He even kicked the gate. Statement at 1–2. | He went towards some fence. He couldn't get through the fence. He kicked the fence, and he got back in the truck. I stayed in the truck. Transcript at 3. | He pulled up to a fence and he stopped. He got out, went to this fence and tried to open it, and told me to stay in the truck. He couldn't get the fence open so he kicked it and came back to the truck. 8.JBKRR.19. | He drove up to a fence *and forced me to get out.* He couldn't get the fence open. He got mad. He pulled me back into the truck. 64.RR.6808–09. |

---

[356] At the pretrial suppression hearing, Kelling testified that she took heroin at six o'clock in the morning on the day of the sexual assault. 3.JBKRR.131.

| Sept. 22 & Nov. 25, 1987 statements | Nov. 16, 1987 taped interview | Mar. 15, 1988 trial testimony | Oct. 30, 1992 trial testimony |
|---|---|---|---|
| He continued down another dirt road. He stopped and asked me to get out. I didn't want to get out, so he came around, opened the door, and pulled me out. I grabbed the bed of the truck but he pulled me around to the front of the truck and told me to face north. Statement at 2. | He drove down another road. He stopped and he got out of the truck and took a shovel from the back of the pickup. with him. He took me out of the truck, put me in the front of the truck, and made me face north when he was going behind the truck. Transcript at 5. | He turned left eventually and made a U-turn around a bush. He parked by the bush and told me to get out. He pulled me by the shirt. He told me to stand in front of the truck. He got a shovel out of the back of the truck. 8.JBKRR.20–22. | He drove around a lot. He stopped the truck and told me to get out. *He tied me in front of the truck.* He took a blanket out of the bed of the truck. He took the blanket and a shovel behind some bushes and started digging for 10 or 15 minutes. 64.RR.6810–11. |
| He said, "Just remember, you are three and walking free." Statement at 4. | He said, "Just remember, you are three free." Transcript at 14. | He said he heard somebody. He put everything in the truck and left me in the desert naked. He did untie me and took the gag out of my mouth. He said, "You're three and walking free." 8.JBKRR.37. | He heard voices. He threw all my clothes and the blanket in the truck and left me in the desert. He said, *"Always remember, I'm free."* 64.RR.6815. |
| Kelling makes no mention of telling her sister about the assault. | When I got home my sister was there. I told her, "Carmen, this guy took me out into the desert." And I told her what he did to me. Transcript at 9. | The truck driver dropped me off at my apartment. My sister Carmen Brown was there. I told her what happened. 8.JBKRR.40, 43–44. | The truck driver gave me a ride to my apartment. My sister was there and I told her what had happened. 64.RR.6816–17. |

a.   **The Assailant's Parting Words**

Kelling's first four accounts of the assailant's parting words to her as he drove

off, leaving her naked in the desert, are relatively similar. "You are three and walking

92

free" appears to refer to the fact—at least those the police asserted at the time—that Kelling would have been the Desert Killer's third victim. Desiree Wheatly disappeared on June 2, 1987, and Karen Baker disappeared on June 5, 1987. Rosa Maria Casio disappeared on August 12, 1987, after the time span Kelling claimed she was assaulted.

When Kelling gave her first three accounts to the police, Ivy Williams's body had not yet been discovered, nor had she been reported missing. Her body was discovered on March 14, 1988, the day before Kelling testified at David Wood's sexual assault trial. Months later, the Task Force detectives settled on May 30, 1987, as the date Ivy Williams disappeared. Kelling could no longer be the Desert Killer's third victim. She was now the fourth. By the time Kelling testified at David Wood's 1992 capital murder trial, her account of his parting words had changed significantly: "After he had sex with me, he took my clothes and threw them in the back of his truck, blanket and everything, and he told me to [']always remember, I'm free,['] and he got in and he left me out there."[357]

### b.     The Assailant's Limp

In her first three accounts of the assault, Kelling noted that her assailant walked with a limp. Gina Gallegos stated that she saw a leg brace in the assailant's pickup truck and that he kept hitting his right leg "like it was hurting him."[358] In

---

[357] 64.RR.6815.

[358] Ex. 67 at 1 (Statement of Gina Gallegos (Sept. 22, 1987)). At the time David Wood was arrested for assaulting Kelling, he was also arrested for kidnapping Gallegos. The State eventually dismissed the charge. Amber Smith, *Wood's Kidnapping Charge Dropped*, El Paso Times (May 20, 1988). Notably, Kelling thought her assailant was limping on his *left* leg. Ex. 66 at 10 (Transcript of Judith Brown Kelling Interview (Nov. 16, 1987)).

early September 1987, Christine Georges saw David Wood at Barnett Harley Da-

vidson, where she worked.[359] She said he walked with his right leg straight because

he wore a knee brace on it.[360]

In January 1988, the State obtained David Wood's medical records in the pos-

session of orthopedic surgeon Charles Zaltz.[361] These records revealed that Dr. Zaltz

had treated David Wood on August 28, 1987.[362] A few weeks later, Joey Blaich told

the police how David Wood had injured his leg:

> I remember that around the 28th of August, he hurt his leg…. On the
> 28th, we went to the doctor to see about David's leg. His father took us
> to some doctor in an orthopedic clinic on Executive Center drive. I re-
> member that on that night he came in real late, around 3:00 a.m. or so.
> . . . When he came in, I woke up and asked him if he had been outside
> and he told me that he had not, I then told him about the noises that I
> heard and he just jumped up and ran outside to see who it was. He then
> jumped the fence and he fell down kind of hard. I heard the noise and
> went outside to see what had happened. When I got there, he was on the
> ground and he was saying "Oh my leg, my leg." I then helped him up
> and helped him get into the apartment. In the morning, we called his
> dad and he took us to the doctor. The doctor told him that he had some-
> thing wrong with his ligaments or something like that. They gave him a
> white velcro type brace for his leg.[363]

Kelling gave her first three accounts of the sexual assault before the police had

obtained David Wood's medical records or spoken to Blaich about his leg injury. At

first glance, Gallegos and Georges seemed to corroborate Kelling's description about

---

[359] Ex. 68 (Statement of Christine Georges (Sept. 23, 1987)).

[360] *Id.*

[361] Ex. 69 (Police Supplementary Report (Jan. 25, 1988)).

[362] *Id.*

[363] Ex. 70 at 2 (Statement of Joanne Blaich (Feb. 11, 1988)). At the capital murder trial, Blaich testified about this incident. 63.RR.6650–51. The State used Blaich's testimony to argue at closing that David Wood had hurt his leg while assaulting and killing Dawn Smith. 69.RR.7461–62.

her assailant's limp. But Gallegos and Georges claimed to have seen David Wood after August 28, 1987. Kelling's mentioning the limp in her first three accounts and then conspicuously omitting it in her last two accounts (her testimony at the sexual assault trial and the capital murder trial) may be explained by the fact that Kelling and Gallegos gave their first statements to the police on the same day—September 22, 1987. But Gallegos was recounting an event that allegedly occurred only a few days earlier. Kelling was recounting an event that allegedly took place two months earlier, before David Wood injured his leg.

### c.     Tying Kelling to the Pickup Truck

In her first four accounts, Kelling never mentioned that her assailant tied her to the pickup truck. This detail did not emerge until her testimony in the capital murder trial.

The State tried to elicit gruesome testimony of this supposed *modus operandi* from Wells at David Wood's capital murder trial:

> Q.     Did he tell you what he did to the girls once he got them out to the desert area?
>
> A.     Yes, ma'am, he tied them up to his pickup.
>
> . . . .
>
> Q.     Did he tell you what he would do after he had tied them up to his pickup.
>
> A.     He would dig a grave.
>
> Q.     Did he ever indicate to you how he tied them up at the time that he would rape them?
>
> A.     Yes, to his pickup and to a tree. And he would put it to me as he was doing it out—because they messed over him, getting revenge back at the girls. He was doing them pretty bad.

95

Q.     And when would he rape them?

A.     When would he rape them; after he tied them up when he would come back from digging the grave.

Q.     Would they be already tied up to the pickup and the tree at the time that he raped them?

A.     Yes, ma'am.[364]

The State doubled-down in closing on the gruesomeness of David Wood's alleged *modus operandi*:

> [T]he testimony of Mr. Wells and Mr. Sweeney gives us a little bit more of an indication as to this defendant. It corroborates to a large degree his method of operation because Mr. Wells told David (sic) some of what he would do about tying up the girls, about stretching the girls out. And this tying episode is something that Judith Brown Kelly experienced. And it is something that this defendant told Mr. Wells.[365]

### d.     Task Force Concerns about Kelling's Credibility

Kelling testified falsely at the sexual assault trial when she denied talking to the police during the two months that elapsed between the time she made her first statement on September 22, 1987, and the time she gave her second statement on November 25, 1987.[366] On November 16, 1987, the police interviewed Kelling, and the interview was audiotaped.[367] The State never disclosed the existence of this additional interview to David Wood before his sexual assault trial or before his capital murder trial.[368] The suppressed audiotaped interview contains exculpatory

---

[364] 65.RR.6969–70.

[365] 69.RR.7552.

[366] *See* 8.JBKRR.64.

[367] Ex. 66 (Transcript of Judith Brown Kelling Interview (Nov. 16, 1987)).

[368] Ex. 44 at 1 (Declaration of Dolph Quijano, Jr. (Feb. 12, 2025)).

information that highlights the Task Force's concerns about the credibility of both Kelling and her sister, Carmen Brown.

In her first statement to the police, on September 22, 1987, Kelling made no mention of telling Carmen Brown that she had been raped in the desert. By October 30, 1987, Carmen Brown had provided a statement to Task Force Det. John Guerrero, in which she said that Kelling had told her about the assault the same night it happened.[369] However, Carmen Brown said, "I had seen this guy before but I had not gone with him at all."[370] The significance of Carmen's Brown's admission would ultimately result in a significant change in her testimony in an effort to neutralize this troublesome fact.

Det. Guerrero interviewed David Wood on October 27, 1987, days after his arrest.[371] David Wood told Det. Guerrero exactly where he had dropped off a prostitute he had picked up.[372] He denied leaving her in the desert and accurately described the location and the outside of the apartment building where she got out.[373] The residence, of course, was that of Judith Brown Kelling. But the prostitute was Carmen Brown.

By the time Det. Guerrero interviewed Kelling on November 16, 1987, he had uncovered a problematic piece of evidence from his interrogation of David Wood:

---

[369] Ex. 71 (Statement of Carmen Brown (Oct. 30, 1987)).

[370] *Id.*

[371] 8.JBKRR.218–19.

[372] 8.JBKRR.238–39.

[373] 8.JBKRR.242–43.

David Wood knew where Kelling lived, but Kelling claimed he had left her in the desert. In the November 16 interview, Det. Guerrero confronted Kelling about this issue, and Kelling gave a long and convoluted answer:

> [W]hen he'd left me out there and came back in, he offered [Carmen Brown] a ride to go out—come out and do some coke out there. And she says, "No, I'm exhausted." And she would tell him, "Weren't you the guy who—who—" because this is what my sister told me that he had asked her—"Weren't you the guy who had"— she had asked him, "Weren't you the guy who took my sister out to, you know, wherever, out to your friend's or whatever?" You know, I don't know. He—my friend's, I mean. So, he had asked if she had took him out to my friend's and he goes, "Yeah I took her out to somebody." I don't know where he told her he took me. But she—and he tried to ask her to go to the desert with him because he had told her he had coke and she wanted to go way out in towards the Northeast to get it and she says, "No, I'm too exhausted. Just take me home." And he goes, "Well, where do you live?" She goes, "Well, take me up to my sister's." He goes—and so he goes, "Where's your sister living?" And that's when he took her up to my apartment, and that's the only way I could figure out how he knew where I lived. That's the only way.[374]

Carmen Brown's statement to the police statement contradicts Kelling's version that David Wood dropped Brown off at Kelling's home the same evening of the assault. Carmen Brown said she saw David Wood a few hours after Kelling had left with him.[375] Brown spoke with him and was assured her sister was "OK."[376] He asked her "to go with him. I told him no and he left."[377]

At the sexual assault trial, Carmen Brown changed her version significantly to account for David Wood's knowing where Kelling lived. Brown testified that David

---

[374] Ex. 66 at 15 (Transcript of Judith Brown Kelling Interview (Nov. 16, 1987)).

[375] Ex. 71 (Statement of Carmen Brown (Oct. 30, 1987)).

[376] *Id.*

[377] *Id.*

Wood had given her a ride to Kelling's apartment, not the same day, but *days before* Kelling was assaulted.[378] Carmen Brown denied that David Wood had taken her to Kelling's apartment the same night Kelling was raped—in contrast to Kelling's explanation in the November 16 interview with Det. Guerrero.[379]

### 7. Kelling's Undisclosed Deal

On two separate occasions in October 1986, Judith Brown Kelling sold heroin to an undercover police officer.[380] However, she was not indicted or arrested for these offenses for another six months.[381] On August 24, 1987, Kelling pleaded guilty in both cases.[382] She was given a six-year suspended sentenced in each case, to run concurrently, and placed on probation for six years.[383] She testified falsely at David Wood's capital murder trial that she had received no benefits for her testimony at his sexual assault trial.[384]

After Kelling was charged with public lewdness in November 1987, the State moved to revoke her probation.[385] An arrest warrant was issued on January 29, 1988.[386] Nearly two months later, when Kelling testified for the State in David Wood's

---

[378] 8.JBKRR.147–48.

[379] 8.JBKRR.148.

[380] Ex. 72 (Criminal Complaint, No. 50,126 (Oct. 15, 1986)); Ex. 73 (Criminal Complaint, No. 50,127 (Oct. 23, 1986). Because Kelling's legal proceedings in these two cases are identical, except for the details of the offense, only the proceedings in Case No. 50,126 will be cited in the footnotes.

[381] Ex. 74 (Indictment, *State v. Kelling*, No. 50,126 (May 28, 1987)); Ex. 75 (Arrest Warrant and Return, *State v. Kelling*, No. 50,126 (May 28, 1987)).

[382] Ex. 76 at 1 (Judgment, *State v. Kelling*, No. 50,126 (Aug. 24, 1987)).

[383] *Id*. at 1–3.

[384] 64.RR.6865.

[385] Ex. 77 (Motion to Revoke Probation, No. 50,126 (Jan. 19, 1988)).

[386] Ex. 78 (Arrest Warrant, *State v. Kelling*, No. 50,126 (Jan. 29, 1988)).

sexual assault trial, her probation for delivery of heroin still had not been revoked.[387] The State objected to defense counsel's attempts to show that Kelling had received preferential treatment in exchange for her testimony.[388] The court sustained the objection.[389]

On March 17, 1988, the day after Kelling completed her testimony, she was arrested.[390] A pre-revocation hearing was set for March 22, 1988.[391] Instead of seeking to revoke Kelling's probation and sentence her to six years in prison for delivery of heroin, the State moved to modify the conditions of her probation.[392] On March 22, 1988, the court agreed.[393] Kelling was released from custody the same day David Wood was sentenced to fifty years in prison for sexually assaulting her.[394]

Kelling did not stay out of trouble for long. By August 1988, she had been arrested for unlawful possession of heroin.[395]

---

[387] 8.JBKRR.70–73, 74–79.

[388] 8.JBKRR.73.

[389] 8.JBKRR.73, 78–79.

[390] Ex. 79 (Sheriff's Return, *State v. Kelling*, No. 50,126 (Mar. 17, 1988)).

[391] Ex. 80 (Order of Court Setting, *State v. Kelling*, No. 50,126 (Mar. 17, 1988)). Norbert Garney, second-chair defense counsel for David Wood in the capital murder case, was appointed to represent Kelling in these revocation cases.

[392] Ex. 81 (Motion and Order to Modify Probation, *State v. Kelling*, No. 50,126 (Mar. 22, 1988)).

[393] *Id.* at 4.

[394] 9.JBKRR.48.

[395] Criminal Complaint, No. 53,683 (Aug. 22, 1988).

## Woman in Wood case held on drug count

*In the herald Post    August 23 1988  Tuesday*

A woman who testified she was a victim of a sexual assault in the desert of Northeast El Paso a year ago was arrested Monday on drug-possession charges.

The woman, 27, also had outstanding warrants for three counts of prostitution and two motions revoking her parole from two previous drug convictions, according to a police report. She was in the County Jail today under a $12,500 bond.

David L. Wood, a suspect in the deaths of six woman found buried in the same area, was convicted in March of sexually assaulting the woman.

The woman said during the trial that she was a prostitute and was using heroin in July and August 1987, when she was attacked.

Under cross-examination by Wood's attorney, she said she was on probation for two convictions for delivering heroin, but her parole had not been been revoked after she admitted she was again using heroin.

She was indicted in September and pleaded guilty in November 1988.[396] Her probation was revoked in her two other possession cases, and she was sentenced to concurrent six-year prison terms.[397]

By the time she testified in David Wood's capital murder trial in October 1992, Kelling was in jail on a parole violation.[398]

Judith Brown Kelling died in 2014 at the age of 54 from an accidental overdose of heroin and cocaine.[399]

### 8.    Carmen Brown's Undisclosed Deal

Carmen Brown served as the "outcry" witness who corroborated Kelling's sexual assault. In closing arguments, the prosecution disparaged defense counsel's

---

[396] Indictment, *State v. Kelling*, No. 53,683 (Sept. 13, 1988); Judgment, *State v. Kelling*, No. 53,683 (Nov. 11, 1988).

[397] *Id.* at 2; *see* Judgment Revoking Probation, *State v. Kelling*, No. 50,126 (Nov. 11, 1988); Judgment Revoking Probation, *State v. Kelling*, No. 50,127 (Nov. 11, 1988). In September 1990, Kelling was arrested for burglary of a habitation. *State v. Kelling*, No. 59,837. In May 1991, she pleaded guilty and was sentenced to 12 years in prison.

[398] 64.RR.6825–26.

[399] Autopsy Report of Judith Roxanne Liskowycz (Dec. 5, 2014) at 1, 6.

assertion that Carmen Brown testified falsely against David Wood because she was motivated by revenge:

> She got on that stand and testified. Now, what would be her motivation for lying? To get back at this man because he stiffed her sister for some cocaine? After eight months? It's been eight months since this came up.

> Do you think she was smart enough, shrewd enough, cunning enough to maintain the story for eight months and then come in here just to help her sister over some cocaine?[400]

Carmen Brown had a much greater incentive than revenge. She wanted to avoid a ten-year prison sentence for delivery of heroin.

Like her sister, Carmen Brown sold heroin to an undercover police officer in October 1986.[401] And, like her sister, she was not indicted or arrested for the offense for another six months.[402] On June 23, 1987, Carmen Brown pleaded guilty.[403] She was given a ten-year suspended sentenced and placed on probation for ten years.[404] The court ordered her to serve an alternate term of probation at the West Texas Regional Adult Probation's Restitution Center.[405]

After Carmen Brown repeatedly left the Restitution Center without authorization, and then never returned after leaving on July 26, 1987, an arrest warrant was

---

[400] 8.JBKRR.325–26.

[401] Ex. 82 (Criminal Complaint, No. 50,089 (Oct. 31, 1986)).

[402] Ex. 83 (Indictment, *State v. Brown*, No. 50,089 (May 28, 1987)); Ex. 84 (Arrest Warrant and Return, *State v. Brown*, No. 50,089 (May 28, 1987)).

[403] Ex. 85 at 1 (Judgment, *State v. Brown*, No. 50,089 (June 23, 1987)).

[404] *Id*. at 1–3.

[405] *Id*. at 3.

issued.[406] She was arrested on August 22, 1987, for violating probation.[407] The State sought to revoke her probation.[408] While awaiting her probation revocation hearing, Carmen Brown received a visit in the county jail from Det. Guerrero.[409] She provided him with a statement that corroborated Judith Brown Kelling's sexual assault allegations.

Three days after her visit from Det. Guerrero, Carmen Brown's probation was revoked.[410] Instead of imposing the suspended ten-year prison sentence as straight time, the court ordered "shock probation," which required Carmen Brown to serve as little as 60 days in prison before becoming eligible for probation.[411]

On March 16, 1988, Carmen Brown testified for the State in David Wood's sexual assault trial. Two days later, the court suspended the remainder of her ten-year sentence and placed her on probation.[412]

### K.     The State's scientific expert gave misleading testimony about the fiber comparison evidence.

The State's forensic chemist, Steve Robertson, testified that fibers found at the Wheatley crime scene "matched" fibers in a vacuum cleaner bag recovered from the

---

[406] Ex. 86 (Arrest Warrant and Return, *State v. Brown*, No. 50,089 (Aug. 3, 1987)).

[407] *Id.*

[408] Ex. 87 (Motion to Revoke Probation, *State v. Brown*, No. 50,089 (Sept. 8, 1987)).

[409] Ex. 71 (Statement of Carmen Brown (Oct. 30, 1987)).

[410] Ex. 88 (Judgment Revoking Probation, *State v. Brown*, No. 50,089 (Nov. 2, 1987)).

[411] *Id.*.

[412] Ex. 89 (Judgment and Addendum to Sentence, *State v. Brown*, No. 50,089 (Mar. 18, 1988)). In February 1989, the court revoked Carmen Brown's probation for repeated unauthorized absences from a halfway house and sentenced her to five years in prison. Judgment Revoking Probation, *State v. Brown*, No. 50,089 (Feb. 16, 1989).

garage at the residence where David Wood had lived with his girlfriend, Joey Blaich. The State's theory was that David Wood kept an orange acrylic blanket in his truck and used the vacuum cleaner to clean his truck. Roberston's testimony enabled the State to argue at closing that the fiber "match" established an actual physical link between David Wood and the site where Desiree Wheatley's body was found. The State argued that all the fibers originated from a common source—the blanket allegedly used by David Wood when sexually assaulting his victims. Robertson testimony was problematic and misleading.

### 1.     The Fiber "Match"

On direct appeal, this Court summarized Robertson's testimony:

> A forensic chemist testified that orange fibers found on the clothing of one of the victims *matched* orange fibers taken from a vacuum cleaner bag which appellant and his girlfriend
> had left in their old apartment.[413]

Robertson did, indeed, testify that the fibers from the two sites "matched" and were "identical."[414] He added that "the likelihood that [the fibers] came from two different items is remote."[415]

In closing argument, the State pointed out the evidentiary significance of Robertson's testimony that the fibers from the crime scene and the vacuum cleaner bag "all matched," and they "all came from a common source."[416] The State argued that this fiber "match" established a direct "physical link" between David Wood and the

---

[413] Ex. 5 at 4 (*Wood v. State*, No. 71,594 (Tex. Crim. App. Dec. 13, 1995)) (emphasis added).

[414] 63.RR.6730.

[415] 63.RR.6741.

[416] 69.RR.7444–45.

Wheatley crime scene.[417] The orange acrylic blanket provided the source of the fibers, the State argued:

> [T]hose orange fibers came from Mr. David Leonard Wood's blanket, the one that Joanne Blaich told you about, the one that had the fuzzies on it, the one that was like a hotel blanket, with the satin edges, sort of burnt orange, orange in color, the one that Mr. David Leonard Wood kept in his pickup truck. I would submit to you that's where those orange fibers came from and that is the common source of those fibers because we know, we know, how he used the blanket. We know what he used them for. Judith Brown Kelly told us that.[418]

**2.      Dr. Palenik's Report**

Christopher S. Palenik, Ph.D., Senior Research Microscopist at Microtrace, reviewed all the fiber evidence and provided a report to undersigned counsel.[419] His report provides "an objective review of the sampling, analytical approach, conclusions, and testimony related to the fiber evidence in this case through a critical examination of each step of this process."[420] Dr. Palenik identified "numerous issues" related to the State's forensic investigation that stemmed from "the limited information available about the analysis and association of orange acrylic fibers."[421] These issues involved sample collection, analysis, data processing, reporting, and testimony.[422]

---

[417] 69.RR.7538–39.

[418] 69.RR.7445.

[419] Ex. 90 (Christopher S. Palenik, Ph.D., Review of Fiber Evidence (Feb. 20, 2025)). Dr. Palenik's CV is attached to his report.

[420] *Id.* at 4.

[421] *Id.* at 16.

[422] *Id.*

Dr. Palenik harshly criticized the use of the terms "match" and "identical" in Robertson's forensic testimony.[423] He said these terms are "generally avoided altogether in modern forensic usage." Dr. Palenik explained that:

> These terms and others have been considered problematic and flagged in independent case files reviews because they are seen to: (a) imply a sense of either specificity or uniqueness that can't be obtained by a typical class evidence comparison or (b) in the case of "remote," they are perceived to imply a probability that hasn't been established.[424]

In short, Dr. Palenik concluded that Robertson testified in a way "that is considered problematic and misleading in forensic testimony."[425] Dr. Palenik also took issue with Robertson's testimony about "the probability of fibers arising from a specific item," because no source for the fibers was ever identified, and the properties of the fibers were never constrained to a specific type of product, much less a specific item."[426]

In addition to Robertson's misleading testimony, Dr. Palenik mentioned that the paucity of analytical details and data raises "significant questions about key aspects of data collection" and "suggest[s] that analyses were not always conducted at the most rigorous levels."[427] He criticized the DPS reports for poor, ambiguous technical writing, pointing out that "the only formal DPS trace evidence report does not actually specify the fiber associations reported at trial."[428] Moreover, Dr. Palenik observed that Robertson, the State's testifying expert, did not actually sign the first two

---

[423] *Id.* at 14.

[424] *Id.*

[425] *Id.* at 16.

[426] *Id.* at 14.

[427] *Id.* at 8–9.

[428] *Id.* at 9.

DPS fiber reports, "rais[ing] issues about who performed the actual analyses."[429] In the "quasi-report"[430] that Robertson did sign, Dr. Palenik criticized the ambiguous language he used to describe the key finding: "*some* of the fibers in B2, B12, and B24 are indistinguishable from fibers in B25."[431] As Dr. Palenik put it, "Does the word 'some' … refer to the fibers that were analyzed or were certain orange fibers from in these samples found to be different?"[432]

Finally, Dr. Palenik expressed concerns surrounding the collection of the vacuum cleaner bag, because the orange fibers found in the debris from the bag represent "the sole fiber evidence" associated with the Wheatley crime scene.[433] He emphasized that scrupulous sample collection provides the foundation on which an expert's analyses, conclusions, and testimony are built.[434] Dr. Palenik noted that Joyce Armstrong testified she could not find the bag to the vacuum cleaner when she first tried to used it after David Wood and Blaich had left the apartment.[435] "This statement alone raises foundational questions about the origin of the vacuum cleaner bag," Dr. Palenik stated in his report.[436] The confusion about the origin of the bag in the vacuum cleaner continued with Armstrong's testimony that indicated she herself may have

---

[429] *Id*. at 17.

[430] *Id*.

[431] *Id*. at 10 (quoting Def. Ex. 5) (emphasis added by Dr. Palenik).

[432] *Id*.

[433] *Id*. at 4.

[434] *Id*.

[435] *Id*. at 5.

[436] *Id*.

put a bag in the vacuum cleaner, in which case, Dr. Palenik continued, "the dirt in the bag was not vacuumed by either Ms. Blaich or Mr. Wood."[437] Armstrong also testified that the vacuum cleaner did not work and that the person who rented the apartment later had also tried to use it.[438] Dr. Palenik found that Armstrong's contradictory testimony and the collection of the vacuum cleaner bag more than two months after Blaich had vacated the apartment (and approximately one month after another tenant had moved in) "raise serious questions about the origin and history of the vacuum cleaner bag and its contents that were collected by Detective Guerrero."[439]

### L. Alternative suspect Sal Martinez gave conflicting statements to the police about knowing the victims and failed a polygraph examination.

During the course of their investigation into the desert murders, the Task Force became interested in Sal Martinez and his possible involvement in the crimes. In November 1987, two officers on the Task Force flew to Salt Lake City, Utah, to interview Martinez. He gave four statements. Eventually, the officers flew back to El Paso with Martinez in tow, and Martinez gave the police a fifth statement. He took a polygraph examination and failed it. Detectives then had local hospital staff collect hair, saliva, and blood samples from Martinez. No DNA testing of Martinez's biological samples has ever been conducted to create a profile and compare it with the

---

[437] *Id.*

[438] *Id.*

[439] *Id.* at 6.

partial male DNA profile recovered from Dawn Smith's yellow sunsuit.[440] None of this evidence was ever presented at David Wood's capital murder trial.[441]

### 1.    The First Statement

On November 27, 1987, Det. Al Marquez and Officer Ben Ayala of the Desert Murders Task Force traveled to Salt Lake City to interview Sal Martinez. Martinez knew David Wood, and the Task Force believed Martinez had information about the murders. While in Salt Lake City, the officers obtained four statements from Martinez.

At 5:45 p.m. on the day they arrived, the officers interviewed Martinez.[442] Martinez said that he had lived in El Paso for about four or five months, from May or June until September or October 1987.[443] Martinez did not recognize a photograph of the victim Karen Baker.[444] When given the name of the victim Rosa Maria Casio, he said that her name did not sound familiar.[445] Martinez mentioned that he had met a girl named Dawn, who was staying with his girlfriend Ruby at her apartment, and he had once given her a ride back to Ruby's apartment.[446]

---

[440] This Court affirmed the trial court's denial of DNA testing of Martinez's biological samples. *Wood v. State*, 693 S.W.3d 308 (Tex. Crim. App. 2024).

[441] The State did not disclose to the defense the information about Martinez's failed polygraph exam or the taking of biological samples and fingerprints from him. Ex. 44 at 6 (Declaration of Dolph Quijano, Jr. (Feb. 12, 2025)).

[442] Ex. 91 (First Statement of Sal Martinez (Nov. 27, 1987)).

[443] *Id.* at 8–9.

[444] *Id.* at 2.

[445] *Id.* at 12.

[446] *Id.* at 25–26, 29–30.

### 2.    The Second Statement

On November 27, 1987, at 8:55 p.m., Sal Martinez gave a second statement to the officers after being interrogated for over an hour.[447] Martinez again claimed that he did not recognize the name "Karen Baker."[448] When the officers showed him a black and white photograph and a color photograph of Baker, Martinez responded, "I can't possibly identify her, it could be, I can't be positive."[449] Martinez could not recall ever meeting Baker in the company of David Wood, or going to the Hawaiian Royale Motel where she lived.[450] At the end of his statement, Martinez said, "About this Karen Baker thing, it's possible that I may have met her, I just don't remember."[451]

### 3.    The Third Statement

One hour after completing his second statement, Martinez gave the police a third statement.[452] He said that he may have seen the victim Desiree Wheatley at the Circle K store.[453] He had been to the Circle K on several occasions when David Wood met some "kids" at the store.[454]

---

[447] Ex. 92 (Second Statement of Sal Martinez (Nov. 27, 1987)).

[448] *Id*. at 2.

[449] *Id*.

[450] *Id*. at 2–3.

[451] *Id*. at 3.

[452] Ex. 93 (Third Statement of Sal Martinez (Nov. 27, 1987)).

[453] *Id*. at 1.

[454] *Id*.

4. **The Fourth Statement**

On November 28, 1987, shortly after midnight, Martinez gave his fourth state-ment to the police.[455] Martinez identified a photograph of Ruby Montoya, a woman he met in El Paso and became friends with.[456] Martinez said that he met Dawn Smith through Ruby, because Smith was living with Ruby.[457] Martinez claimed he had taken David Wood to Ruby's house one time.[458] When the police asked whether Mar-tinez had introduced Dawn Smith to David Wood, Martinez replied, "Apparently, I did, I don't recall?"[459] Martinez did not know whether David Wood saw Dawn Smith at any other time or dated her.[460] Martinez denied that he and David Wood ever went riding with or met up with Dawn Smith together.[461] Martinez did recall seeing Smith at bars and nightclubs in El Paso.[462]

5. **The Fifth Statement**

On November 29, 1987, Det. Guerrero and Det. Giron of the Task Force ob-tained a fifth statement from Sal Martinez after he arrived in El Paso from Salt Lake City.[463] Despite previously telling the police he did not know Karen Baker, he now

---

[455] Ex. 94 (Fourth Statement of Sal Martinez (Nov. 28, 1987)).

[456] *Id.* at 2.

[457] *Id.* at 3.

[458] *Id.*

[459] *Id.*

[460] *Id.*

[461] *Id.*

[462] *Id.* at 4.

[463] Ex. 95 (Fifth Statement of Sal Martinez (Nov. 29, 1987)).

recalled seeing her.[464] Martinez said that he and David Wood had picked up Baker from the Hawaiian Royale Motel, taken her for a "cruise," and then returned to the motel.[465] Martinez also told the detectives that he recalled seeing Rosa Maria Casio working at the Cabaret the night he visited the bar with David Wood.[466] Finally, Martinez said that he and Dawn Smith became "pretty good friends," and that he had seen her several times.[467]

### 6.     The Failed Polygraph Examination

On December 2, 1987, Martinez voluntarily submitted to a polygraph examination. The Task Force detectives wanted to determine whether Martinez was telling the truth when he repeatedly denied knowing anything about the desert deaths.[468] The polygraph examiner asked Martinez the following questions:

1. Did you personally take part in any of the disappearances of the young women who were found buried in North-East El Paso?

2. Did you personally participate in any of the murders of the young women who were found in North-East El Paso?

3. Were you present when any of the young women were killed in North-East El Paso?

4. Have you purposely withheld information about the young women who were found buried in North-East El Paso?

5. Do you have any personal knowledge of the disappearances of any of the young women who were found buried in North-East El Paso?[469]

---

[464] *Id.* at 4.

[465] *Id.* at 11.

[466] *Id.* at 5.

[467] *Id.* at 16

[468] Ex. 96 at 1 (Polygraph Examination of Sal Martinez (Dec. 2, 1987)).

[469] *Id.* at 2.

The polygraph examiner concluded:

> In the polygraph recordings there were significant emotional disturbances which are usually indicative of deception when Mr. Martinez answered "No" to questions 1, 2, 3, 4, 5.[470]

### 7. Taking Biological Samples and Fingerprints

On December 10, 1987, Martinez went to Sierra Medical Hospital in El Paso, and consented to medical personnel obtaining biological samples from him, which included the taking of plucked and cut head hair, plucked and cut pubic hair, saliva, and blood.[471] The following day, Martinez went to the Task Force office and had his fingerprints taken.[472]

The State never attempted to create a DNA profile of Sal Martinez from these biological samples. The State still maintains possession of Martinez's biological samples, but opposed David Wood's 2015 motion to create a DNA profile of Martinez and compare it to the partial male DNA profile found on Dawn Smith's sunsuit.

### 8. The Declaration of Ruby Montoya

When Dawn Smith told Ruby Montoya that she had been kicked out of her parents' house, Montoya let Smith stay at her apartment.[473] In exchange, Smith agreed to watch Montoya's three small children while Montoya was working and going to school.[474] Montoya met Sal Martinez through David Wood, when they came

---

[470] *Id.*

[471] Ex. 97 at 1 (Supplementary Police Report (Dec. 17, 1987)).

[472] *Id.* at 2.

[473] Ex. 98 at 1 (Declaration of Ruby Montoya (Jan. 29, 2025)).

[474] *Id.*

into the bar where she was working.[475] One time, Martinez snuck up behind Montoya, wrapped his arm around her neck and said, "Do you know how easy it would be for me to snap your neck in two right now?"[476] She spent the rest of the night watching her back and keeping away from him.[477] When Task Force detectives began questioning Montoya about David Wood and the disappearance of Dawn Smith, Montoya told the detectives that they should be investigating Martinez instead.[478] The detectives were uninterested.[479] They accused Montoya of concealing incriminating information and trying to protect David Wood.[480]

## M. The State conducted minimal investigation of other alternative suspects.

The State disclosed to David Wood's counsel information related to alternative suspects Edward Dean Barton and James Bradley. However, the State conducted only a minimal investigation of these suspects.

### 1. Edward Dean Barton

In July 1991, the prosecution disclosed *Brady* information related to Edward Dean Barton, who had "claimed to have killed four women in the El Paso, Texas, area between May and December of 1987."[481] At a pretrial hearing in David Wood's capital murder case, the prosecution conceded that the Task Force may have received the

---

[475] *Id.*

[476] *Id.*

[477] *Id.*

[478] *Id.* at 2.

[479] *Id.*

[480] *Id.*

[481] Ex. 99 at 16 (Edward Dean Barton Documents).

report from the FBI as early as March 1989.[482] The court ordered the State to determine if any of the Task Force detectives had conducted an investigation related to the contents of the Barton report.[483] In a later hearing related to the Barton report, the defense questioned ADA Shook, who confirmed that the Task Force did not follow up on the information they had received from the FBI.[484] Not until little more than four months remained before the capital murder trial began did the State conduct any investigation related to Barton.[485]

### 2.    James Patrick Bradley

On January 14, 2025, less than two months before David Wood's scheduled execution, undersigned counsel received exculpatory information from the Attorney General's Office.[486] Michelle Bradley claimed that her father, James Patrick Bradley, was "responsible or had something to do with the desert murders."[487] She explained that said she was coming forward now "because [she] saw on the internet that David Wood was going to be executed and [she] figured [she] should say something."[488]

### N.    Task Force Detectives engaged in serious misconduct during their desert murders investigation.

During their investigation, members of the Desert Murders Task Force coached witnesses, suppressed exculpatory evidence, pressured witnesses to

---

[482] 15.RR.368–69; *see* Ex. 99 at 4, 9, 12 (Edward Dean Barton Documents).

[483] 15.RR.385.

[484] 17.RR.411–12.

[485] Ex. 99 at 18 (Edward Dean Barton Documents).

[486] Ex. 100 at 1 (James Bradley Documents).

[487] *Id.* at 4.

[488] *Id.* at 8.

incriminate David Wood or change their statements, and tampered with and destroyed probative evidence.

### 1.    Coaching the jailhouse snitches

Task Force detectives brought James Carl Sweeney, Randy Wells, and George Hall to the CAP office from the jail and handed them their files on the desert murders investigation.[489]

### 2.    Suppressing exculpatory evidence

Task Force detectives suppressed the Tactical Unit memos that showed David Wood was under surveillance on the days when Angelica Frausto and Rosa Maria Casio disappeared.[490] Task Force detectives also suppressed the audiotaped interview of Judith Brown Kelling that Det. Guerrero conducted on November 16, 1987.[491] Finally, Task Force detectives suppressed the polygraph examination results and the taking of biological samples and fingerprints from alternative suspect Sal Martinez.[492]

### 3.    Pressuring and threatening witnesses

### a.    Judith Brown Kelling and Carmen Brown

Task Force detectives had considerable leverage over Judith Brown Kelling and her sister, Carmen Brown.[493] Both Kelling and Brown were engaged in illegal

---

[489] *See* Part III-B, *supra* ("The jailhouse snitches, Randy Wells and James Carl Sweeney, fabricated their testimony against David Wood.").

[490] Ex. 44 at 1 (Declaration of Dolph Quijano, Jr. (Feb. 12, 2025)); *see* Part III-G, *supra* ("David Wood was under police surveillance when two of the murder victims disappeared.").

[491] Ex. 44 at 3 (Declaration of Dolph Quijano, Jr. (Feb. 12, 2025)); *see* Part III-J(6)(d), *supra*.

[492] Ex. 44 at 6 (Declaration of Dolph Quijano, Jr. (Feb. 12, 2025)); *see* Part III-L, *supra*.

[493] *See* Part III-J, *supra*.

activity daily as sex workers, had extensive criminal records, and were addicted to heroin.[494] The police held possible charges of delivery of heroin over their heads for months, stemming from sales to an undercover narcotics officer in October 1986. They were not arrested until May 1987, and both were placed on lengthy terms of probation. Revocation loomed as a distinct, daily possibility for both Kelling and Brown. When the Task Force needed their help to make a case against David Wood, they had little choice but to cooperate or face revocation and a prison term. Both received deals for their assistance.

### b.    Ramona Dismukes

Task Force Det. Guerrero and Det. Marquez told Ramona Dismukes that she needed to provide an incriminating statement against David Wood.[495] They wanted her to say that David Wood had tried to coax her into his pickup truck the night they first met at the Circle K, but that he had abandoned his plan when Ramona Dismukes's mother showed up.[496] Dismukes refused to make such a statement.[497] The detectives then drove her out to the desert where the victims' bodies were found.[498] The detectives had her get out of the car, "pointed to the ground, and told [her] it

---

[494] Kelling served as a confidential informant for Det. Guerrero. Ex. 64 at 2 (Declaration of Richard Jewkes (Oct. 31, 2024)).

[495] Ex. 62 at 1–2 (Declaration of Ramona Dismukes (Jan. 24, 2025)).

[496] *Id.*

[497] *Id.* at 2.

[498] *Id.*

could have been [her] in a grave."[499] Dismukes felt threatened by Guerrero and Marquez, but she refused to sign a false statement.[500]

### c.    Ruby Montoya

Ruby Montoya agreed to let Dawn Smith live in her apartment and, in exchange, Smith babysat Montoya's three small children while she was at work or school.[501] After Smith disappeared, two detectives began "harassing [Montoya] for information about David Wood."[502] They accused her of protecting David Wood and refusing to divulge incriminating evidence.[503] They brought her to the police station several times and would show up at her apartment frequently.[504] Montoya gave them a couple of statements, but they continued to harass her.[505] The detectives made Montoya look at photographs of Dawn Smith's decomposed body, as well as photographs of the bodies of the other victims.[506]

### d.    Veronica Gatzka

Det. Marquez convinced Veronica Gatzka to change her initial statement about the last time she saw Ivy Williams.[507] Gatzka's first statement did not line up with the Task Force's narrative that Ivy Williams was last seen with David Wood in late

---

[499] *Id.*

[500] *Id.*

[501] Ex. 98 at 1 (Declaration of Ruby Montoya (Jan. 29, 2025)).

[502] *Id.* at 2.

[503] *Id.*

[504] *Id.*

[505] *Id.*

[506] *Id.*

[507] *See* Part III-I(2), *supra.*

May 1987. Gatzka had seen Williams several months after that date, in September or October of 1987.

### e.     Debbie Galvan

At the trial, Debbie Galvan, David Wood's sister, testified that Task Force Det. Tony Tabullo "got in [her] face" and said, "We are going to get a conviction and your brother is going to die by lethal injection and you may as well get used to the idea."[508] Outside the presence of the jury, Galvan recounted a separate incident involving Det. Tabullo and Det. Marquez:

> Detective Marquez came to my place of employment, which was Wal-Mart on Oyer street in El Paso, Texas, on three separate occasions. . . . And Mr. Tabullo was there on one occasion with Mr. Marquez and he stood at the front door, like I said, he's a big man and he stood there like he was guarding the front door. And after Mr. Marquez and Mr. Tabullo left, a lot of my fellow associates, as well as my manager, they came down on me pretty hard about it. They wanted to know who he was and why he was standing there like that.[509]

### 4.     Suspicious behavior surrounding the collection of the fiber evidence

The suspicious circumstances in which the police recovered orange fibers from the Desiree Wheatley crime scene and an item allegedly associated with David Wood undermine the inculpatory value of the fiber comparison evidence.

Det. Marquez twice falsely testified that he returned to the scene the day after discovering Wheatley's body to sift the sand.[510] He eventually conceded that he may not have returned to the crime scene for another nine days, during which time the

---

[508] 66.RR.7227.

[509] 66.RR.7224–25.

[510] 58.RR.5719–23.

scene was left unprotected.[511] Three days after the discovery of Desiree Wheatley's body—but six days before officers returned to the crime scene for sand sifting—David Wood was arrested.[512] His pickup truck was impounded and Task Force Det. John Guerrero obtained a search warrant for the truck.[513] Det. Guerrero listed the evidentiary items he believed would be found in the truck: "clothing belonging to Judith Brown [Kelling], cigarette butts, fingerprints, ligatures, and knife belonging to David Wood."[514]

On October 23, 1987, the police searched the pickup truck, and Det. Guerrero filed a return and inventory of the items he discovered from the search of the truck, which included: "Three plastic baggies with vacuumed samples from 1986 Nissan."[515]

On October 29, 1987, police returning to the crime scene discovered large amounts of fibers while sifting the sand.[516] The State's fiber expert expressed surprise at the number of fibers found at the Wheatley site. In his testimony, he twice noted that, in all the cases he had worked in his fifteen years at DPS, "this was a lot of fibers to recover" from a crime scene.[517] The presence of large numbers of fibers at the Wheatley crime scene raises additional suspicion, considering that her body remained in the desert—exposed to the elements—for nearly five months before it was

---

[511] 58.RR.5723.

[512] 3.JBKRR.195.

[513] 3.JBKRR.196–97.

[514] State's Suppression Ex. 5 at 1 (Affidavit for Search Warrant and Return & Inventory (Oct. 23, 28, 1987)).

[515] *Id.* at 3 (emphasis added).

[516] 58.RR.5721–22, 5750.

[517] 63.RR.6758; *see* 63.RR.6760.

discovered. Moreover, the failure of the police to find orange fibers at any of the other crime scenes is notable. According to the State's theory of the case, David Wood's *modus operandi* included his use of a burnt orange acrylic blanket that he kept in his pickup truck and used during the sexual assault of his victims.[518] Yet the police did not uncover fibers at any of the other five crime scenes, despite the use of sand sifters.[519] Nor did the police ever recover the blanket that David Wood supposedly always kept in his truck.

The defense later successfully suppressed the items recovered from David Wood's pickup truck.[520] But by that time, Det. Guerrero had found another source of fibers allegedly associated with David Wood. Nearly three months after the discovery of Desiree Wheatley's body, Det. Guerrero retrieved a vacuum cleaner bag from Joey Blaich's former landlady, Joyce Armstrong.[521]

The vacuum cleaner is a suspect source for the fibers from the blanket for several reasons. First, Det. Guerrero found the vacuum cleaner in Armstrong's garage, not the apartment where Blaich and David Wood lived.[522] Second, the vacuum cleaner was an upright model,[523] making it an unwieldy, if not impossible, means of vacuuming the cab of a pickup truck. Third, Armstrong testified that the vacuum cleaner did

---

[518] 69.RR.7445.

[519] *See*, *e.g.*, 58.RR.5664–65 (sifting at Dawn Smith crime scene found nothing).

[520] CR.153. The State appealed the trial court's suppression of the evidence, and the Eighth Court of Appeals upheld the trial court's decision. *State v. Wood*, 828 S.W.2d 471 (Tex. App.–El Paso 1992).

[521] 63.RR.6653; 63.RR.6666.

[522] 63.RR.6654.

[523] 63.RR.6660, 6668–69.

not work when she tried to use it to clean the apartment after Blaich moved out.[524] Fourth, Det. Guerrero did not seize the vacuum cleaner itself, but claimed that he removed the vacuum cleaner bag from it.[525] Fifth, Det. Guerrero did not immediately place the vacuum cleaner bag in the property office when he returned to the police station.[526] Sixth, close examination of the State's Ex. 252 reveals that the vacuum cleaner bag is flattened and empty. The supposed contents of the vacuum cleaner bag have been emptied into the same clear evidence bag that contains the vacuum cleaner bag. Without the vacuum cleaner itself in evidence, it is impossible to know whether the vacuum cleaner bag is compatible with the vacuum cleaner. Moreover, it is impossible to determine whether the debris in the larger clear evidence bag originated from the flattened vacuum cleaner bag.

---

[524] 63.RR.6674.

[525] 63.RR.6655–56.

[526] 63.RR.6660.



**State's Ex. 252**.

### 5.     Scrubbing and bleaching the bones

The State retained a physical anthropologist, Dr. Harold Gill-King, to examine

Ivy Williams's skeletonized remains.[527] Dr. Gill-King concluded that Williams's body

had been in the desert less than a year between death and exhumation.[528] Dr. Gill-

King explained that the post-mortem interval—that is, the interval between time of

death and exhumation—could be determined based on "the condition of the remains,

how much soft tissue is remaining, whether any insect materials are there, the degree

---

[527] 60.RR.6072, 6077–78.

[528] 60.RR.6079–80.

to which the materials are scavenged, the aroma of the materials."[529] However, he criticized the police processing of the skeletonized remains with bleach because it had destroyed evidence critical to his analysis:

> Medicolegal authorities in El Paso removed the remaining tissues in a solution of chlorox [?], and scrubbed them with an [abrasive] pad. This accounts for the extremely clean condition of the materials and the blue-green stains (probably due to chemical interaction between the chloride with which the bone was cleaned and the copper metal in the abrasive used to scrub it), but compounds the difficult problem of determining time since death. This treatment has also eliminated markings by scavengers, possible small toolmarks (e.g., knife), and useful insect and plant evidence that might indicate season of death.[530]

This "curious processing" of the remains, as Dr. Gill-King put it, affected his ability to draw conclusions about the length of the post-mortem interval:

> If the materials had not been processed in that way, we might have been able to give a tighter estimate than that. . . . We might have been a little bit more specific if we had had insect evidence or soil characteristics or rootlets that might have grown into the material, we might have been a little bit more definitive about our estimate of the time since death.[531]

At the end of his official report, Dr. Gill-King reiterated that the police processing of the remains had destroyed valuable evidence:

> [I]t cannot be overemphasized that *important features which would be useful in certifying time since death and cause of the damage noted has been lost lost [sic] as a result of the manner in which the skeleton was processed after exhumation.*[532]

---

[529] 60.RR.6079.

[530] State's Ex. 233 at 1 (Report of Dr. Gill-King) (quotation marks omitted).

[531] 60.RR.6092–93.

[532] State's Ex. 233 at 3 (emphasis in original).

Because no one had reported Ivy Williams missing, the Task Force detectives were unsure when she had disappeared.[533] In reconstructing her movements and activities before she was last seen, the Task Force eventually decided that Jennifer Prefontain had been the last person to see Williams, in late May 1987. Prefontain testified that she had seen Williams leave the King's X Bar with David Wood around Memorial Day.[534] The improper processing of the remains of Ivy Williams deprived Dr. Gill-King from giving a "tighter estimate" of the post-mortem interval. A tighter post-mortem interval of "less than a year" may have contradicted the evidence that Ivy Williams died in late May 1987, and would have supported the statements of witnesses who claimed to have seen Ivy Williams after that date—but not in the company of David Wood.

### 6.    Destroying the Baker crime scene evidence

Det. Guerrero attended the autopsy of Karen Baker the day after her body was discovered in the desert.[535] Several pieces of clothing were removed from her body during the autopsy, including a pair of red pants, a red blouse, a Levi jacket, and a bra.[536] Det. Guerrero left the clothing items at the morgue instead of taking them to the police station.[537] The clothing was sent along with the body for cremation; the clothing was destroyed.[538]

---

[533] Ex. 53 at 1–2 (Police Presentation Supplement (June 17, 1988)).

[534] 60.RR.6170–72, 6183.

[535] 57.RR.5602.

[536] 57.RR.5602–04.

[537] 57.RR.5604.

[538] 57.RR.6604.

**O.    The El Paso Police Department conspired to keep harmful infor-mation about a Task Force detective from coming to light, thwart-ing David Wood's change of venue motion in the sexual assault trial.**

The State failed to inform the court and defense counsel about an Internal Af-fairs investigation of Task Force Det. Al Marquez for falsifying official records. EPPD's cover-up of the investigation rendered Lt. Paul Saucedo's testimony at a change of venue hearing for the sexual assault trial no longer accurate before the court issued its final ruling on the motion.

### 1.    The Falsification of Records

On November 27, 1987, Detective Marquez and Officer Ben Ayala, members of the Desert Murders Task Force, flew to Salt Lake City, Utah, to interview Sal Mar-tinez, a potential witness and alternative suspect.[539] Marquez and Ayala shared a hotel room costing a total of $49.61.[540] When they submitted their receipts for reim-bursement, Marquez falsely told Captain Aguilar that they had each paid $49.61.[541] Marquez and Ayala signed a reconciliation sheet itemizing the falsified expenses.[542] The Budget and Finance Officer then telephoned the hotel, discovered the fraudulent behavior, and requested an investigation.[543]

Lt. Paul Saucedo and Sgt. Ramiro Gomez were Det. Marquez and Officer Ayala's supervisors. They were upset that the officers' lies might undermine their

---

[539] Ex. 101 at 14 (Det. Al Marquez, Internal Affairs Incident Report).

[540] *Id.*

[541] *Id.*

[542] *Id.*

[543] *Id.*

credibility as witnesses for the prosecution in the Northeast Desert Murders case.[544] As Sgt. Gomez explained:

> The Desert Death Investigation, of which I have been repeatedly re-minded is the biggest investigation that has hit El Paso, and of which I directly oversee, at this point was and is my biggest concern. Knowing what I had learned [about Det. Marquez and Officer Ayala's misappro-priation], weighed heavy on my mind. I could not continue the investi-gation without knowing if the two officers involved could be further trusted to carry out their assigned duties, I felt I had to know what ac-tually happened on the Salt Lake City trip.[545]

Lt. Saucedo contacted First Assistant District Attorney Richard Jewkes and asked about the legal consequences of the falsified reports.[546] Jewkes confirmed that the officers' credibility could be in jeopardy.[547] Lt. Saucedo also tried to keep Internal Affairs away from the investigation.[548] He approached Captain Aguilar on several occasions and asked that the matter be reviewed in-house, without involving Internal Affairs.[549] Lt. Saucedo was concerned that an Internal Affairs investigation could negatively affect the Task Force's ongoing desert murders investigation.[550]

When Captain Aguilar decided to go forward with an Internal Affairs investi-gation, Sgt. Gomez disobeyed a direct order and confronted Det. Marquez and Officer

---

[544] *Id.* at 6.

[545] *Id.* at 25.

[546] *Id.* at 7.

[547] *Id.*

[548] *Id.*

[549] *Id.*

[550] *Id.*

Ayala directly.[551] Sgt. Gomez said the importance of the desert murders investigation required him to act:

> I had to have trust in my Officers, I did not want to jeopardize the [Northeast Desert] Murders Case and I had already had plenty of head-aches and explanations on a previous trip made by Dets. Guerrero and Giron.[552]

Despite Sgt. Gomez's and Lt. Saucedo's efforts, Internal Affairs became involved. Internal Affairs investigators interviewed Officer Ayala and obtained a thorough explanation of the expenditures.[553] Ayala ran through a list of meals and other expenses incurred during the trip, which included additional expenditures of "drinks and cigarettes" for Sal Martinez.[554]

While Officer Ayala directly admitted to wrongdoing, Det. Marquez changed his story several times during the investigation. Upon seeing the expense report, Captain Aguilar suspected irregularities and called Marquez.[555] Det. Marquez told Captain Aguilar, "We stayed in one room, but we paid for two. I even asked the clerk, if we stay in one room, do we still have to pay for both, and she said yes."[556] Captain Aguilar reported:

> I gave Detective Marquez an opportunity to rectify the situation when I called him over the phone, but he deliberately lied to me. He was given

---

[551] *Id.* at 21.

[552] *Id.* at 25. David Wood has not received any information from the State about the "previous trip" by Det. Guerrero and Det. Giron.

[553] *Id.* at 27.

[554] *Id.* at 28.

[555] *Id.* at 22.

[556] *Id.*

a second opportunity when he and Ayala were asked to sign the travel memo breakdown showing that each had paid $45.00 for motel.[557]

Shortly afterwards, EPPD discovered Det. Marquez was lying. Internal Affairs investigators twice interviewed him.[558] In the first interview, Marquez admitted that he made an "error" in reporting expenses.[559] In the second interview, Marquez was asked directly about his conversation with Captain Aguilar.[560] Det. Marquez denied telling Captain Aguilar that he had been charged for two hotel rooms.[561] Instead, he claimed that hotel expenditures were never discussed and that Captain Aguilar had questioned him only about "overeating."[562]

Lt. Saucedo recommended lenient, one-day suspensions for Det. Marquez and Officer Ayala.[563] However, Captain Aguilar pushed for harsher punishment and recommended a five-day suspension for Ayala and a ten-day suspension for Marquez.[564] EPPD gave both Det. Marquez and Officer Ayala 15-day suspensions.[565]

Det. Marquez and Officer Ayala challenged the suspensions and brought their grievances to arbitration.[566] The parties agreed that Marquez and Ayala had committed willful misrepresentation and continued that misrepresentation even after

---

[557] *Id.*

[558] *Id.* at 36, 37.

[559] *Id.* at 30.

[560] *Id.* at 34.

[561] *Id.*

[562] *Id.*

[563] *Id.* at 21.

[564] *Id.* at 22.

[565] *Id.* at 1.

[566] *Id.* at 13.

Captain Aguilar afforded them the opportunity to provide an honest explanation.[567] Det. Marquez and Officer Ayala challenged the penalty only for being excessive and inconsistent with notions of progressive discipline.[568] The arbitrator lowered the penalty to a three-day suspension because of its excessiveness.[569]

### 2.  The Cover-up

On January 17, 1988, at a pretrial hearing, the State called Lt. Saucedo to contest David Wood's motion to change the venue of the sexual assault trial. David Wood had specifically alleged in his motion that:

> There is a dangerous combination against the Defendant, David Wood, instigated by influential persons, specifically by the officers in the Crimes Against Persons Division of the El Paso Police Department to the extent that the Defendant, David Wood, cannot expect a fair trial.[570]

Lt. Saucedo denied that any dangerous combination or conspiracy existed against David Wood at CAP.[571] Lt. Saucedo also testified that there had been no "concerted effort" to prevent David Wood from getting a fair trial.[572] The trial court held in abeyance ruling on the motion for change of venue pending jury selection.[573]

---

[567] *Id.* at 16.

[568] *Id.*

[569] *Id.* at 17.

[570] JBKCR.41 (Motion for Change of Venue (Jan. 11, 1988)).

[571] 3.JBKRR.95–96.

[572] 3.JBKRR.97. ADA Jewkes objected to the question whether David Wood was the only suspect in the desert murders investigation. In support of his objection, Jewkes argued: "[W]e haven't heard any testimony from anybody on the defense, least of all the defendant, concerning this so-called dangerous combination by influential persons." 3.JBKRR.100–01.

[573] 3.JBKRR.110–11.

Defense counsel filed an Amended Motion for Change of Venue on February 9, 1988,[574] and re-urged the motion on March 14, 1988, the eve of trial.[575] The trial court again deferred ruling on the motion until completing voir dire.[576]

In the middle of Judith Brown Kelling's testimony on the first day of trial, March 15, 1988, the afternoon edition of the El Paso Herald-Post ran the headline: "6th Body Found in Desert."[577] Defense counsel, once again, renewed his motion for change of venue.[578] The court, in effect, denied the motion, stating that it was "under consideration."[579] Instead, the court, on its own motion, ordered the jury to be sequestered.[580]

By that time, of course, Lt. Saucedo knew about the investigation into Det. Marquez's falsification of official records. And Lt. Saucedo knew his earlier testimony at the January 17 hearing was no longer accurate. ADA Jewkes knew that as well. But, instead of notifying the court or defense counsel and amending the record, Lt. Saucedo and ADA Jewkes remained silent. They did not inform the court of unequivocal evidence of a dangerous combination of influential persons—from direct supervisors in CAP all the way up to the Assistant Chief of Police—against David Wood that deprived him of a fair trial.

---

[574] JBKCR.54–59.

[575] 6.JBKRR.1–2.

[576] 6.JBKRR.6.

[577] Def. Ex. 11; 8.JBKRR.101.

[578] 8.JBKRR.100.

[579] 8.JBKRR.100.

[580] 8.JBKRR.99, 102.

**P.     State's witness Patricia von Maluski, who testified that she saw Karen Baker with David Wood, was mentally incompetent to testify.**

Patricia von Maluski testified that she saw David Wood at a Chinese restaurant with Karen Baker on May 23, 1987, two weeks before Baker disappeared.[581] The restaurant was next to the Hawaiian Royale Motel, where Baker lived.[582] Von Maluski had previously told Baker that she was concerned about her tendency to go out with dangerous men.[583]

Von Maluski's testimony was erratic and rambling, and she was hostile, unresponsive, and uncontrollable on cross-examination, despite the efforts of defense counsel and the court.[584] At one point during her cross-examination, von Maluski suddenly addressed David Wood directly and asked him to stand up and turn around.[585] An in-chambers discussion the following day raised serious concerns about von Maluski's competency. Facts discovered after trial revealed that her son had reported her missing during the same period she allegedly saw David Wood with Karen Baker. In addition, her children said she suffered from mental illness.

### 1.     The In-Chambers Hearing

The court held an in-chambers hearing the morning after von Maluski testified.[586] ADA Karen Shook informed the judge and defense counsel that von Maluski

---

[581] 61.RR.6196–97.

[582] 61.RR.6196.

[583] 61.RR.6197, 6200.

[584] 61.RR.6204, 6207, 6210–11, 6217.

[585] 61.RR.6210. Von Maluski also refused to speak with defense counsel before trial. 61.RR.6201.

[586] 62.RR.6431–39.

had called an investigator in the DA's Office to tell the investigator that she had lied during her testimony.[587] She also insisted that she had spoken with ADA Shook earlier when she had not.[588] And von Maluski was convinced that Shook had conducted her direct examination, while ADA Morgan "sat in court like a bump on a log."[589]

Von Maluski said that she testified falsely when she denied seeing David Wood with any of the other desert murder victims.[590] Von Maluski told the investigator that she saw David Wood with another victim, Rosa Maria Casio, at a Chinese restaurant in the middle of August 1987.[591] According to ADA Shook, von Maluski accused the State of "telling her to lie under oath about having seen one of the other girls."[592]

ADA Shook told the court that von Maluski appeared to be "exhibit[ing] some confusion" because she insisted that she had previously spoken with Shook, but Shook maintained that she had not spoken to von Maluski.[593] Moreover, ADA Shook mentioned that von Maluski had never included this information in her police statement.[594] "She has been tremendously inconsistent," is "intensely angry," and has been "extremely hostile," Shook said.[595]

---

[587] 62.RR.6431.

[588] 62.RR.6431–32.

[589] 62.RR.6438. ADA Morgan conducted the direct examination of von Maluski. 61.RR.6195.

[590] 62.RR.6431.

[591] 62.RR.6431.

[592] 62.RR.6432.

[593] 62.RR.6431–32, 6438.

[594] 62.RR.6432.

[595] 62.RR.6432, 6437.

Defense counsel added that von Maluski is "obviously unstable," and asked the court to instruct the jury to disregard her testimony.[596] The court denied the motion to strike her testimony and, instead, offered the parties an opportunity to recall von Maluski to the witness stand.[597] Neither the prosecution nor the defense wanted her back on the stand.[598] Defense counsel re-urged the motion at the close of the State's evidence, and the court again denied it.[599]

Despite conceding in chambers that von Maluski was confused, angry, and erratic, and had never previously told the police that she had seen David Wood at a Chinese restaurant with a different victim, the prosecution twice brought up her testimony in closing argument:

> Then we have the testimony of the school teacher, Ms. Von Maluski. She cared about Ms. Baker. She felt that Ms. Baker had made some poor choices in life. That she tended to pick up men, bikers, like Mr. Wood. And she saw Karen with her children and David Leonard Wood in the Chinese restaurant just a little ways down the street from Hawaiian Royale on May 23rd of 1987.
> . . . .
> Karen Baker liked to date. She knew David Wood. We know that from the evidence that she was seen with Mr. Wood having dinner at a restaurant a couple of weeks prior to June 5th of 1987.[600]

---

[596] 62.RR.6433–34.

[597] 62.RR.6434–35.

[598] 62.RR.6436–38. Despite having no other evidence of a direct link between David Wood and Rosa Maria Casio, the State declined the opportunity to put von Maluski back on the stand.

[599] 65.RR.7095–96. In response to the defense's re-urging the motion to strike, the court found that there was no evidence that von Maluski was "mentally unstable." 65.RR.7096. On direct appeal, this Court held that the record supported the trial court's finding that von Maluski was not incompetent. Ex. 5 at 14–15 (*Wood v. Texas*, No. 71,594 (Dec. 13, 1995)).

[600] 69.RR.7451, 7548.

### 2.     The Missing Person's Police Report

On May 16, 1987, at about ten o'clock at night, Patricia von Maluski's adult son, Tracy von Maluski, contacted the police to report that he had not seen or heard from his 56-year-old mother for the past three days and that this behavior was unlike his mother.[601] On May 24, eleven days after Patricia von Maluski went missing, Tracy contacted the police to inform them that he had located his mother.[602] Within the time frame she was reported missing, Patricia von Maluski claimed that she had seen Karen Baker with David Wood at the Chinese restaurant: May 23, 1987.[603]

### 3.     Patricia von Maluski exhibited signs of mental illness years before the trial.

Patricia von Maluski was diagnosed with bipolar disorder in 1996, but she had exhibited symptoms of the disorder well before then.[604] Bipolar disorder, formerly known as "manic depression," is a mental health condition that causes extreme mood swings between emotional highs (mania or hypomania) and lows (depression).[605] During a manic episode, an individual may engage in multiple overlapping new projects, "often initiated with little knowledge of the topic."[606] An inflated sense of self-esteem is typically evident, which can range from uncritical self-confidence to grandiosity,

---

[601] Ex. 102 at 1 (Patricia von Maluski, Missing Person's Report).

[602] *Id.* at 3.

[603] 61.RR.6196–97.

[604] Ex. 103 (Declaration of Tracy von Maluski (Jan. 27, 2025)).

[605] *See generally* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2022 text rev.) 139–59.

[606] *Id.* at 144.

and can even become delusional.[607] In some cases, mania may cause psychosis—a break from reality.[608]

Patricia von Maluski's son Tracy said that, throughout his childhood, he noticed his mother's mood swings and general irritability.[609] Moreover, after his parents got divorced, Tracy said that his mother lost custody of the children, due to her "erratic behavior" in court.[610] Tracy's older brother, Larry von Maluski, was estranged from his mother for the last twenty years of her life, because of her mental health issues.[611] He said his mother was delusional.[612] Larry von Maluski would not believe his mother if she said him she saw someone, because she had told him in the past that "she spoke to Ronald Reagan, Gorbachev, and Clinton."[613]

## Q. Task Force Detectives have been reprimanded for professional and personal misconduct.

Detectives on the Desert Murders Task Force demonstrated a pattern of misconduct in other cases, including coercing confessions that led to wrongful convictions. Their behavior raises questions not only about their credibility, but also the integrity of their investigation into the desert murders.

---

[607] *Id.*

[608] *Id.* at 149.

[609] Ex. 103 (Declaration of Tracy von Maluski (Jan. 27, 2025)).

[610] *Id.*

[611] Ex. 104 at 1 (Declaration of Larry von Maluski (Feb. 5, 2025)).

[612] *Id.* at 2.

[613] *Id.* at 1.

### 1.     The Wrongful Conviction of Daniel Villegas

Since David Wood's conviction, Det. Al Marquez has been found to have violated a suspect's constitutional rights that resulted in a wrongful conviction. In 1993, Det. Marquez was involved in the arrest, interrogation, and conviction of sixteen-year-old Daniel Villegas. Nearly twenty years later, this Court vacated Villegas's conviction based on ineffective assistance of counsel and ordered a new trial.[614]

During Daniel Villegas's first trial in 1994, a series of witnesses established that Det. Marquez had exhibited a pattern of using illegal interrogation techniques.[615] Two El Paso attorneys testified that Marquez has a reputation for untruthfulness.[616] And a former First Assistant Chief Felony Prosecutor and Director of the Organized Crime Unit in El Paso twice presented a perjury indictment to the Grand Jury against Det. Marquez.[617] Det. Marquez himself testified that he had been the subject of a number of Internal Affairs investigations and that roughly thirty citizen complaints had been filed against him.[618]

After holding a hearing to suppress Daniel Villegas's confession before his third trial, Judge Sam Medrano found that:

> The core of this case revolved around the confessions presented by the State of Texas at trial. Moreover, the focus on the confessions must involve the actions and the methods employed by the El Paso Police Department, particularly Detective Al Marquez.

---

[614] *Ex parte Villegas*, 415 S.W.3d 885 (Tex. Crim. App. 2013).

[615] Ex. 105 at 21 (Findings and Conclusions, *State v. Villegas*, No. 76,187 (Aug. 15, 2012)).

[616] *Id.*

[617] *Id.*

[618] *Id.* at 22. *See* Nate Blakeslee, *How to Get a Teenager to Admit to a Murder He Didn't Commit*, Texas Monthly (Jan. 7, 2014).

> . . . .
> This Court finds that the testimony of Detective Marquez at the eviden-
> tiary hearing was not credible. This Court reaches this conclusion based
> on the corroborating evidence presented that supports the claim that
> Detective Marquez had a pattern and practice of using illegal and coer-
> cive interrogation tactics both in this investigation and others.[619]

Judge Medrano suppressed Villegas's confession as involuntary and in violation of

his constitutional right to due process.[620] In suppressing the confession, Judge

Medrano found Villegas credible and concluded that his confession was the constitu-

tionally unreliable product of coercion.[621] The State did not appeal Judge Medrano's

suppression order.[622]

In 2018, Daniel Villegas was tried a third time, after he rejected an *Alford* plea

that would have allowed him to remain out of prison. Prosecutors could no longer use

the confession coerced by Det. Marquez. In addition, much of the police investigative

work had been discredited. On October 5, 2018, the jury found Daniel Villegas not

guilty. Daniel Villegas's name has now been added to the National Registry of Exon-

erations.[623]

### 2.    The Wrongful Conviction of Agustin Fabio Carreon

In 1994, Det. Tony Tabullo arrested Agustin Fabio Carreon and elicited a con-

fession from him for the murder of Robert Cobb.[624] Carreon's confession implicated

---

[619] Ex. 105 at 42–43 (Findings and Conclusions, *State v. Villegas*, No. 76,187 (Aug. 15, 2012)).

[620] *State v. Villegas*, 506 S.W.3d 717, 728, 728 n.2 (Tex. App. –El Paso 2016).

[621] *Id.* at 728 n.2.

[622] *Id.*

[623] *See* https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5389 (last viewed Feb. 7, 2025).

[624] Ex. 106 at 1–4 (Alejandro Hernandez Documents).

Alejandro Hernandez.[625] At trial, Carreon was acquitted of the murder, but Hernandez was convicted and sentenced to 99 years in prison.[626] Six years later, Carreon provided an affidavit stating that his confession had been coerced: Carreon had never met Hernandez, but Tabullo had promised to free Carreon if he identified Hernandez's photograph.[627]

In 2002, Hernandez filed a state petition for a writ of habeas corpus alleging that his defense attorney had provided ineffective assistance.[628] In March 2006, an El Paso judge recommended that the conviction be vacated.[629] On June 21, 2006, this Court agreed and vacated Hernandez's conviction.[630] The prosecution dismissed the case against him on September 17, 2006.[631] Alejandro Hernandez's name has now been added to the National Registry of Exonerations.[632]

### 3.     Assault at Nightclub

On July 5, 1986, Scott Jernigan was at the Dallas nightclub, where he worked as a disc jockey.[633] After finishing his shift, Jernigan went outside and saw a woman

---

[625] *Id.*

[626] *Id.* at 13.

[627] *Id.* at 10.

[628] *Id.* at 13.

[629] *Id.*

[630] *Ex parte Hernandez*, No. AP-75,445 (Tex. Crim. App. June 21, 2006).

[631] Ex. 106 at 13 (Alejandro Hernandez Documents).

[632] *Id.* at 11–13. *See* https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4092 (last viewed Feb. 7, 2025).

[633] Ex. 107 at 2 (Det. John Guerrero, Internal Affairs Incident Reports).

hiding by a trash dumpster.[634] Jernigan asked if she needed help.[635] She accepted his offer for a ride.[636]

The woman was Det. Guerrero's girlfriend, Sammye Davis.[637] Guerrero and Davis had been fighting, and Davis wanted to leave.[638] She got in Jernigan's car but, before they could leave, Det. Guerrero approached the car and began pounding on it.[639] Det. Guerrero opened the car door and punched Jernigan in the face, breaking his nose.[640]

Jernigan called the police, but was reluctant to make a statement after he found out that Guerrero was a police officer.[641] Jernigan feared retaliation from Det. Guerrero.[642]

The day after the assault, Det. Guerrero obtained Jernigan's home address.[643] Det. Guerrero went to Jernigan's home to apologize and offer to pay for the damage to Jernigan's car.[644]

---

[634] *Id.*

[635] *Id.*

[636] *Id.*

[637] *Id.* at 6.

[638] *Id.*

[639] *Id.*

[640] *Id.*

[641] *Id.* at 3.

[642] *Id.*

[643] *Id.* at 11.

[644] *Id.* at 6–7, 11.

Jernigan took several weeks to decide whether to press charges.[645] EPPD asked Jernigan to contact the office when he had made a decision, but Jernigan never called back.[646] As a result of Jernigan's inaction, the EPPD closed the case twenty-five days after the assault.[647] Det. Guerrero received a two-day suspension for the assault.[648]

### 4.    Off-Duty Car Crash and Leaving Scene of Accident

Less than four months after the nightclub assault, Det. Guerrero used a city vehicle without permission after work, caused substantial property damage, and left the scene of an accident.[649]

On the evening of October 29, 1986, Det. Guerrero left work and went to a bar, Moriarty's.[650] He drove an unmarked police vehicle.[651] He was off duty and did not have permission to drive the vehicle.[652] The bartenders at Moriarty's served Guerrero three beers.[653] Guerrero left Moriarty's and went to a second bar, Joe, John and

---

[645] *Id.* at 12.

[646] *Id.*

[647] *Id.*

[648] *Id.* at 10.

[649] *Id.* at 21.

[650] *Id.* at 45.

[651] *Id.* at 13.

[652] *Id.* at 46.

[653] *Id.* at 26–27.

Mark's Club.[654] Det. Guerrero stated that he had half a beer at Joe, John and Mark's Club.[655] Finally, Guerrero stopped at his ex-wife's house.[656]

While Det. Guerrero was driving home from his ex-wife's house, he claimed a car pulled up next to him and one of the occupants "flipped him off."[657] The gesture angered Det. Guerrero, and he began to chase the other vehicle.[658] Guerrero lost control of his vehicle, skidded across a street after making a turn at high speed, hopped the curb, and struck a parked truck.[659] He also struck a rock wall, a mailbox, and several shrubs.[660]

Det. Guerrero left the scene of the accident in the car.[661] Guerrero's car sustained significant damage: a piece of chrome and some body molding was missing; it had two flat tires; and the front right tire was missing completely, leaving only the metal rim.[662] Det. Guerrero drove away on the metal rim.[663] Police officers and bystanders were able to trace Guerrero's escape path by following a trail of shrubbery, damaged property, and gouge marks in the roadway.[664] Despite the extensive damage

---

[654] *Id.* at 24.

[655] *Id.* at 43.

[656] *Id.* at 24.

[657] *Id.* at 24–25.

[658] *Id.* at 25.

[659] *Id.*

[660] *Id.* at 14.

[661] *Id.* at 38.

[662] *Id.* at 30–31, 38.

[663] *Id.* at 36.

[664] *Id.* at 28, 31–32.

to his vehicle, Det. Guerrero claimed he had fled the scene because he wanted to continue his hot pursuit of the other car.[665]

Det. Guerrero drove the damaged vehicle for about a mile before stopping at a Circle K convenience store.[666] Guerrero used the payphone in the Circle K parking lot to call his girlfriend, Elva Locato.[667] Det. Guerrero told investigators that Locato had a "wrecker" that could tow the damaged police vehicle.[668] Locato drove to the Circle K and was at the scene before Sgt. Ellett arrived.[669]

After calling Locato, Det. Guerrero called police dispatch.[670] Guerrero lied to police dispatch and stated that a "car load of kids pulled a gun on him."[671] As officers arrived, Det. Guerrero repeated his assertion that one of the occupants of the other car had a gun.[672] In reality, there was no gun.[673] Det. Guerrero later admitted that he had lied about the gun in an attempt to "substantiate his story."[674]

Sgt. Ellett, along with other officers and various witnesses, reported evidence of Det. Guerrero's drinking. Guerrero had an odor of alcohol on his breath and watery, red eyes.[675] The smell of beer was apparent, even though Det. Guerrero had bought

---

[665] *Id.* at 38.

[666] *Id.* at 49.

[667] *Id.* at 45.

[668] *Id.*

[669] *Id.* at 23.

[670] *Id.* at 48.

[671] *Id.*

[672] *Id.* at 36.

[673] *Id.* at 45.

[674] *Id.*

[675] *Id.* at 24, 33, 34.

gum at the Circle K.[676] Officers who did not smell alcohol noticed the chewing gum and the smell of strong cologne.[677] Despite this evidence, Sgt. Ellett concluded that Det. Guerrero was not intoxicated.[678]

Det. Guerrero received two citations: one for causing an accident, and the second for leaving the scene of an accident.[679] Det. Guerrero received a 30-day suspension.[680] Department Head Joseph Messer concluded that harsh discipline was necessary because the accident occurred so soon after Det. Guerrero assaulted Jernigan at the nightclub.[681] The Notice of Suspension explained: "This is the second incident in a six-month period in which you have brought discredit on the department by losing your temper after having consumed alcoholic beverages."[682]

### R.  The State failed to disclose a Crime Stoppers tip about an alternative suspect.

For six and a half years, the State sat on a Crime Stoppers tip about an alternative suspect. The tip did not come to David Wood's attention because the State eventually fulfilled its *Brady* obligation. It came to light inadvertently, when undersigned counsel received over 600 pages of records from the DA's Office related to the prosecution of David Wood for the sexual assault of Judith Brown Kelling. Within those records, counsel found a 2010 Crime Stoppers tip from an anonymous caller

---

[676] *Id.* at 30.

[677] *Id.* at 36.

[678] *Id.* at 24.

[679] *Id.* at 15.

[680] *Id.* at 16.

[681] *Id.* at 20.

[682] *Id.*

that a man named Francisco Coto was responsible for the Northeast Desert serial murders, not David Wood.[683]

The DA's Office passed the tip along to the Attorney General. However, the Attorney General never disclosed the tip to undersigned counsel, despite knowing that David Wood had been trying for years to prove his innocence through forensic DNA testing. More troubling, David Wood uncovered a series of contemporaneous email messages from EPPD, the DA's Office, and the Office of the Attorney General discussing what to do with the tip and whether it should be disclosed to David Wood.[684] The tip was never disclosed to undersigned counsel.

On February 22, 2010, an anonymous caller contacted Crime Stoppers and identified Francisco Coto as the true perpetrator of the crimes for which David Wood was on death row.[685] The caller said that Coto was an interstate 18-wheeler truck driver who would routinely lure women and prostitutes into his truck with the promise of narcotics.[686] Coto had admitted to the caller that he had killed "a number of women."[687] The caller said Coto was a member of the El Salvador Special Forces Unit and was extremely violent.[688] Coto had a specific hatred of women, the caller said.[689] The caller provided Crime Stoppers with Coto's cell phone number, his city of

---

[683] Ex. 108 (Francisco Coto Documents).

[684] *Id.* at 3–17.

[685] *Id.* at 1.

[686] *Id.* at 2.

[687] *Id.*

[688] *Id.*

[689] *Id.*

residence, the name of his brother, and the license plate numbers of Coto's van and 18-wheeler.[690]

## IV. David Wood's conviction and sentence violate the Eighth and Fourteenth Amendments because he is actually innocent.

Wood's conviction and sentence violate the Eighth Amendment prohibition against cruel and unusual punishment and the Fourteenth Amendment's Due Process Clause because he is actually innocent. Wood acknowledges that the Supreme Court has previously rejected actual innocence as a basis for federal habeas relief. *Herrera v. Collins*, 506 U.S. 390, 393 (1993) (plurality); *see also Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (accord). The Supreme Court, however, also assumed that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417; *see also House v. Bell*, 547 U.S. 518, 554–55 (2006) (*Herrera* "left open" the possibility of a freestanding actual innocence claim); *Sawyer v. Whitley*, 505 U.S. 333, 345–46 (1992) ("A federal district judge confronted with a claim of actual innocence may with relative ease determine whether a submission . . . consists of credible, non-cumulative, and admissible evidence negating [an] element of [the offense]."); *Graves*, 351 F.3d at 151 (*Herrera* Court "left open whether a truly persuasive actual innocence claim may establish a constitutional violation sufficient to state a claim for habeas relief."). It cautioned that "the threshold showing for such an assumed right would

---

[690] *Id.* at 1, 2. The DA's Office redacted the license plates numbers, asserting that they were not subject to disclosure under the Public Information Act.

necessarily be extraordinarily high." *Herrera*, 506 U.S. at 417. There is potential merit to Wood's claim that he can meet that burden.

As set out in the Statement of Facts, Wood's actual innocence is supported by DNA testing which excludes him from male DNA on blood found on Smith's clothing; a first-hand account from Hall that the State coached the jailhouse snitches' testimony; evidence suppressed by the State that Kelling identified Plyler as her attacker; and new information that the State's expert testified falsely about the only forensic evidence allegedly tying Wood to the murders. Based on this evidentiary landscape, several factors support authorizing Wood's actual innocence claim. First, it is not based exclusively on hearsay affidavits and includes an exculpatory DNA result, first-hand testimony, and evidence suppressed by the State. *Cf. Herrera*, 506 U.S. at 417. Second, the DNA testing which yielded the exculpatory result was not previously available to Wood as it relied on new testing techniques. *Cf. id.* at 417–18; *see* Ex. [7]. Likewise, Hall explained in his affidavit that he would not have provided a declaration that the jailhouse snitches' testimony was coached before 2024 out of fear that his parole would be revoked. Ex. [8]. Third, no reliable evidence of Wood's guilt remains. *Cf. id.* at 418.

In David Wood's case, the State's evidence was entirely circumstantial and exceedingly weak. The El Paso DA Steve Simmons concluded that the case against David Wood was unindictable in late 1989, before the jailhouse snitches came forward. On direct appeal, this Court reasoned that the weakness of the State's evidence,

including the jailhouse snitch testimony, weighed in favor of upholding the trial court's decision to permit Judith Brown Kelling to testify under Rule 404(b) to prove identity.



### 1.    The District Attorney's Review of the Task Force Investigation

In July 1989, DA Simmons began an unprecedented four-month review of the desert murders investigation at the request of the Task Force to determine whether there was sufficient evidence to prosecute David Wood.[691] At the time Simmons

---

[691] Ex. 109 at 1 (DA Simmons letter to EPPD Police Chief Scagno (Nov. 2, 1989)).

reviewed the investigative files, the Task Force had developed three of the four evidentiary components that eventually comprised the State's case against David Wood:

1.  Witnesses who last saw the victims.

2.  Fiber comparison evidence from the Wheatley crime scene and fibers from items associated with David Wood.

3.  Judith Brown Kelling's testimony that David Wood sexually assaulted her.

The tables below summarize these three components of the State's case.

| Component 1: WITNESSES RE: IVY WILLIAMS | |
|---|---|
| **EVIDENCE OF GUILT** | **EVIDENCE OF REASONABLE DOUBT** |
| Jennifer Prefountain testified that she saw David Wood and his brother Randy leave the King's X Bar with Ivy Williams two or three days before Memorial Day weekend in 1987. | Prefountain admitted that the clothes found with Williams's body were not the same clothes she was wearing when Prefountain last saw her with David Wood. |
| --------- | Randy Wood lived in Colorado in May 1987. He visited David Wood for a week in July 1987, not May. Randy Wood had never been to the King's X bar. |
| --------- | No one ever reported Ivy Williams missing. |

| Component 1: WITNESSES RE: DESIREE WHEATLEY ||
|---|---|
| **EVIDENCE OF GUILT** | **EVIDENCE OF REASONABLE DOUBT** |
| Yvette Garcia testified that she saw Desiree Wheatley get into a beige Nissan pickup truck on the night she disappeared. | Garcia did not tell the police in her first statement that Desiree Wheatley got into Skeeter's truck. In her first statement, Garcia said she did not see Desiree leave with anyone at all. |
| --------- | Garcia did not tell Desiree's sister the next morning that she had seen Desiree get into a pickup truck. |
| --------- | Garcia did not see who was driving the truck. |
| --------- | Garcia was not wearing her glasses the night she last saw Desiree. |
| --------- | Det. Guerrero interviewed Garcia more than twenty times. He would take her out of school and question her at the police station. She was only 15 years old and unaccompanied by her parents. |
| --------- | Det. Guerrero showed Garcia a photo lineup and also had Garcia view David Wood in a room by himself. |
| Garcia identified David Wood as "Skeeter." | David Wood was never known by the nickname "Skeeter." |

| Component 1: WITNESSES RE: KAREN BAKER | |
|---|---|
| **EVIDENCE OF GUILT** | **EVIDENCE OF REASONABLE DOUBT** |
| Charles Lloyd saw Karen Baker get on a red Harley Davidson motorcycle on June 5, 1987. When she returned, she told Lloyd she had a date with the driver. Lloyd later saw her getting into a white or beige truck. | Lloyd said in his first statement that he did not see the face of the man who gave Karen Baker a ride on his motorcycle the day she disappeared. |
| Lloyd identified David Wood in a photo line-up. | Lloyd was unable to identify David Wood the first time he viewed a photo line-up. When he later viewed a live line-up, Lloyd selected someone other than David Wood. |
| --------- | Lloyd did not identify a photo of David Wood's red Harley Davidson motorcycle as the same motorcycle he saw the man driving who had picked up Karen Baker. |
| Lloyd testified that the same man came by a few days later on a dull black Harley Davidson motorcycle. | Lloyd told police that he did not see the face of the man who returned a few days later because he had on a cap and goggles. |
| --------- | David Wood did not drive a black Harley Davidson motorcycle. |
| Patricia von Maluski saw Karen Baker with David Wood at a restaurant on May 23, 1987. | Von Maluski gave her statement to EPPD on November 21, 1987. By that time, she had seen David Wood's name and picture in the news. |

| Component 1: WITNESSES RE: ANGELICA FRAUSTO | |
|---|---|
| **EVIDENCE OF GUILT** | **EVIDENCE OF REASONABLE DOUBT** |
| Veronica Minjarez testified that she last saw Angelica Frausto when she got on a red Harley Davidson motorcycle with a white man of medium build and wavy brown hair. | Minjarez testified that she last saw Angelica Frausto on August 4, 1987, four days before the date the State alleged she disappeared. |
| --------- | Minjarez did not see the man's face. She said Angelica Frausto rode on the motorcycle briefly and came back. |
| Denise Frausto Kramer testified that she last saw her sister on August 8, 1987, at Rudy's Bar. Kramer testified that the clothes found on Angelica's body were the same clothes she was wearing when Kramer last saw her. | Kramer made no mention of seeing Angelica with David Wood or a man resembling him when she left Rudy's Bar. |

151

| Component 1: WITNESSES RE: ROSA MARIA CASIO | |
|---|---|
| **EVIDENCE OF GUILT** | **EVIDENCE OF REASONABLE DOUBT** |
| Fritz Zimmerle testified that he last saw Rosa Maria Casio at the Cabaret Club on August 12, 1987. He saw Casio walking with a tall, well-built white man with short brown or blond hair. | --------- |
| Zimmerle said that the man had a mole on his face. | Zimmerle said in his first statement that he did not see the man's face. He admitted that he did not mention the mole when he gave his first statement to the police. |
| --------- | Zimmerle admitted that he had seen David Wood on television three times and had seen his picture in the newspapers in the years leading up to his testimony. |
| When Casio left the Club later that night, Zimmerle said that a Ford Bronco pulled out and followed her car. | Zimmerle was not sure if the driver of the Bronco was the same man he had seen with Casio earlier. |
| --------- | David Wood did not drive a Ford Bronco. |

| Component 1: WITNESSES RE: DAWN SMITH | |
|---|---|
| **EVIDENCE OF GUILT** | **EVIDENCE OF REASONABLE DOUBT** |
| Mary Fernandez testified that she last saw Dawn Smith around 11 o'clock at night on August 27, 1987. | Fernandez could not identify anyone from a photo line-up that contained David Wood's picture, nor did she recognize seeing a motorcycle or another vehicle in photos the police showed her. |
| Dawn Smith's boyfriend, Ernesto de los Santos, saw David Wood at Ruby Montoya's apartment one time. | De los Santos could not remember when he saw David Wood and Dawn Smith at the apartment. |
| Michael Jimenez saw David Wood with Dawn Smith at his house at some point in 1987. | Jimenez could not remember when he saw David Wood with Dawn Smith. |
| --------- | Jimenez may have seen David Wood with Jo Smith, who looked "remarkably similar" to Dawn Smith. |

| Component 2: FIBER COMPARISON EVIDENCE | |
|---|---|
| **EVIDENCE OF GUILT** | **EVIDENCE OF REASONABLE DOUBT** |
| The police found orange acrylic fibers at the Desiree Wheatley crime scene. | The police did not find the orange fibers at the Wheatley crime scene until they returned to the scene nine days after her body was discovered. |
| --------- | The police recovered no fibers from the other five crime scenes. |
| DPS examination concluded that orange fibers from a vacuum cleaner bag and a coat hanger associated with David Wood matched the fibers found on Desiree Wheatley's body and in sand siftings from the crime scene. | --------- |
| --------- | The vacuum cleaner did not work. Det. Guerrero did not seize the vacuum cleaner. |
| --------- | Det. Guerrero did not immediately place the vacuum cleaner bag in the property office when he returned to the police station. |

| Component 3: EXTRANEOUS OFFENSE - JUDITH BROWN KELLING | |
| --- | --- |
| **EVIDENCE OF GUILT** | **EVIDENCE OF REASONABLE DOUBT** |
| David Wood was driving a little brown pickup truck when he offered her a ride. | --------- |
| H took her out to the desert and tied her to his pickup truck while he dug a hole with a shovel he removed from the bed of the truck. | --------- |
| He buried something heavy rolled up in a blanket that he removed from the bed of the truck. | --------- |
| He spread the blanket on the ground, ripped off Kelling's clothes, and forced her onto the blanket. | --------- |
| He heard voices in the desert and drove Kelling to another location. He again spread the blanket on the ground, ripped off her clothes, and raped Kelling, after tying her hands together, tying one of her legs to a bush, and gagging her with a bandana. | --------- |
| --------- | Kelling was currently residing in jail where she was awaiting possible revocation for possession of cocaine, a parole violation. |
| --------- | Kelling was a prostitute. She had a criminal record. |
| --------- | Kelling was a heroin addict. She had track marks on her arms. She had injected heroin earlier that day. |

After reviewing these evidentiary components, DA Simmons found that the Task Force had produced only "very weak circumstantial evidence" in their three years of investigation focused almost exclusively on David Wood.[692] DA Simmons concluded that the presentation of evidence related to these three components of the Task Force's case would not result in the indictment—let alone the conviction—of

---

[692] Ex. 109 at 17 (DA Simmons letter to EPPD Police Chief Scagno (Nov. 2, 1989)).

David Wood: 'The bottom line is, that much further investigation is needed, before this case is ready to present to a Grand Jury, much less ready to go to trial."[693] On the Case Information Sheet appended to the investigative files for each of the six victims, Simmons had written: "No evidence in this investigation to connect anyone to any grade of criminal homicide."[694]

DA Simmons listed over fifty follow-up investigative tasks for the police to complete, which he believed would make the case prosecution-worthy.[695] In conclusion, Simmons wrote: "I believe a thorough investigation, not press releases, will bring the person or persons to justice for murdering those six young women in the desert."[696]

Over the next three months, the Task Force completed the investigation that DA Simmons recommended in his letter. The Task Force developed no further inculpatory evidence against David Wood.

### 2.      The Fourth and Final Component: Jailhouse Snitches

On January 19, 1990, ADA David Nichols sent a memorandum to DA Simmons about the Northeast Desert Murders.[697] Nichols set out a number of obstacles to the successful prosecution of David Wood. He framed the most pressing legal issue as:

> [W]hether a suspect, linked to one victim by a witness' observation of the suspect and the live victim together, corroborated by fiber evidence

---

[693] *Id.*

[694] Ex. 110 (District Attorney's Case Information Sheets (Nov. 2, 1989)).

[695] Ex. 109 at 1–10 (DA Simmons letter to EPPD Police Chief Scagno (Nov. 2, 1989)).

[696] *Id.* at 18. The Task Force had issued a press release a few days earlier about the lack of progress in the desert murders investigation. Ex. 111 (Desert Deaths Press Release (Oct. 27, 1989)).

[697] Ex. 112 (ADA Nichols Memorandum to DA Simmons (Jan. 19, 1990)).

which "could have come from the same source," should be indicted and prosecuted for murder, when no evidence exists of an illegal act.[698]

After reviewing the relevant law, ADA Nichols concluded:

> Here, we have some bodies and a suspect but absolutely no evidence of an illegal act linking the two. . . . [A]bsent that link, even if an indictment and conviction could be obtained of our suspect in this case, an appellate reversal is assured. There would seem to be no point in proceeding with a prosecution at the present time. This does not rule out the advisability of prosecution, however, if at some point in the future the illegal act can be proven and the suspect linked to it.[699]

In the final section of the memorandum, entitled "Recommendations for Further Investigation," ADA Nichols suggested a way to prove that an illegal act occurred:

> Seldom does a serial killer keep all the details a secret. Somewhere, at some time, he is likely to have shared with someone, a friend, a co-worker, a neighbor, at least a hypothetical interest in killing someone by some means that would leave no evidence on the skeleton of the victim. Cellmates and other prisoners of the Texas Department of Corrections are another possible source.
> . . . .
> The course of action most amenable to effective prosecution would be for the suspect to confess to the illegal act, then to corroborate the confession by a witness or by physical evidence not presently fathomed.[700]

Two months after ADA Nichols drafted his memorandum, Randy Wells was arrested for first-degree murder in Eastland County. Wells told his lawyer that he had information about the bodies buried in the desert. By April 1990, the State had procured the kind of evidence that ADA Nichols had recommended: David Wood's

---

[698] *Id.* at 1.

[699] *Id.* at 5.

[700] *Id.* at 5–6.

allegedly confessing to his cellmates. DA Simmons now had the critical evidence he needed to take the case to a Grand Jury.

| Component 4: THE JAILHOUSE SNITCHES | |
|---|---|
| **EVIDENCE OF GUILT** | **EVIDENCE OF REASONABLE DOUBT** |
| David Wood confessed to Randy Wells and James Carl Sweeney that he was the Desert Killer. | --------- |
| David Wood would tie his victims to the pickup truck, dig a grave, and then tie them to a tree and his truck and rape them. | --------- |
| Wells covered up some of David Wood's tattoos because David Wood told him that one of his victims had gotten away and could identify him based on his tattoos. | --------- |
| --------- | David Wood's sister sent him approximately 200 newspaper articles about the desert murders investigation. |
| --------- | David Wood gave Sweeney access to the newspaper articles because Sweeney was drafting a lawsuit for him. |
| --------- | Wells and Sweeney both had lengthy criminal records. |
| --------- | Sweeney knew about the $25,000 reward and had made inquiries about it. |
| --------- | Wells made a deal to have his capital murder charge dismissed and plead to 15 years for forgery in exchange for his testimony against David Wood. |

### 3.    The TCCA's Assessment of the Evidence

On direct appeal of David Wood's conviction and sentence, the State argued that Judith Brown Kelling's testimony about the extraneous criminal offense was "extremely important" to the prosecution's case:

> The primary evidence that the State had available to establish the identity of appellant was purely circumstantial. . . . With the weaknesses of

the circumstantial evidence and the attack upon the credibility of the witnesses who testified to appellant's admissions, it is obvious that the testimony of [Kelling] was *extremely important* to the State's case in establishing appellant's identity and in establishing that he committed these murders pursuant to the same scheme or course of conduct. Appellant's identity and the fact that he acted in the scheme or course of conduct in committing these murders was certainly in dispute throughout this trial.[701]

The TCCA agreed that the trial court did not err in finding Kelling's evidence relevant to establish David Wood's identity.[702] It noted that Kelling's testimony revealed that the "location, time, and circumstances of the assault" upon her were "strikingly similar" to the unique pattern of the six murders in the capital case.[703] To admit extraneous evidence under a theory of *modus operandi*—the defendant's "distinctive and idiosyncratic" manner of committing criminal acts—the proponent must show that "the extraneous offense was so nearly identical in method to the charged offense as to earmark them as the handiwork of the accused."[704] The TCCA found "obvious similarities" between the sexual assault of Kelling and the murders.[705]

The TCCA then rejected the point of error that the prejudicial effect of the extraneous evidence substantially outweighed its probative value. Because identity was "a hotly contested issue," it found that Kelling's testimony was "very compelling evidence" of the identity of David Wood as the murderer.[706] In addition, the TCCA

---

[701] Appellee's Brief, *Wood v. State*, No. 71,594, at 21–22 (emphasis added).

[702] Ex. 5 at 6 (*Wood v. State*, No. 71,594 (Tex. Crim. App. Dec. 13, 1995)).

[703] *Id.* at 2.

[704] *Id.* at 6.

[705] *Id.*

[706] *Id.* at 7. The TCCA found "unassailable" the evidence that David Wood "did in fact commit the extraneous offense." *Id.* David Wood has challenged the reliability of that "unassailable" evidence with

explained that Rule 403 balancing is more forgiving when the proponent has no other compelling or undisputed evidence to establish the proposition that the extraneous evidence is intended to prove.[707] Because the State's other evidence against David Wood was circumstantial and weak, the TCCA agreed with the State that Kelling's evidence was "extremely important" to the prosecution's case:

> The identity of the murderer was a disputed issue at trial, obviously critical to both sides. Other evidence linking appellant to the murders consisted of the testimony of his former cellmates, circumstantial evidence and witness testimony placing appellant with one of the victims on the night of her disappearance. But appellant impeached his former cellmates with their lengthy criminal history and vigorously attacked their testimony as the product of deal-making with the State. *The remaining evidence was not so compelling or undisputed as to render unnecessary the extraneous offense evidence.* Under these circumstances the State's need for the evidence was great.[708]

## S.    The New Evidence

### 1.    Newly Discovered Evidence

Even with the exercise of due diligence, David Wood could not have discovered numerous pieces of affirmative evidence of his innocence, including that:

(1) Technological advances in DNA testing since the trial would definitively exclude David Wood as the contributor of male DNA found in a bloodstain on Dawn Smith's yellow terrycloth sunsuit.

(2) Police detectives handed their investigative files to the jailhouse snitches, Randy Wells and James Carl Sweeney, to help them

---

the new evidence set out in this Application. *See* Part III-J, *supra* ("David Wood did not sexually assault Judith Brown Kelling").

[707] *Id.* at 8.

[708] *Id.* (emphasis added).

fabricate their testimony that David Wood confessed to being the Desert Killer. George M. Hall, whom the State hoped to use as a third jailhouse snitch, witnessed the State coach Wells and Sweeney's false testimony. Hall would not come forward to reveal this information until 2024, when he successfully completed nearly thirty years of parole.

(3) Randy Wells would be indicted for aggravated perjury for testifying falsely against his co-defendants in their first-degree murder trials.

(4)  James Carl Sweeney would receive $13,000 for his testimony against David Wood.

(5) Randy Wells would not only have his first-degree murder charges dismissed because of his role in securing David Wood's conviction, he would never serve a day in prison on the reduced charge of forgery, for which he was to serve 12 years; that charge was dismissed as well.

(6) James Carl Sweeney would receive a favorable recommendation for his testimony against David Wood and would be released on parole after serving only seven years of a 69-year sentence.

(7) The Tactical Unit of the EPPD had David Wood under surveillance for a week in August 1987, which included the days on which two of the victims disappeared.

(8)  Judith Brown Kelling said Michael Plyler, not David Wood, sexually assaulted her. But Task Force detectives pressured her into accusing David Wood instead.

(9)  Plyler resembled David Wood and owned a beige Nissan pickup truck with pinstripes, remarkably similar to the one David Wood owned.

(10)  The State suppressed an audiotaped interview of Kelling that would have provided significant opportunities for impeaching her.

(11)  Task Force detectives attempted to pressure Ramona Dismukes into providing a false statement that David Wood had tried to lure her into his pickup truck.

(12)  The Task Force took blood, saliva, and head and pubic hair from alternative suspect Sal Martinez and fingerprinted him after he failed a polygraph exam.

(13)  Patricia von Maluski, who testified that she had seen Karen Baker in the company of David Wood days before her disappearance, suffered from mental illness and had been reported missing by her son during the time she allegedly saw David Wood with Karen Baker.

(14)  Two Task Force detectives would later play prominent roles in the wrongful convictions of Daniel Villegas and Agustin Fabio Carreon.

**2.   Evidence Never Presented**

The suppression of exculpatory evidence, presentation of false evidence, police and prosecutorial misconduct, and ineffective assistance of counsel prevented the jury

from considering evidence that raises a reasonable doubt about David Wood's guilt, including that:

(1) David Wood's beige Nissan pickup truck—an essential element of his alleged *modus operandi*—sat undrivable in an auto salvage yard the entire month of August 1987, when three of the victims disappeared.

(2) Three witnesses saw Ivy Williams after May 30, 1987, when she was allegedly last seen, leaving a bar with David Wood.

(3) David Wood had an alibi on the day he allegedly assaulted Judith Brown Kelling.

(4) Kelling gave materially inconsistent testimony about the sexual assault.

(5) Judith Brown Kelling and her sister, Carmen Brown, received deals in exchange for their testimony against David Wood.

(6) The State's fiber expert testified with unwarranted and scientifically unfounded certainty when he overstated the probative value of his analysis of the fibers found at the Wheatley crime scene and the fibers taken from items associated with David Wood.

(7) Randy Wells lied when he testified that David Wood wanted his tattoos covered up so a victim who "got away" could not identify him.

(8) Alternative suspect Sal Martinez gave materially inconsistent statements to the police about the victims.

(9)     The State suppressed evidence about Task Force detectives' profes-
sional and personal misconduct that would have undermined their
credibility.

**T.    David Wood's new evidence rebuts or nullifies all of the State's pri-
mary inculpatory evidence from the "old" trial.**

David Wood has made a strong case of his actual innocence.

### 1.     The Testimony of the Jailhouse Snitches

The linchpin of the State's case against David Wood was, of course, the jail-
house-snitch testimony of Randy Wells and James Carl Sweeney. Wells and Sweeney
were the indispensable witnesses who jump-started an investigation that had stalled
and grown stagnant. They testified that David Wood confessed to them that he was
responsible for the murders of the girls and young women whose bodies were found
in the desert. They provided the evidence that transformed an unindictable case into
a conviction for capital murder and a sentence of death. But their testimony is ration-
ally irreconcilable with the new evidence. David Wood's new evidence nullifies the
State's primary inculpatory evidence.

### a.     The Unknown Male DNA on Dawn Smith's Yellow Terrycloth Sunsuit

DNA evidence can radically transform the meaning of inculpatory evidence.
The new postconviction DNA result definitively excludes David Wood as a contributor
of male DNA extracted from a bloodstain on Dawn Smith's yellow terrycloth sunsuit.
This affirmative evidence of innocence nullifies the inculpatory testimony of Wells
and Sweeney.

The State's theory was that the perpetrator acted alone in carrying out the offense. Sweeney testified that David Wood specifically mentioned Dawn Smith as one of his victims.[709] The State sought DNA testing of the bloodstain on Dawn Smith's sunsuit before trial for a single reason: They believed the DNA test result would be highly probative in identifying the perpetrator—David Wood. This new DNA test result cannot be reconciled with the "old" evidence from Wells and Sweeney.

Since that exculpatory test in 2011, the Attorney General of the State of Texas—acting as the district attorney *pro tem*—has opposed David Wood's motions for additional DNA testing, including testing of the biological samples that the police collected from alternative suspect Sal Martinez. The State's steadfast opposition to DNA testing of additional items not only raises troubling questions about what it fears the testing may reveal, but its opposition violates its duty to act as a minister of justice, not as an advocate for convictions.[710] No DNA testing of Martinez's biological samples has ever been conducted to create a profile and compare it with the male DNA profile recovered from Dawn Smith's yellow sunsuit.[711] Moreover, the Task Force's decision to fly Martinez back to El Paso from Salt Lake City, Utah, so that they could continue to question him (after he had given them four conflicting statements about knowing the victims), and their subsequent decision to take biological

---

[709] 66.RR.7039.

[710] *See Berger v. United States*, 295 U.S. 78, 88 (1935) (recognizing that the government "is the representative not of an ordinary party to a controversy, but of a sovereignty … whose interest … in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

[711] This Court affirmed the trial court's denial of DNA testing of Martinez's biological samples. *Wood v. State*, 693 S.W.3d 308 (Tex. Crim. App. 2024). Approximately 135 additional items collected from the six separate crime scenes have never been subjected to DNA testing.

samples and fingerprints from him, reveal Martinez as a compelling alternative suspect.[712] None of this evidence was ever presented to the jury.[713]

### b.    The Declaration of George M. Hall

According to Randy Wells and James Carl Sweeney, David Wood confessed to them, while they were in prison together, that he was the Desert Killer. Along with Wells and Sweeney, the State had George M. Hall bench-warranted to the El Paso County Jail. Like Wells and Sweeny, Hall had served time with David Wood in prison and knew him.[714] Hall witnessed the extensive coaching the Task Force detectives provided to Wells and Sweeney in preparation for their testimony.[715]

Hall's declaration is reliable for a number of reasons. First, he did not seek to be bench-warranted to El Paso. Wells provided Hall's name to the Task Force detectives and assistant district attorney who interviewed Wells in the Eastland County Jail after his arrest for first-degree murder.[716] Second, Hall lived only a few cells away from David Wood and Wells.[717] Hall shared a cell with Sweeney, who was drafting a lawsuit for David Wood and had access to over one hundred newspaper articles about the desert murders investigation.[718] Yet Hall never heard David Wood confess to the murders, nor did Hall ever hear Wells or Sweeney tell him that David Wood had

---

[712] *See* Part III-L, *supra*.

[713] Ex. 44 at 5–6 (Declaration of Dolph Quijano, Jr. (Feb. 12, 2025)).

[714] Ex. 8 at 2 (Declaration of George M. Hall (Oct. 13, 2024)).

[715] *Id.* at 4–6.

[716] 65.RR.6975.

[717] Ex. 8 at 2 (Declaration of George M. Hall (Oct. 13, 2024)).

[718] 65.RR.7038; Ex. 8 at 2 (Declaration of George M. Hall (Oct. 13, 2024)).

confessed to them.[719] Third, photographs confirm Hall's statement that he saw "notes on the wall about the victims" at the EPPD Homicide Division.[720] The photographs show chalkboards in the desert murders "war room" that have columns marked out listing information about each of the victims.




Fourth, Hall suffered to his detriment for refusing to cooperate with the Task Force detectives. A protest was filed against his release on parole after the Board had already approved his parole.[721] He did not receive a new parole date but was, instead, given a "serve-all," which meant he had to serve the remainder of his sentence—three

---

[719] *Id.* at 2.

[720] *Id.* at 4.

[721] *Id.* at 6.

more years.[722] Fifth, Hall brought his concern about Wells and Sweeney's fabrication of David Wood's confession to the attention of ADA Debra Morgan before the trial. Morgan did nothing. Sixth, because of the 1991 decision to rescind his previously approved parole, Hall did not contact David Wood's counsel until Hall was completely "off paper," successfully completing nearly thirty years of parole in 2024 without a violation.[723] Finally, Hall has had no contact with David Wood since he last saw him in prison in 1990.[724]

The credibility of Wells and Sweeney, on the other hand, continued to plummet after they testified against David Wood. Wells was indicted for aggravated perjury for testifying falsely against his co-defendants on the first-degree murder charges he himself avoided.[725] In fact, Wells never served a day in prison for the forgery charge that he was to plead to in exchange for the dismissal of the first-degree murder charge.[726] In addition, Wells testified falsely when he said David Wood asked him to cover up his tattoos so that a victim who "got away" (Judith Brown Kelling) could not identify him.[727]

A little over a year after testifying, Sweeney received $13,000 for his role in the conviction of David Wood.[728] In an undisclosed deal, Sweeney also received a

---

[722] *Id.*

[723] *Id.* at 1–2.

[724] *Id.* at 7.

[725] *See* Part III-C, *supra.*

[726] *See* Part III-C(3), *supra.*

[727] *See* Part III-D, *supra.*

[728] *See* Part III-E, *supra.*

favorable recommendation for parole from the District Attorney, and was released on parole—despite being classified as a habitual offender—after serving only seven years of his 69-year sentence.[729] Finally, like Wells, Sweeney lied on the witness stand. He claimed, if he did apply for and obtain the reward, he would use it to pay the $8,000 restitution ordered on his burglary conviction. Sweeney owed no restitution.[730]

The words of the leading expert on the use of jailhouse informants are particularly fitting:

> The risks of fabrication are especially high in high-profile and serious cases such as murder or rape that have been covered by the media, and that are known to elicit substantial benefits from the government. The risks of wrongful conviction are further heightened in cases where the rest of the evidentiary record is weak or contradictory, since these are the cases in which informant testimony is most valuable to the government and also simultaneously the cases in which defendants are especially likely to be actually innocent.[731]

### c.     The Police Surveillance

At the capital murder trial, Sweeney testified that David Wood specifically mentioned Rosa Maria Casio as one of his victims.[732] This "old" inculpatory evidence cannot rationally be reconciled with the newly discovered evidence that the police had

---

[729] *See* Part III-F, *supra.*

[730] *See* Part III-E, *supra.*

[731] Ex. 113 at 7 (Affidavit of Expert Alexandra Natapoff (July 15, 2024)). A judge appointed to review a case that ultimately resulted in a wrongful conviction aptly put it: "Usually, [the] presence [of jailhouse informants] as witnesses signals the end of any hope of providing a fair trial." The Hon. Peter Cory, Commissioner, *The Inquiry Regarding Thomas Sophonow: The Investigation, Prosecution and Consideration of Entitlement to Compensation* 63 (Winnipeg: Manitoba Attorney General, 2001).

[732] 66.RR.7039.

David Wood under surveillance for an entire week in August 1987, including on the days that Frausto and Casio disappeared.[733]

### d.     The Undrivable Pickup Truck

According to the jailhouse snitches, David Wood told them the manner in which he carried out his abductions and murders. David Wood's beige Nissan pickup truck was allegedly an essential element of his scheme. As Wells testified, "It was *always* the pickup."[734]

Wells and Sweeney told the jury that David Wood used the pickup truck to transport a victim from the city into the desert. Once there, he tied the victim to the truck. He then removed a shovel from the bed of the truck and dug a shallow grave. After finishing digging, he would remove a long, rolled-up orange blanket from the bed of the truck. He would unroll the blanket and place it on the ground. He would then untie the victim, tear off her clothes, force her to the ground on the blanket, and then tie one leg to a bush or tree and the other to the truck before sexually assaulting her.[735]

The testimony of Wells and Sweeney that David Wood's *modus operandi* "always" included the use of the pickup truck was false. And it is irreconcilable with the

---

[733] *See* Part III-G, *supra*.

[734] 65.RR.6968 (emphasis added). Notably, the State argued on direct appeal that "[e]specially important" to the Rule 403 balancing analysis (regarding Judith Brown Kelling's testimony) "are the admissions reported by Randy Wells that appellant always used the pickup truck to take the girls into the desert area…." Appellee's Brief, No. 71,594 at 16.

[735] *See* Part II-A(4), *supra* (setting out testimony of jailhouse snitches).

new evidence that the truck sat, undrivable, in an auto salvage yard through the month of August 1987 when three of the desert murder victims disappeared.

### 2.  The Testimony of Judith Brown Kelling

The three remaining evidentiary components of the State's case against David Wood were reviewed by DA Simmons in 1989 to determine the prospects for moving forward with prosecution. Clearly, Simmons concluded that the evidence associated with these three components (Judith Brown Kelling, the fiber comparison, and the witnesses who last saw the victims) would not result in the indictment—let alone the conviction—of David Wood.[736] Even though a jury had already convicted David Wood of sexually assaulting Kelling by the time DA Simmons conducted his review, he believed that Kelling still presented serious credibility problems for the jury.

David Wood's new evidence exposes the deception of the State and Kelling, whose lies were shoddily constructed but effective, until now. Task Force detectives pressured Kelling into falsely accusing David Wood of the sexual assault. Kelling admitted to Ramona Dismukes that Michael Plyler had assaulted her, not David Wood. The Task Force investigation corroborates Dismukes. The Task Force files include a folder containing photographs of Plyler's Nissan pickup truck, remarkably similar to the one David Wood owned.[737] Task Force detectives persuaded Kelling, along with

---

[736] Ex. 109 at 17 (DA Simmons letter to EPPD Police Chief Scagno (Nov. 2, 1989)) ("The bottom line is, that much further investigation is needed, before this case is ready to present to a Grand Jury, much less ready to go to trial."). On the Case Information Sheet appended to the investigative files on each of the six victims, DA Simmons had written: "No evidence in this investigation to connect anyone to any grade of criminal homicide." Ex. 110 (District Attorney's Case Information Sheets (Nov. 2, 1989)).

[737] *See* Part III-J(1)–(4), *supra.*

her sister, Carmen Brown, to point the finger at David Wood in exchange for preferential treatment on their pending criminal matters.[738]

The State's deception continued with the intentional alteration of David Wood's purported parting words to Kelling in the desert. Her testimony from the sexual assault trial to the capital murder trial transformed from "You're three and walking free" to "Always remember, I'm free."[739] The radical revision of her testimony was necessary because, by the time Kelling testified in the capital murder trial, the Task Force had settled on Ivy Williams as David Wood's first victim, meaning Kelling was no longer his third victim, but his fourth.[740]

It is inconceivable that Kelling—a tragically drug-addicted person forced into sex work to feed her heroin habit—realized independently that she needed to drastically modify David Wood's alleged parting words to her.[741] Instead, Kelling's altered testimony reveals the lengths the State was willing to go to convict David Wood of capital murder. Impeaching Kelling with her sworn testimony in the sexual assault trial would have undermined the State's case, destroying the last shred of Kelling's quaking credibility. Moreover, exposing the State's role in the deception "carried within it the potential [for] the discrediting, in some degree, of the police methods

---

[738] *See* Part III-J(7), (8), *supra.*

[739] 8.JBKRR.37; 64.RR.6815.

[740] *See* Part III-J(6)(a), *supra.*

[741] Even if the prosecutors were caught off-guard by Kelling's testimony at the capital murder trial, they had a duty to correct it immediately. *Napue v. Illinois*, 360 U.S. 264 (1959)..

employed in assembling the case against [David Wood]."[742] The jury heard none of this evidence.[743]

Finally, the new evidence of innocence includes the unpresented alibi testimony of David Wood's father, sister, and girlfriend showing that he was asleep at his girlfriend's apartment when Kelling alleged he sexually assaulted her in the early evening hours of July 26, 1987. An incident that happened the next day enabled these witnesses to recall David Wood's whereabouts: On July 27, 1987, Randy Wood crashed the Nissan pickup truck into another car and was arrested at the scene of the accident.[744] David Wood's girlfriend—who would eventually become a State's witness—recalled that David and Randy Wood had spent the prior evening at her apartment.

The new evidence of innocence regarding Kelling's accusation exposes the deceptions the State perpetrated to "get David Wood off the streets"[745] by arresting (and convicting) him for the sexual assault of Kelling. This new evidence rebuts or nullifies all of Kelling's extraneous offense inculpatory evidence from the "old" trial.

### 3.   The Fiber Comparison Evidence

In suggesting ways to make the State's case against David Wood indictable and prosecution-worthy, ADA Nichols not only recommended procuring the testimony of jailhouse snitches, but he also provided advice for strengthening the fiber link

---

[742] *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985).

[743] *See* Ex. 44 at 3–4 (Declaration of Dolph Quijano (Feb. 12, 2025)).

[744] *See* Part III-J(5), *supra*.

[745] Ex. 64 at 2 (Declaration of Richard Jewkes (Oct. 31, 2024)).

beyond the milquetoast phrase "could have come from the same source."[746] He suggested that "the FBI lab might be able to link the fiber evidence with a higher degree of confidence."[747] The State did not need to adopt his recommendation when they found an expert who was willing to testify unequivocally and with unfounded scientific certainty that the orange acrylic fibers from the Wheatley crime scene and the vacuum cleaner bag "matched."

The testimony of the State's expert, Steve Robertson, left the jury with the impression that the fiber "match" was akin to DNA evidence: that the fibers originated from a single, unique source—namely the orange acrylic blanket that allegedly played an essential role in David Wood's *modus operandi*. Dr. Palenik's report exposes the misleading and problematic nature of Robertson's testimony that distorted and overstated the probative value of the fiber evidence. As Dr. Palenik emphasized, the terms "match" and "identical" "imply a sense of either specificity or uniqueness that can't be obtained by a typical class evidence comparison."[748] David Wood's new evidence breaks the direct physical link the State established through Robertson's misleading forensic testimony that the fibers "matched."

### 4.    The Witnesses Who Last Saw the Victims

The testimony of the witnesses who claimed to have last seen some of the victims in the company of David Wood, or someone who vaguely resembled him, or someone who drove a truck or motorcycle that fit the general description of David Wood's

---

[746] Ex. 112 at 1 (ADA Nichols memo to DA Simmons (Jan. 19, 1990)).

[747] *Id.* at 5.

[748] Ex. 90 at 14 (Christopher S. Palenik, Ph.D., Review of Fiber Evidence (Feb. 20, 2025)).

vehicles was exceedingly weak to begin with. This "old" evidence cannot rationally be reconciled with the new evidence of innocence that:

- David Wood was under police surveillance on August 8, 1987, the day witnesses claimed Angelica Frausto disappeared.[749]

- David Wood was under police surveillance on August 12, 1987, the day witnesses claimed Rosa Maria Casio disappeared.[750]

- Steve Dahl, Veronica Gatzka, and Carol Eason saw Ivy Williams after May 30, 1987, the day she allegedly disappeared, in the company of David Wood.[751]

- Patricia von Maluski, who testified that she saw Karen Baker in a restaurant with David Wood two weeks before she disappeared, suffered from mental illness and was reported missing by her son at the time she claimed to have seen Baker with David Wood.[752]

## V.    Conclusion

Each component of the State's "old" inculpatory evidence cannot be reconciled with David Wood's new evidence of innocence. In light of all of the new evidence of actual innocence, no reasonable juror would have a basis to conclude beyond a reasonable doubt that the State had proven David Wood's guilt. Rather, reasonable jurors would have rejected the incredible testimony of the jailhouse snitches, who were coached by the Desert Murders Task Force detectives; their lies exposed by the unassailable DNA evidence, police surveillance memos, and testimony from numerous witnesses establishing that David Wood's beige Nissan pickup truck—an indispensable

---

[749] *See* Part III-G, *supra.*

[750] *Id.*

[751] *See* Part III-I, *supra.*

[752] *See* Part III-P, *supra.*

element of his alleged *modus operandi*—sat undrivable in an auto salvage yard the entire month of August 1987, when three of the victims disappeared.

## VI. This claim was presented in state court.

On February 21, 2025, Wood filed a subsequent state habeas application. He amended that filing on February 27, 2025. Among other claims, that application included the actual innocence claim at issue here. That filing is still pending in state court as of the filing of Wood's Motion for Authorization.

## VII. This claim meets the requirements of 28 U.S.C. § 2244.

David Wood has not previously raised a claim of actual innocence as a claim for federal habeas relief. *Wood*, No. 3:01-cv-2103, 2006 WL 1519969. Section 2244(b)(1) therefore does not bar authorization.

### A. Wood diligently pursued evidence of his innocence.

Wood can show that "the factual predicate for [his actual innocence claim] claim could not have been discovered previously through the exercise of due diligence;" *See* 28 U.S.C. § 2244(b)(2)(B)(i). For purposes of § 2244(b)(2)(B)(ii), "due diligence is measured against an objective standard, as opposed to the subjective diligence of the particular petitioner of record." *Johnson v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006). Wood can establish that he was objectively diligent in pursuing the evidence underpinning his actual innocence claim. 28 U.S.C. § 2244(b)(2)(B)(i).

The DNA testing which excluded Wood from male DNA discovered on the bloodstain on Smith's clothing was not available until 2006. Ex. 7. Hall did not, and would not have, come forward with evidence that the State coached the jailhouse snitches' testimony until 2024 because he remained on parole and was concerned that

any evidence he gave would jeopardize his parole. Ex. 8. Likewise, even after the State turned over its 13,000-page file, the significance of the investigation of Plyler and the pickup truck and motorcycle as it related to Kelling's testimony was not apparent until a witness (who was previously threatened by the Task Force) finally revealed the connection to Kelling's sexual assault. *See* Ex. 62. Likewise, the State's pre-trial suppression of exculpatory evidence, *see* Claim II, continued in post-conviction with the decision not to disclose the Crime Stoppers tip about Francisco Coto. Ex. 108.

Wood's investigation of evidence of actual innocence has progressed despite the State's staunch opposition, at every turn, to disclosing or developing evidence which points to a miscarriage of justice. This backdrop to Wood's diligent efforts include the State's staunch opposition to DNA testing based on the 2011 exculpatory result and refusal to provide a complete copy of its investigation of Plyler. This backdrop also includes the harassment and intimidation of witnesses, who suffered negative consequences for attempting to provide exculpatory information. Exs. 8, 62, 98.

## B.    Wood can make a prima facie showing of innocence.

Wood's claim is that his conviction and execution violate the Eighth and Fourteenth Amendments because he is actually innocent. Although *Herrera* did not decide what burden of proof would apply to a claim of actual innocence, it described that showing as "extraordinarily high." *Herrera*, 506 U.S. at 417; *see also In re Davis*, 557 U.S. 952, 952 (2009) (transferring petition for writ of habeas corpus to federal district court to "receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's

innocence"). At this stage, Wood need only make a showing under § 2244(b)(2)(B)(ii), which is lower than the burden posited in *Herrera* and *Davila*. Wood therefore incorporates by reference all allegations and argument under his actual innocence claim to make a prima facie showing that § 2244(b)(2)(B)(ii) is met.

Because Wood has shown that he meets Section 2244(b)(2)(B), this Court should authorize this claim to proceed.

### CLAIM 2: THE STATE SUPPRESSED EVIDENCE IN VIOLATION OF *BRADY*.

The "suppression by the prosecution of evidence favorable to an accused [] violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1985). Evidence is material when there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Materiality is assessed by reviewing the "suppressed evidence considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). Wood can make a prima facie showing of potential merit under all three components of *Brady*.

177

I.    **The State suppressed multiple items of favorable evidence.**

A.    **David Wood was under police surveillance when two victims disappeared.**

As set out in Claim 1, § III.G, *supra*, David Wood was under police surveillance when two of the victims disappeared. David Wood incorporates that Section by reference. The State never disclosed the Tactical Unit memos to trial counsel. Ex. 44 at 1. The memos are plainly favorable evidence under *Brady*. Trial counsel, now having seen these memos, would have used them at trial to show that David Wood was under surveillance when Frausto and Casio disappeared and that the police never saw his pickup truck. *Id.* This evidence shows that David Wood was not responsible for Casio's and Frausto's disappearance, and that he did not have access to his truck, which he supposedly always used to carry out his crimes.

B.    **Judith Brown Kelling's November 16, 1987, Interview With Police**

As set out in Claim 1, § III.J.6, *supra*, Kelling gave various inconsistent statements regarding her claim that David Wood sexually assaulted her. David Wood incorporates that Section by reference. Pertinent to *Brady*, she was interviewed by police on November 16, 1987. Ex. 66. In that interview, her account contains numerous impeachable inconsistencies with her earlier police statements and her later testimony at the sexual assault trial and the capital murder trial. Notably, Kelling's account of what her sister Carmen Brown told her about David Wood diverged materially with what Brown told the police about him. The State never disclosed this interview to trial counsel. Ex. 44 at 3. David Wood's trial counsel would have used it to

impeach her credibility at trial. *Id.* The inconsistencies in that statement compared to her trial testimony make it favorable impeachment evidence under *Brady*.

### C.    Alternative suspect Sal Martinez failed a polygraph and provided biological samples.

As explained in Claim 1, § III.L, *supra*, the Task Force became interested in Sal Martinez and his possible involvement in the crimes. David Wood incorporates that Section by reference. In short, Martinez failed a polygraph exam, showing deception when denying questions pertaining to his knowledge of the desert murders. Ex. 96 at 1. Detectives then had local hospital staff collect hair, saliva, and blood samples from Martinez, and he was fingerprinted at the Task Force office at the police station. Ex. 97. This information was suppressed. Trial counsel has no recollection of the State disclosing it. Ex. 44 at 6. Martinez's failed polygraph and the State's considering him a suspect worth collecting DNA from was favorable information that should have been provided to David Wood.

### D.    The State investigated Plyler and determined he drove a Nissan pickup truck and Harley motorcycle.

Kelling identified Plyler, not David Wood, as her attacker. Ex. 62[753]. Wood incorporates here by express reference all facts alleged in Claim One, Section III.J. Evidence that Plyler was the assailant in Kelling's sexual assault case, that he was known as "Skeeter," and that he drove a beige Nissan pickup truck and a Harley

---

[753] Dismukes tried to bring this information to the Task Force's attention, but her efforts resulted only in threats by Task Force detectives that "it could have been [her] in a grave." Ex. 62.

motorcycle is favorable, exculpatory evidence. This evidence, however, was suppressed and was never turned over to trial counsel. Ex. 44.

Wood is unable to determine what other information the Task Force uncovered about Plyler: The records in undersigned counsel's possession are partially obscured and in black and white. *See* Ex. 63. Wood's request to obtain legible, unobscured, and color copies was refused by the State.

## II.    The suppressed evidence is cumulatively material.

Collectively, these suppressed items were material, because there is a reasonable probability that David Wood would not have been convicted if they were turned over. *See Kyles*, 514 U.S. at 436; *Bagley*, 473 U.S. at 682. David Wood has briefed in extensive detail the weakness of the State's trial evidence. *See* Claim 1, § IV.A, *supra*. This suppressed evidence—that he was under surveillance when two victims went missing; an interview with Kelling inconsistent with her earlier statements and later testimony; and the evidence inculpating Martinez—would have created reasonable doubt in the mind of the jury.

## III.    This claim was presented in state court.

On February 21, 2025, Wood filed a subsequent state habeas application. He amended that filing on February 27, 2025. Among other claims, that application included the *Brady* claim at issue here. That filing is still pending in state court as of the filing of Wood's Motion for Authorization.

**IV.    This claim meets the requirements of 28 U.S.C. § 2244.**

Wood has not previously raised a *Brady* claim in his initial federal habeas petition. *Wood*, 2006 WL 1519969. Section 2244(b)(1) therefore does not bar authorization.

**A.    Wood diligently pursued evidence suppressed by the State.**

Wood can show that "the factual predicate for [his *Brady*] claim could not have been discovered previously through the exercise of due diligence;" *See* 28 U.S.C. § 2244(b)(2)(B)(i). "Trial counsel need not assume the prosecution may be withholding information in order to exercise diligence," and "may rely, absent notice to the contrary, on representations by the prosecutor" that they have complied with *Brady*. *In re Will*, 970 F.3d 536, 542–43 (5th Cir. 2020). This is because "[t]he Supreme Court has stated that its 'decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed.'" *Id.* at 542 (quoting *Banks v. Dretke*, 540 U.S. 668, 695 (2004)).

Objectively, the memos of police surveillance of Wood, Kelling's inconsistent statement, evidence that Plyler sexually assaulted Kelling, and the taking of Martinez's biological samples and his failed polygraph examination could not have been obtained previously through due diligence. The record establishes that trial counsel was not aware of any of this suppressed evidence. *See* Ex. 44, 44A/44B. Defense counsel filed multiple motions requesting *Brady* material and the State assured trial counsel and the Court that it would comply, and had complied, with its *Brady* obligations. CR.55–57, 164–65, 200, 209–10; *See also* Ex. 44A/44B. Trial counsel and successor

counsel reasonably relied on these representations by the State. *See In re Will*, 970 F.3d at 542.

Moreover, defense counsel did not have notice that Wood was under surveillance. *See Blackman v. Davis*, 909 F.3d 772 (5th Cir. 2018) (no due diligence where "reasonable attorney would have been put on notice at that time that [evidence] may exist."). The surveillance memos establishing that Wood was not seen with Casio or Frausto on the dates of their disappearances were conspicuously absent from the State's otherwise voluminous disclosures. *See* Ex. 44A/44B.

Likewise, defense counsel did not have any awareness of Plyler and his significance to the case against Wood. Kelling was steadfast in her testimony at the 1988 sexual assault trial and the 1992 capital murder trial that Wood was her attacker. The State never turned over any information indicating that it not only had knowledge of Plyler, but had also pulled his criminal history and photographed and documented that the vehicles he drove matched witnesses' descriptions of vehicles involved in the victims' disappearances. *See* Ex. 63. Remarkably, the State continues to refuse Wood access to a complete and legible copy of its investigation into Plyler.

Finally, the State's efforts to hide any information pertaining to its investigation of Martinez is well established by an Internal Affairs reports revealing misconduct by the Task Force detectives who conducted that investigation. Ex. 101. The State explicitly cautioned law enforcement not to raise the issue of the detectives' misconduct because it threatened their credibility. *Id.* Counsel therefore had no

notice of the detective's misconduct. Wood has made a prima facie showing that he was diligent in pursuing this *Brady* information.

### B.     Wood can make a prima facie showing of innocence.

Under § 2244(b)(2)(B)(ii), Wood must also show that "by clear and convincing evidence that, but for [this *Brady* violation], no reasonable factfinder would have found" him guilty.[754] This assessment of innocence requires a comparison of the new evidence to the existing evidentiary landscape to determine "the likely impact of the *Brady* material on reasonable jurors." *Will*, 970 F.3d at 543. The case against Wood looks significantly different than it did the last time this Court reviewed his case.

By withholding critical *Brady* evidence, the State made its case at trial appear significantly stronger than it actually was. 57 RR 5467. The suppressed *Brady* evidence negates the State's case that Wood was responsible for the murders of all six women and establishes that he could not have murdered Frausto and Casio. Particularly when weighed against the State's evidence tying Wood to Frausto and Casio based on vague descriptions of a man bearing some physical traits of Wood, this *Brady* evidence overwhelmingly supports Wood's innocence.

Likewise, Kelling, who testified to prove Wood's identity and *modus operandi* as the Northeast Desert serial killer, identified another man as her attacker. In the absence of Kelling's testimony, the State would not have been able to make Wood out

---

[754] To convict, Wood's jury was required only to find that he murdered Williams and one of the other five named victims. CR 264. The jury was not required to specify, nor to be unanimous on, which other victim. He may therefore establish that he is actually innocent by establishing his innocence of the murder of Williams or any one of the other five named victims.

as the Northeast Desert serial killer, nor establish a *modus operandi.* 69.RR.7552. Notably, in holding on direct appeal that the trial court did not err in admitting Kelling's testimony, the TCCA emphasized that her testimony was "extremely important to the State's case" and the State's "need for the evidence was great," because the remainder of the State's case was "not so compelling[.]" Ex. 5.

Based on this evidence, the jurors would also have learned that Plyler drove vehicles matching witnesses' descriptions and was known by the nickname "Skeeter." Jurors would have been able to consider the possibility of a credible and compelling alternative suspect. Moreover, the jurors would have had doubts about Kelling's credibility after hearing her inconsistent statements regarding her sexual assault. These inconsistencies—most glaringly about her attacker's parting words—would have caused them to further doubt the State's casting of Wood as the Northeast Desert serial killer.

In addition to Plyler, the suppressed evidence also establishes that the State considered Martinez a strong alternative suspect. The State's further suppression of an Internal Affairs memo revealing that detectives were expressly cautioned that their misconduct during this investigation would negatively impact the State's case would have made it clear how far the State was willing to go to convict Wood.

Wood has thus made a showing that he is innocent by clear and convincing evidence because, but for this *Brady* violation, no reasonable juror would have convicted him. *See also* Claim I (explaining the new evidence of Wood's innocence).

Because Wood has shown that he meets Section 2244(b)(2)(B), this Court should authorize this claim to proceed. In the alternative, this Court can authorize this claim because Wood has made a "gateway" showing of actual innocence: Mr. Wood incorporates by reference all facts and argument in support of his actual innocence claim. *See In re Vasquez*, No. 23-40079, n.2 (5th Cir. June 23, 2023).

## CLAIM 3: THE STATE OBTAINED DAVID WOOD'S CONVICTION BY PRESENTING FALSE TESTIMONY.

The Fourteenth Amendment prohibits the State from eliciting testimony that it knows to be false or from failing to correct misleading testimony. *Napue v. Illinois*, 360 U.S. 264, 268 (1959). To establish a due process violation, a petition must show that (1) the testimony was false; (2) the State knew or should have known that the testimony was false; and (3) the false testimony was material. *Giglio v. United States*, 405 U.S. 150, 153–54 (1972). False testimony is material if it could "in any reasonable likelihood have affected the judgment of the jury." *Id.* (internal quotation omitted).

### I.    The State presented false testimony.

### A.    The State fiber expert's testimony was false and misleading.

As the State's forensic expert, DPS chemist Steve Robertson testified that orange acrylic fibers linked David Wood to the Wheatley crime scene. 63.RR.6712–64. Robertson testified about orange fibers that were found in Desiree Wheatley's grave, on a t-shirt found there, and in a vacuum cleaner bag in the garage of an apartment David Wood previously lived in with his girlfriend. 63.RR.6728–30, 6745–46. New evidence provided by Dr. Palenik now demonstrates that Robertson's testimony was inaccurate and misleading. Ex. 90 (Christopher Palenik report).

### 1.   Robertson testified falsely that that the orange fibers "matched."

Robertson testified that the fibers found in Desiree Wheatley's grave siftings, on the t-shirt found in that grave, and in the vacuum cleaner bag were "matches" and "identical" 63.RR.6729–32, 6740, 6743, 6750. Robertson's testimony was false because without a source, using terms such as "match" or "identical" is misleading and can give the jury a false impression about the specificity or uniqueness of the orange fibers that cannot be obtained with fiber evidence comparison. Ex. 90 at 14–15.

### 2.   Robertson testified falsely about the implications of transfer, persistence, and time.

Robertson testified that the presence of a large number of fibers found on the t-shirt indicated a link that placed David Wood at the Wheatley crime scene or placed him with her near the time of her death. 63.RR.6731–32, 6755–57. On cross-examination Robertson testified that "[f]inding a lot of foreign fibers on a murder victim's clothing tends to indicate that those fibers were placed there in a few hours proceeding death or as the body was transported." 63.RR.6757.

According to Dr. Palenik, Robertson's testimony was a "flawed" conclusion that is scientifically unsupported and contradicted in forensic literature. Ex. 90 at 12–13. Robertson did not have the scientific data to accurately link David Wood to Desiree Wheatley a few hours prior to her death. *Id.*

### 3.   Robertson testified falsely about the likelihood that the fibers came from a common item or source.

The forensic use of words such as "item" and "source" in regard to evidence is important because they have technical meanings that are different. Ex. 90 at 13. The

fibers in David Wood's case were not associated with any source or potential source. *Id.* at 1, 13. As Dr. Palenik explained, a source can produce multiple and varying items. *Id.* at 13. In this case, an item could be interpreted to mean one specific object or type of object based on the false testimony of Robertson. *Id.* Robertson testified that the likelihood that the fibers from the grave and the t-shirt "came from two different items is remote." 63.RR.6741. Dr. Palenik found that Robertson's testimony was misleading because it gave the jury a false impression about the probability of similarity that has not been statistically established. Ex. 90 at 14.

Robertson also testified falsely about the higher likelihood of the grave, t-shirt, and vacuum bag fibers coming from more than one item. Robertson testified that it is more likely that the fibers could have come from the "same item" rather than the possibility of them coming from different items. 63.RR.6761–63. Dr. Palenik stated that Robertson's testimony about the higher likelihood of fibers coming from the "same item" was false because, without a known source for the fibers, Robertson could not opine on the likelihood that the fibers came from a particular item or not. Ex. 90 at 13–14.

### 4. Robertson testified falsely about the fibers found in the vacuum cleaner bag.

It was misleading for Robertson to testify that the vacuum cleaner bag fibers were "identical" or a "match" to the fibers from the grave or t-shirt, because the Wheatley DPS report concluded only that the fibers from the grave and t-shirt and the fibers on the "items associated with David Wood" have the same "color, size, shape, and microscopic characteristics." 63.RR.6729–30; Ex. 114 at 2. The vacuum

cleaner bag was not listed under the "items associated with David Wood." *Id.* As Dr. Palenik emphasized, using terms such as "match" or "identical" are problematic. But, in addition, Robertson gave the jury the false impression that the Wheatley DPS report included the vacuum cleaner bag in its conclusion. The DPS report is ambiguous and does not support the conclusion Robertson gave it in his testimony about the vacuum cleaner bag. Ex. 90 at 9. Even in his letter to ADA Shook, Robertson made a conclusion about the vacuum cleaner bag that is ambiguous and does not support the conclusion Robertson attributed to it in his testimony. Ex. 115; Ex. 90 at 10–11. In short, Robertson's testimony and opinions went well beyond the conclusions of the DPS report, or what could be proven scientifically.

### B.    The State coached the jailhouse snitches' false testimony that David Wood confessed.

As set out in Claim 1, § III.B and § III.N.1, *supra*, the Task Force detectives handed their investigative files to Wells and Sweeney, and extensively prepared them to deliver fabricated testimony that David Wood had confessed to being the Northeast Desert serial killer. David Wood incorporates those Sections by reference.

### C.    Sweeney testified falsely that his testimony was not financially motivated and, that if he did receive the reward, he would use it to pay restitution.

The State presented Sweeney as a selfless snitch who was testifying at great risk, 65.RR.7030–31, with no financial forethought, 65.RR.7033, and absent any deal with the State. Sweeney emphasized to the jury that he had not wanted to snitch because he "was concerned about that for [his] wife and [his] kids and [him]self." 65.RR.7031. He added: "A lot of snitches don't survive." 75.RR.7031. He testified

falsely. As set out in Claim 1, § III.E, *supra*, Sweeney received $13,000 for his efforts, and he had no restitution to pay off. David Wood incorporates that Section by reference.

**D.    Kelling testified falsely that David Wood sexually assaulted her.**

The State alleged that David Wood assaulted Kelling in the early evening hours of July 26, 1987. She testified that on that evening, David Wood picked her up, took her to the desert Northeast of El Paso, tied her up to his truck, and dug a grave before letting her go when he heard nearby voices. 64.RR.6806–16. She had survived the Northeast Desert serial killer and provided direct testimony of his *modus operandi*. That testimony, however, was false.

As set out in Claim 1, § III.J.5, *supra*, David Wood could not have committed the sexual assault of Kelling because, based on the State's own records, he was with his then-girlfriend (turned State's witness), Joey Blaich, and his brother Randy until at least 10 p.m. on July 26, 1987. Ex. 50. The accuracy of Blaich's recollection of that evening is confirmed by the fact that Randy Wood wrecked David Wood's truck the very next day, July 27, while she was a passenger, thus cementing her recollection of the events immediately surrounding that event.[755]

Notably, as set out in Claim 1, § III.J.2, *supra*, Kelling identified a different man, Michael Plyler, whom she knew by the nickname "Skeeter," as her attacker. She

---

[755] Nor could the assault have taken place any other date if Kelling's account is to be believed. Kelling testified that, after hitchhiking back to her apartment, she told her sister, Carmen Brown, about the assault. 64.RR.6816–17. At that time, Carmen Brown was residing at an in-patient program that closely monitored her absences. Her only absence in that timeframe of late July—when she would have been home when Kelling returned from the assault—corresponds to July 26, 1987. 7.JBKRR.194, 197. David Wood did not have access to his truck starting on July 27, 1987, when his brother wrecked it.

189

said that she had never even seen David Wood before being shown his photograph. Plyler drove a tan Nissan truck that resembled David Wood's, and also bore tattoos on both forearms. *See* Claim 1, § III.J.3, *supra*.

Finally, Kelling was an informant for Det. Guerrero. Ex. 64. As set out in Claim 1, § III.J.7, *supra*, Kelling's assault was not at the hands of David Wood. Her sexual assault was leveraged to arrest and convict David Wood as part of the State's tunnel-vision investigation of the Northeast Desert murders. In exchange, Kelling received favorable treatment from the El Paso DA, including by escaping a six-year sentence following the violation of her probation in connection with a delivery-of-heroin charge. Kelling, however, also falsely testified that she had received no deal in exchange for her testimony. 64.RR.6865. This assertion is betrayed by the State's lenient treatment following her arrest soon after her testimony against David Wood.

## II.    The State knew or should have known this testimony was false.

The State coached the jailhouse snitches' false testimony, Ex. 8, and therefore knew that testimony was false. It also told them about the monetary reward, *id.*, and therefore knew that Sweeney's testimony that he had not known about the $ 26,000 until after he communicated with the Task Force was false. Likewise, Kelling was an informant for Det. Guerrero and the State's investigation of Plyler indicate its knowledge that she had identified him as her attacker. Exs. 63, 64. And the State knew or should have known that Robertson's testimony was false because the State was in possession of the DPS report prior to trial and had the opportunity to question Robertson about his inconsistencies and scientifically unsupported testimony. See *Napue*, 360 U.S. at 269; Ex. 114. Moreover, the State violated Wood's due process

190

rights because it let Robertson's testimony go uncorrected at trial. *See Napue*, 360 U.S. at 269.

## III.   This testimony was material.

There is a reasonable likelihood that this testimony affected the judgment of the jury. The State described its case to the jury as "purely a circumstantial-evidence case." 57 RR 5467. Its case turned on the jailhouse snitch confession testimony, Kelling's identification testimony, and the fiber testimony as the only forensic evidence. 69 RR 7465–60. False testimony tainted each of these issues.

First, the materiality of the jailhouse testimony is underscored by the State's 1990 memo concluding that there was "absolutely no evidence" linking Wood to the murders and suggesting that snitch testimony of a confession would provide that evidence. Ex. 112. Indeed, it was only after Wells and Sweeney agreed to testify falsely that the State was able to indict Wood. Their testimony at trial that Wood had expressly discussed particular victims also strengthened otherwise tenuous links between Wood and the victims. *See e.g.* 57 RR 5450 (arguing that Wood could be tied to Casio because she worked at "a place where the defendant had been seen talking to a tall Mexican girl").

Relatedly, Sweeney's testimony that he was not testifying out of financial interest was material because it bolstered his credibility. Wells's testimony in exchange for a pass on capital murder presented obvious credibility challenges. Sweeney's apparently selfless testimony, at great risk to himself and his family, was therefore critical to cementing the jailhouse snitches' credibility to the jury. Indeed, the State

emphasized Sweeney's testimony that he had not known about the reward in closing argument to the jury. 68 RR 7465.

Kelling's testimony was likewise critical to the State's case. She testified to prove identity and modus operandi. 64 RR 6795, 6798. In closing, the State emphasized the elements of that supposed modus operandi, including that Wood had worn "a Harley Davidson T-shirt" to tie him to the bike described by witnesses, the "beige pickup truck with the stripe down the side," that he had taken Kelling "to the same area where the other six girls were found," and had "tied [Kelling] to the front of that pickup truck" and dug a grave. 68 RR 7462–63. Kelling's false testimony thus enabled the State to meet its burden of proving beyond a reasonable doubt that Wood murdered Williams and at least one other victim "pursuant to the same scheme and course of conduct[.]" 57 RR 5467; *see also* Ex. 5.

In a case primarily based on circumstantial evidence, there is a reasonable likelihood that Robertson's testimony affected the jury because the fiber evidence was the State's only forensic evidence that allegedly linked Wood to one of the crime scenes. Robertson's false testimony about the fibers enabled the State to make leaps in its closing arguments and assert that Wood used a blanket that was common source of all the fibers as part of his alleged *modus operandi*, that resulted in Wood's capital murder conviction. 69 RR 7538, 7445.

Moreover, Robertson's false testimony about the number of fibers found on the t-shirt in Desiree Wheatley's grave being indicative of Wood being with her or near her gravesite shortly before her death was highly prejudicial. Moreover, many of

Robertson's opinions and conclusions about the fibers were not stated in the DPS report or his letter to ADA Shook, and defense counsel had no opportunity to prepare a cross examination. *See* Ex. 114 and Ex. 115. Without the ability to fully challenge Robertson's assertions, the jury was left with the impression that Robertson's statements bared some truth. However, Robertson's testimony was riddled with false testimony, that led to the jury's guilty verdict.

## IV.    This claim was presented in state court.

On February 21, 2025, Wood filed a subsequent state habeas application. He amended that filing on February 27, 2025. Among other claims, that application included the false testimony claim at issue here. That filing is still pending in state court as of the filing of Wood's Motion for Authorization.

## V.    This claim meets the requirements of 28 U.S.C. § 2244.

Wood has not previously raised a false testimony claim in his initial federal habeas petition alleging that (1) the State coached Wells and Sweeney and they fabricated their false testimony that Wood confessed; (2) Kelling testified falsely that Wood sexually assaulted her; and (3) the State's fiber expert testified falsely. *Wood*, 2006 WL 1519969. Section 2244(b)(1) therefore does not bar authorization.

### A.    Wood diligently pursued evidence of false testimony.

Wood can establish that he was objectively diligent in pursuing the information underpinning his false testimony claim. 28 U.S.C. § 2244(b)(2)(B)(i). First, Hall explained that he did not come forward about the State coaching and Wells and Sweeney's fabricating their testimony until after he successfully completed his parole in February 2024, because he was "afraid [he] might get revoked if [he] spoke out

about [Wood's] case, and then [he'd] have to go back to prison." Ex. 8. The information that Sweeney received $13,000 for his testimony was never disclosed to Wood: He learned of it after reading a September 2009 news report that Sweeney had received the reward after settling a lawsuit against various El Paso officials. Moreover, none of the correspondence between Sweeney and various officials from the El Paso DA's Office was included in the State's capital murder file.

Second, the State suppressed its investigation of Plyler, including that he drove a truck and motorcycle matching witnesses' descriptions. *See* Claim II. Notably, as recently as January 2025, the State refused to turn over a complete copy of that investigation. *See* Ex. 63. And to this day, Wood is unable to access a complete copy of his own parole records, which contain evidence of an alibi on the date of the alleged sexual assault. *See* Ex. AG letter. Counsel had no notice of the falsity of Kelling's testimony. *See* Ex. 5 (TCCA describing Kelling's evidence as "unassailable"). Counsel likewise had no notice of Bradley and her belief that her father may have murdered Williams: She explained that she did not come forward with information until January 2025 because she "was terrified of [her] father," who was convicted in 1995 of murdering and dismembering her step-mother. Ex. 100. Similarly, the State did not turn over the tip about Coto at all: Wood learned of it and the State's decision to not turn it over only when internal emails were (inadvertently) disclosed to counsel. *See* Ex. 108. And the DNA test that excluded Wood from DNA on a bloodstain on Smith's clothing was not available until 2006. Ex. 7.

Third, witnesses described being threatened by Task Force detectives when they attempted to come forward with information that undercut the State's case against Wood as the Northeast Desert murderer. When Dismukes contacted the Task Force, Dets. Guerrero and Marquez "drove [Dismukes] out to the desert where the girls were found . . . pointed to the ground, and told [her] it could have been [her] in a grave." Ex. 62; *see also* Ex. 98 ("They [detectives] made me look at pictures of Dawn's decomposed body, as well as the bodies of the other girls."); *id.* ("I also ended up losing my jobs because of the police harassment."). Likewise, despite being approved for parole in 1991—months after refusing to testify against Wood—Hall received a serve-all and was made to serve the remainder of his sentence—another three years. Ex. 8.

## B.     Wood can make a prima facie showing of innocence.

Wood can show by clear and convincing evidence that, but for the false testimony, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2244(b)(2)(B)(ii). At this stage, however, this Court does not need to determine whether Wood is actually innocent. *See Will,* 970 F.3d at 540. The Court considers only whether, objectively reviewing the evidence as a whole, "it's reasonably likely" that the false testimony "changed the outcome." *Id.*

Wood can show that the facts underlying this claim would be sufficient to establish by clear and convincing evidence that, but for the false testimony elicited by the State, no reasonable juror would have voted to convict:

- DNA testing excludes Wood from male DNA on a bloodstain on the clothing Smith was wearing at the time of her murder. Ex. 7.

- The State coached the testimony of Wells and Sweeney. Ex. 8. Wood did not confess to them. *Id.*

- No forensic evidence reliably ties Wood to the murders. Ex. 90. The only reliable forensic evidence, the DNA testing, excludes Wood. Ex. 7.

- Wood has an alibi on the date and time of Kelling's sexual assault. Ex. 50.

- Kelling did not identify Wood as her attacker. Exs. 62, 63. Instead, she identified Plyler. Ex. 62.

- The Task Force investigated Plyler and documented that he drove a beige Nissan pickup truck and a Harley Davidson motorcycle, matching the description of vehicles connected to victims' disappearances. Ex. 63.

- Wood's truck sat damaged and undrivable in an auto salvage yard when Frausto, Casio, and Smith disappeared in August 1987. Exs. 46, 47, 48.

- Bradley believes her father may have murdered Williams, the predicate murder upon which the State built its capital murder case. Ex. 100.

- Crime Stoppers received a tip that Francisco Coto murdered the six victims. Ex. 108.

But for the jailhouse snitches' testimony, the State's case against Wood was in the posture it was in 1989, when the DA reviewed the evidence and found the case unindictable. Ex. 112.

The facts, hidden until now behind false testimony, support a showing of innocence. Because Wood has made a showing that he meets Section 2244(b)(2)(B), this Court should authorize this claim to proceed. In the alternative, this Court can

authorize this claim because Wood has made a "gateway" showing of actual innocence: Mr. Wood incorporates by reference all facts and argument in support of Claim I. *See In re Vasquez*, No. 23-40079, n.2 (5th Cir. June 23, 2023).

## CLAIM 4: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN VIOLATION OF THE SIXTH AMENDMENT.

To establish ineffective assistance of counsel, David Wood must show that trial counsel's performance was deficient and that counsel's deficiency prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, David Wood must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Id.* at 693–94.

I.   **Trial counsel's representation was deficient.**

A.   **Trial counsel failed to introduce evidence that David Wood's pickup truck was in an auto salvage yard when three of the victims went missing.**

Trial counsel were appointed to represent David Wood in 1990, shortly after he was indicted for capital murder. Ex. 44 ¶¶2, 4. In the two years leading up to trial, the State disclosed thousands of pages of discovery resulting from its years-long investigation of David Wood, including its investigation into the accident that resulted

in David Wood's truck being undriveable throughout August 1987. Because the State put on evidence that the pickup truck was an essential element of David Wood's *modus operandi*, the fact that the truck sat in an auto salvage yard when three of the victims disappeared would have undermined the State's case for guilt. *See* Claim 1, § IV, *supra*.

Despite the State making this significant evidence of David Wood's innocence available to the defense, trial counsel failed to present *any* testimony that David Wood did not have his pickup truck when Frausto, Casio, and Smith disappeared. Ex. 44 ¶12. Moreover, trial counsel later stated that this failure was not attributable to any strategic reason. *Id.*

## B. Trial counsel failed to introduce evidence that witnesses had seen Ivy Williams after the State alleged she had disappeared.

The discovery of Ivy Williams's body in March 1988, nearly five months after David Wood's arrest and incarceration, created a case-jeopardizing issue for the State: if Williams had disappeared within the prior five months, David Wood could not be responsible for the desert murders. *See* Claim 1, § III.I, *supra*. To head off any reasonable doubt, the State represented to the jury that Williams had been David Wood's first victim and that she had disappeared in May 1987. At least three witnesses, however, gave statements that they had seen Williams as late as October 1987. *See id.* The State disclosed this information to trial counsel.[756] *See* Ex. 44 ¶¶18, 20–21. Veronica Gatzka and Carol Eason stated that they had seen Williams as late

---

[756] The third witness, Steve Dahl, died in a traffic accident before the trial. *See* Claim 1, § III.I.1, *supra*.

as October 1987, although Gatzka amended her statement later. *See* Claim 1, III.I.2, *supra*; Claim 4, *supra*.

The month of October 1987 was especially significant because David Wood was arrested in October. In their opening, defense counsel told the jury that they would be presenting evidence contradicting the State's allegation that Williams disappeared in May 1987. 57.RR.5493. However, counsel never presented such evidence. Ex. 44 ¶25. Despite having the statement of Gatzka and the police report about Eason, trial counsel did not present testimony from either of them. Counsel later conceded that this failure was "a mistake." *Id.* at ¶25.

### C.  Trial counsel failed to impeach the jailhouse snitches.

The testimony of the jailhouse snitches, Randy Wells and James Sweeney, featured prominently in the State's case. Wells's deal with the State was no secret: he said that he had agreed to testify in exchange for pleading downward from capital murder to forgery and a 15-year sentence. 65.RR.6962. Trial counsel largely repeated these facts in its cross-examination of Wells but elicited little further information tending to undermine Wells's credibility. But prior to his 1992 testimony at David Wood's capital murder trial, Wells had already testified in accordance with the same deal against his codefendants in the murder case in which he had initially been charged. Notably, at Shirley Hennington's trial in 1991, Texas Ranger Gene Kea testified extensively about Wells's propensity for lying.  *See* Claim 1, § III.C, *supra*. Ranger Kea agreed that lying did not bother Wells at all, that Wells had lied to him, and that Wells would lie to the jury. 7B.SHRR.581–82. The jury hung in Shirley Hennington's trial.

Despite Ranger Kea's testimony being readily available, trial counsel failed to review it or introduce any evidence of Wells's well-established penchant for lying. Ex. 44 ¶¶48–49. Trial counsel stated that this failure was not attributable to any strategic reason. *Id.* at ¶50.

Likewise, trial counsel failed to impeach Wells's testimony that David Wood wanted Wells to cover up his tattoos out of his fear that he would be identified based on Kelling's description of his tattoos. *See* Claim 1, § III.D, *supra.* As trial counsel later realized, "Wells's claim that David Wood wanted to cover up his tattoos after he had already been convicted of the sexual assault of Kelling (the victim who got away) made no sense." Ex. 44 ¶61. EPPD already had detailed photographs of David Wood's tattoos and, most critically, David Wood had already been identified by Kelling and convicted of her sexual assault by the time he came across Wells in prison. *Id.* at ¶¶60, 61. Trial counsel later admitted that he could not attribute his failure to impeach Wells to any strategy. *Id.* at ¶62.

Finally, trial counsel failed to review Sweeney's criminal record and impeach his testimony that his coming forward, at great risk to himself and his family, was entirely selfless and unrelated to the reward. Sweeney testified that even if he did receive any of the reward money, he would ask the DA from the county of his conviction to apply those funds to his restitution. *See* Claim 1, § III.E, *supra.* But had trial counsel reviewed Sweeney's criminal record, he would have realized that Sweeney did not owe any restitution. Ex. 44 ¶64. As with Wells, trial counsel stated that the

failure to impeach Sweeney's credibility was not attributable to a strategic reason. *Id.*

**D.     Trial counsel failed to impeach Judith Brown Kelling with her prior inconsistent statements.**

By the time of her testimony at David Wood's capital murder trial, Judith Brown Kelling had given at least four prior statements and extensive testimony at the 1988 sexual assault trial.[757] She was also known to Garney, who had previously represented her in proceedings in which she received favorable treatment from the State based on her cooperation. *See* Claim 6, *infra*. A review of Kelling's prior statements and testimony would have revealed material inconsistencies. As explained in Claim 1, § III.J.6, *supra*, at the 1988 sexual assault trial, Kelling testified that her attacker's parting words were: "You're three and walking free." But by the time she testified four years later at the capital murder trial, Kelling testified that his parting words were: "Always remember, I'm free." Because the State had decided that Ivy Williams would be David Wood's first victim, Kelling could no longer be number "three."

Trial counsel never confronted Kelling with the material inconsistencies across her prior statements and her 1988 testimony. Ex. 44 ¶¶28–35. Trial counsel thus failed to impeach her credibility, confront the inconsistencies across her statements designed to make David Wood appear more violent, and expose the State's reliance upon false testimony to secure David Wood's conviction. *Id.* at ¶¶33, 35. Likewise,

---

[757] Kelling had actually given five statements. On November 16, 1987, Det. Guerrero audio-taped his interview of Kelling. The State never disclosed this interview to trial counsel. *See* Ex. 44; Claim 3, *supra*.

trial counsel failed to impeach Kelling's testimony that she had not received a deal in exchange for accusing Wood of sexually assaulting her: her criminal records established that she received favorable treatment within days of her 1988 testimony. Trial counsel conceded that these failures were not attributable to any strategic decision. *Id.* at ¶35.

### E.    Trial counsel failed to introduce evidence that an alternative suspect knew three of the victims.

As explained in Claim 1, § III.L, *supra*, Task Force detectives repeatedly interrogated alternative suspect Sal Martinez. Over the course of the interviews, Martinez denied, then admitted, knowing Karen Baker, Dawn Smith, and Rosa Maria Casio. EPPD eventually flew Martinez from Salt Lake City to El Paso, where he gave a fifth statement. The State turned over to trial counsel five statements by Martinez. Ex. 44 ¶43.

Trial counsel, however, did not introduce any testimony or other evidence relating to Martinez, the EPPD's investigation of him, or his admissions that he knew three of the victims. *Id.* at ¶47. Trial counsel admitted that the introduction of this evidence would have caused the jury to have reasonable doubt and that he did not have a strategic reason for failing to introduce this evidence. *Id.*

### F.    Trial counsel failed to identify an actual conflict of interest.

Dolph Quijano and Norbert Garney represented David Wood. Ex. 44 ¶¶2, 4. Garney, however, had previously represented Kelling within days of David Wood's conviction for the sexual assault of Kelling. *See* Claim 6, *infra*. At the capital murder trial, Kelling testified to the assault to prove David Wood's identity as the Desert

Killer and his *modus operandi*. Garney's representation of Kelling and David Wood created an actual conflict of interest. Ex. 44 ¶37.

Trial counsel, however, did not identify this actual conflict of interest arising from Garney's representation of both Kelling and David Wood. Trial counsel failed to review Kelling's criminal record and court files, which would have revealed Garney's representation of Kelling and his conflict of interest. Ex. 44 ¶36. Trial counsel admitted that the failure to review Kelling's records and thus identify the conflict was not attributable to any strategic reason. *Id.*

## II. David Wood was prejudiced by trial counsel's deficient representation.

Individually and cumulatively, trial counsel's failures prejudiced David Wood. First, David Wood was prejudiced by trial counsel's failure to put on evidence that David Wood did not have his pickup truck when three of the victims disappeared. This failure was especially prejudicial because the State charged David Wood with capital murder "during different criminal transactions but pursuant to the same scheme or course of conduct." Tex. Penal Code §19.03(a)(7)(B). Trial counsel could The jury would thus have not only doubted Wells's credibility generally, but known that his testimony that David Wood confessed to always using his truck was patently false.

Second, David Wood was prejudiced by trial counsel's failure to introduce evidence that witnesses saw Ivy Williams months after the State alleged she had disappeared. Such evidence would have damaged the foundation of the State's capital murder case. Because Ivy Williams was the predicate murder victim, trial counsel's failure to expose the State's machinations regarding the circumstances of her

disappearance was prejudicial. By instilling reasonable doubt regarding David Wood's involvement in Williams's murder, trial counsel would have undone the entirety of the State's case. The unexplained amendment to Gaztka's statement that aligned with the State's case and the presentation of testimony the State knew to be false that Williams disappeared in May 1987 would have shown how far the State was willing to go to convict David Wood.

Third, David Wood was prejudiced by trial counsel's failure to impeach the jailhouse snitches because they testified to especially powerful evidence: a supposed confession by David Wood. Testimony by Texas Ranger Kea that Wells was a known liar would have provided highly credible evidence of Wells's lack of truthfulness. And confronting Sweeney with the fact that he did not owe any restitution would have prevented the State from arguing in closing that the jury could trust his testimony because it was a selfless act. 68.RR.7465.

Fourth, the prejudice arising from trial counsel's failure to impeach Judith Brown Kelling is well established: Kelling's testimony was extremely important to the State's case in establishing identity. On direct appeal, this Court concluded that "[t]he remaining evidence was not so compelling or undisputed as to render unnecessary the extraneous offense evidence [of Kelling]. Under these circumstances the State's need for the evidence was great." *See* Claim 1, § IV.A.3, *supra* (quoting *Wood v. State*, No. 71,594).

Fifth, David Wood was prejudiced by trial counsel's failure to introduce evidence that Sal Martinez knew, and had lied about knowing, the victims. Notably, the

resources the Task Force dedicated to the investigation of Martinez—including flying to Salt Lake City and bringing Martinez back to El Paso—would have lent great weight to his casting as an alternative suspect and introduced reasonable doubt into the State's case against Wood. The State's failure to pursue any investigation into Martinez after November 1987 would also have exposed the State's myopic focus on David Wood, to the detriment of other and stronger leads. Martinez's denial, then admission, to recognizing at least three of the victims would have further underscored the weakness of the State's case.

Finally, David Wood was prejudiced by trial counsel Dolph Quijano's failure to discover that co-counsel Norbert Garney was laboring under an actual conflict of interest for having previously represented Judith Brown Kelling. That conflict prevented counsel from effectively impeaching Kelling. *See* Claim 6, *infra*. But for trial counsel's failures, there is a reasonable probability of a different outcome.

## III.    This claim was presented in state court.

On February 21, 2025, Wood filed a subsequent state habeas application. He amended that filing on February 27, 2025. Among other claims, that application included the ineffective assistance of counsel claim at issue here. That filing is still pending in state court as of the filing of Wood's Motion for Authorization.

## IV.    This claim meets the requirements of 28 U.S.C. § 2244.

Wood has not previously raised an IAC claim for federal habeas relief based on trial counsel's failure to (1) introduce evidence that Wood did not have his pickup truck when three of the victims disappeared; (2) introduce evidence that Williams was seen alive after the State alleged she had disappeared; (3) introduce evidence

that an alternative suspect, Martinez, knew three of the victims and failed a polygraph; (4); impeach Kelling with her prior inconsistent statements; (5) confront Wells with prior testimony and Sweeney with records establishing he owed no restitution; and (6) identify an actual conflict of interest. *Wood*, No. 3:01-cv-2103, 2006 WL 1519969; *In re Wood*, 648 F. App'x 388, 389 (5th Cir. 2016). Section 2244(b)(1) therefore does not bar authorization.

### A. This Court can authorize the IAC claim pursuant to Section 2244(b)(2)(B).

This Court can authorize Wood's IAC claim pursuant to § 2244(b)(2)(B). *See In re Vasquez*, No. 23-40079 (5th Cir. June 23, 2023)*; see also, In re Swearingen*, 556 F.3d 344, 348–49, (5th Cir. 2009). As with Wood's other claims, the IAC claim relies in part on previously unavailable evidence of innocence—including Hall's declaration that the State coached the snitches' confession testimony and other information suppressed by the State—which supports a prima facie finding under § 2244(b)(2)(B). *See Swearingen*, 556 F.3d at 348–49. This Court can also authorize this claim because Wood has made a "gateway" showing of actual innocence. *See Vasquez* at n.2.

### STATUTE OF LIMITATIONS

Notwithstanding arguments that Wood can meet 28 U.S.C. § 2244(d)(1), the statute of limitations may be excused because Wood can show that he is actually innocent. *McQuiggin v. Perkins*, 569 U.S. 383, 392–93 (2013); *see also*, *id.* at 399 (holding that statute of limitations may be excused where petitioner can show that "'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" (quoting *Schlup*, 513 U.S. at 327)). Wood incorporates here by

reference all facts and legal arguments made above in support of Claim One and that he can meet 28 U.S.C. § 2244(b)(2)(B)—reasonable diligence and actual innocence by clear and convincing evidence—as to his claims. Because Wood has alleged a "viable basis" for excusing the statute of limitations, this Court should permit Wood to proceed on his argument that the statute of limitations can be excused based on his actual innocence. *In re Campbell*, 750 F.3d at 523, 533 (5th Cir. 2014).

## PRAYER FOR RELIEF

WHEREFORE, David Wood, requests that this Court consider his Petition for Writ of Habeas Corpus and grant the following remedies and other relief as the Court deems appropriate:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2. Allow Petitioner leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3. Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases; and

4. That this Court grant such relief as law and justice require.

DATED: March 5, 2025

Respectfully Submitted,

JASON D. HAWKINS
Federal Public Defender

*/s/ Jeremy Schepers*
Jeremy Schepers

*/s/ Naomi Fenwick*
Naomi Fenwick

*/s/ Claire Davis*
Claire Davis
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, Texas 75202
(214) 767-2746
(214) 767-2886 (fax)
jeremy_schepers@fd.org

*/s/ Gregory W. Wiercioch*
Gregory W. Wiercioch
Frank J. Remington Center
University of Wisconsin Law School
975 Bascom Mall
Madison, Wisconsin 53706
(832) 741-6203
wiercioch@wisc.edu